**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Action No. 13-cr-00392-CMA


**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**

1.  **GEORGE THOMAS BROKAW,**
2.  **JOHN J. PAWELSKI, and**
3.  **MIMI M. VIGIL,**

**Defendants.**

_____

**REPORTER'S TRANSCRIPT**
**(Jury Trial - Day 1)**
_____

        Proceedings before the HONORABLE CHRISTINE M.
ARGUELLO, Judge, United States District Court, for the
District of Colorado, commencing at 8:46 a.m. on the 3rd
day of November, 2014, Alfred A. Arraj United States
Courthouse, Denver, Colorado.

**A P P E A R A N C E S**

**FOR THE PLAINTIFF:**
MATTHEW T. KIRSCH and MARTHA A. PALUCH, U.S. Attorney's
Office - Denver, 1225 17th St., Suite 700, Denver, CO
80202

**FOR DEFENDANT BROKAW:**
Pro Se.
**FOR DEFENDANT PAWELSKI:**
Pro Se.
**FOR DEFENDANT VIGIL:**
Pro Se.

**I N D E X**

| **WITNESSES:** | **PAGE** |
|---|---|

**MICHAEL PRYOR**
DIRECT EXAMINATION BY MR. KIRSCH                    153

**TROY PARKER**
DIRECT EXAMINATION BY MS. PALUCH                    168

**WILLIAM FRANKEL**
DIRECT EXAMINATION BY MR. KIRSCH                    185

**E X H I B I T S**

| **NO.** | | **ADMITTED** |
|---|---|---|
| 82 | .......................................... | 171 |
| 83 | .......................................... | 172 |
| 84 | .......................................... | 174 |
| 210 | .......................................... | 175 |
| 250 | .......................................... | 156 |
| 258 | .......................................... | 161 |
| 320 | .......................................... | 190 |
| 321 | .......................................... | 195 |
| 322 | .......................................... | 197 |
| 323 | .......................................... | 198 |
| 324 | .......................................... | 200 |
| 325 | .......................................... | 201 |
| 326 | .......................................... | 203 |

| **No.** | | **REFUSED** |
|---|---|---|
| | .......................................... | |

1                      **NOVEMBER 3, 2014**

2              (Proceedings commence at 8:46 a.m.)

3              THE COURT:  You may be seated.

4              All right.  The Court calls Criminal Case No.

5      13-cr-00392-CMA, encaptioned United States of America v.

6      George Thomas Brokaw, John J. Pawelski, and Mimi M. Vigil.

7              Would the parties please enter your appearances.

8              MR. KIRSCH:  Good morning, Your Honor.  Matthew

9      Kirsch and Martha Paluch for the United States.  We also

10     have at counsel table with us the person designated as our

11     advisory witness, IRS Special Agent Adam Rutkowski.

12             THE COURT:  Good morning.

13             DEFENDANT BROKAW:  Judge, my name is private.  On

14     and for the record, my name is private.  In regards to

15     this all capital letters name on the birth certificate

16     spelled G-E-O-R-G-E, all capital letters name, Thomas,

17     T-H-O-M-A-S, all capital spelling, Brokaw, B-R-O-K-A-W,

18     all capital letters, I am the agent for the general

19     executor office for the trust.

20             THE COURT:  All right.  Thank you very much.

21             Mr. Pawelski?

22             DEFENDANT PAWELSKI:  My name is also private.  On

23     and for the record, my name is private.  In regards to the

24     all capital letters name on the birth certificate spelled

25     capital J-O-H-N, capital J., capital P-A-W-E-L-S-K-I, I

1    conditionally accept the agent for the general executor,

2    and the Judge is the trustee.  And I do not consent of

3    being the surety.

4        I consensually accept the agent for the general

5    executor office.  Let's move this matter to settlement and

6    closure.  I want an immediate status hearing to resolve

7    this matter.

8        THE COURT:  Thank you, Mr. Pawelski.

9        Ms. Vigil?

10       DEFENDANT VIGIL:  My name is private.  On and for

11   the record -- public record, my name is private.  Mimi,

12   spelled all capital letters, M-I-M-I, Michelle, all

13   capital letters, Vigil, all capital letters.  I am the

14   general executor, and the Judge is the trustee.  I

15   conditionally accept the agent for the general executor.

16   I am the general executor and the Judge is the trustee.

17       THE COURT:  All right.  Thank you very much.  You

18   may be seated.

19       We have -- first, I want to let you know that you

20   were supposed to be here at 8:30 this morning.  I have

21   already warned you several times, you need to leave

22   Colorado Springs earlier to get here on time.  I am not

23   going to allow the starting late in these proceedings.  We

24   have jurors waiting downstairs to come up here.  So

25   tomorrow leave at least half an hour earlier than you left

1    this morning to get here on time.

2         We have a number of motions that we need to deal

3    with.  First will be Mr. Pawelski's motion, No. 315,

4    Motion to Terminate Counsel Representation, Subpoena

5    Orders, and Investigators.  Mr. Pawelski, I have gone over

6    several times with you the dangers and disadvantages of

7    representing yourself.  You clearly indicated that first

8    you didn't want counsel, then last time you were here you

9    wanted Mr. Stuckey appointed only to provide you guidance

10   with respect to subpoenas and other matters preparing for

11   court.

12        At this point I assume you are asking for me to

13   excuse him or terminate him even as advisory counsel; is

14   that correct.

15        DEFENDANT PAWELSKI:  Correct.

16        THE COURT:  That motion is granted.  Mr. Stuckey is

17   released from his services to represent.  I will not go

18   through another Faretta colloquy because I have done that

19   several times.

20        Mr. Stuckey?

21        MR. STUCKEY:  May I be excused, Your Honor?

22        THE COURT:  You are excused.

23        That motion also requested that I terminate the

24   orders for subpoenas and the investigator request.  I

25   don't know if you mean to withdraw them.  I had already

1    issued the order for subpoenas.  I had not ruled on the

2    investigator request.  I guess I didn't see an

3    investigator request.  To the extent you wish to withdraw

4    those, that is granted.

5         That motion also requested that I strike or dismiss

6    the Indictment.  The motion to strike or dismiss the

7    Indictment is denied.

8         You also filed Document No. 294, a Motion for Order

9    of Service of Subpoenas, which I believe you have now

10   withdrawn.  But that is, therefore, denied as moot.

11        Document No. 296, Motion for Open File Policy and

12   Production of All Records in All State and Federal

13   Agencies and to Declare Federal Rule of Criminal Procedure

14   16 Unconstitutional.  That motion is denied.

15        Document No. 297 is a Motion for Findings of Fact

16   and Conclusions of Law.  That motion is denied.

17        Document No. 298, Motion for Court Order for

18   Contact Information of all of the Government's Witnesses.

19   That motion is denied.

20        Document No. 299, Production of FINSEN Records or

21   Dismissal of Indictment.  That motion is also denied.

22        You all may be seated.

23        DEFENDANT PAWELSKI:  Ma'am, what facts of law are

24   you denying those motions on?

25        THE COURT:  I am not stating any.  I don't think

1    there is any needed.  I don't think they state any valid

2    claim or request that is valid at this point.  Some of

3    them I already dealt with at the final trial prep

4    conference.  Others I dealt with prior to this time

5    through written orders.  And at this time I am not going

6    to allow you to take up this Court's time with respect to

7    motions that don't have any legal substance behind them.

8         Now, Mr. Brokaw, Mr. Pawelski, Ms. Vigil, when this

9    Court granted your motions to proceed pro se, you agreed

10   that in representing yourselves you were willing and able

11   to abide by the same rules governing attorneys.  In the

12   context of this trial, that means that you may not speak

13   out of turn.  You may not interrupt the witnesses or

14   interrupt me.  When I ask you to do something, I expect

15   you to do it, such as take your seats, please.

16        DEFENDANT VIGIL:  I take exception.

17        THE COURT:  The record will show that you are just

18   ignoring my admonitions to you, my request to you.  You

19   are allowed to make non-frivolous objections at any time

20   you believe that they are called for.  But when I ask you

21   to sit down, you need to sit down.  You will not stand

22   here throughout this trial.

23        DEFENDANT BROKAW:  I take exception, Your Honor.

24        THE COURT:  You have been professional, with the

25   exception of Mr. Brokaw, at the last hearing.  But both

1    Mr. Pawelski and Ms. Vigil, up until this time, you have

2    behaved very professionally.

3         Based on Mr. Brokaw's behavior at the final trial

4    prep conference, I want to make sure that all three of you

5    understand that the jury is not going to be favorably

6    impressed with you if you are disruptive or disrespectful

7    in this courtroom.

8         Also, you need to know that if you are disruptive

9    or disrespectful to anyone in this courtroom, or you

10   continue to ignore my requests of you, there will be

11   consequences.  The United States of America has indicated

12   that I can cite for you civil contempt, that I can have

13   you bound and gagged, or I can have you removed from the

14   courtroom if you are being disruptive or you do not follow

15   my directions, and that that action would not violate your

16   confrontation rights under the Sixth Amendment.

17        Now, unfortunately, as you recall at the last

18   hearing, I had to have the marshals remove Mr. Brokaw at

19   the final trial prep conference because he was being

20   disruptive.  And he would not stop being disruptive even

21   after I asked him nicely a number of times.

22        Now, because you have chosen to proceed pro se and

23   you have refused the assistance of even stand-by or

24   advisory counsel, there is no lawyer who will step in to

25   represent you if you are removed from the courtroom.  And

1      although you would be able to hear the proceedings in the

2      holding cell next door, you would not be able to

3      participate in the trial by examining or cross-examining

4      witnesses.

5              Therefore, if you are disruptive, I will most

6      likely have you gagged until it is time for you to examine

7      the witness, that way you can still participate in this

8      trial.

9              Now, I hope I don't have to do this, but you are

10     already demonstrating to me that you intend to be

11     disruptive.

12             DEFENDANT VIGIL:  I take exception.

13             THE COURT:  I asked you several times to sit down.

14     You refused to sit down.

15             DEFENDANT BROKAW:  I don't consent.

16             THE COURT:  You need to understand, this is my

17     courtroom.  You are the defendants in this case, whether

18     you want to acknowledge it or not.  And, again, I want to

19     remind you that you are not going to give a favorable

20     impression to this jury if they see you disrupting the

21     proceedings or treating me or others in this courtroom

22     disrespectfully.

23             Now, you promised not to be disruptive when I

24     allowed you to proceed on your own.  And at this point you

25     are being disruptive.

```
 1          DEFENDANT VIGIL:  Ask to speak.  To speak is being
 2    disruptive?
 3          THE COURT:  I asked you to sit down, Ms. Vigil.  We
 4    have matters we need to take care of.  You either sit down
 5    or I will have the marshals come up and we will have you
 6    sat down.
 7          DEFENDANT BROKAW:  I don't consent to sit down.
 8          DEFENDANT VIGIL:  I do not consent.
 9          THE COURT:  You will stand throughout the trial?
10    DEFENDANT BROKAW:  Judge --
11          THE COURT:  Do you understand that I will gag you
12    if you go off on these speeches that you tried to give me
13    in all of the filings you have.  I will not have you
14    disrupting this case.  It is not going to bode well with
15    the jury to see you gagged.
16          DEFENDANT BROKAW:  This is not a speech, Judge.
17    There is a notice before the IRS of the fiduciary
18    appointment in this case.  There is also --
19          THE COURT:  That a has nothing do with this case,
20    Mr. Brokaw.  You are the defendant in this case.
21          DEFENDANT BROKAW:  Judge.
22          THE COURT:  Whether you want to acknowledge it or
23    not, you are the defendant in this case.  I don't care
24    about your thoughts about you being a trustee.  You are a
25    defendant in this case.  You are either going to be tried
```

1    now --

2            DEFENDANT BROKAW:  I do not consent, Your Honor.

3            THE COURT:  I know you don't consent.

4            DEFENDANT BROKAW:  I would like to make -- this

5    document maybe hasn't appeared before your eyes yet.

6            THE COURT:  Is that this document here?

7            DEFENDANT BROKAW:  This just came in.

8            THE COURT:  I have the document that is titled

9    Mandatory Judicial Notice.

10            DEFENDANT BROKAW:  Reversionary -- this was a

11    financing statement put before the Colorado Secretary of

12    State with a reversionary interest to sign to the account

13    for the United States.  So the IRS --

14            THE COURT:  Mr. Brokaw, I know what it purports to

15    be.  It has no legal authority in this courtroom.  We are

16    proceeding with the Indictment, and you either will be

17    seated or I will have the marshals come up get you seated.

18            DEFENDANT BROKAW:  I don't consent to your

19    jurisdiction.

20            DEFENDANT VIGIL:  And I have filed a reversionary

21    interest since August of this year.  I filed a

22    reversionary interest assigning the United States --

23            THE COURT:  Ms. Hartmann, would you please call the

24    marshal.

25            DEFENDANT VIGIL:  -- upon property sold and

1    proceeds used to reduce the public debt as gratitude for

2    the extension of hospitality for the gift of safe harbor

3    as per 12 U.S. Code 95(a)(2).  So this case has been

4    assigned back to the United States.

5         DEFENDANT PAWELSKI:  This man asked me nicely to

6    have a seat.

7         THE COURT:  Thank you very much, officer.  All

8    right.

9         So, at this point, I will tell you again, if you

10   behave this way in front of the jury, it will not go over

11   well.  So, I will take action necessary to keep this

12   matter from being disruptive.

13        Ms. Hartmann, would you please bring up the jury.

14        COURTROOM DEPUTY:  Yes, Your Honor.

15        DEFENDANT BROKAW:  Judge, I haven't consented to

16   this jury trial.

17        THE COURT:  You don't need to consent.

18        DEFENDANT BROKAW:  I haven't consented.

19        THE COURT:  I know you haven't.

20        DEFENDANT BROKAW:  My name is private, and I

21   haven't consented to this.

22        THE COURT:  I am proceeding without your consent.

23        DEFENDANT VIGIL:  I am beneficiary for the trust.

24   I am appointing you as trustee.

25        THE COURT:  I don't accept the appointment.  Sit

1    down.

2         DEFENDANT BROKAW:  I appoint you as trustee.  Also,

3    I don't accept your offer to contract.

4         THE COURT:  Please sit down.  I am not offering to

5    contract.

6         Mr. Brokaw, Ms. Vigil, I am telling you now, I will

7    have you gagged if you continue with this.

8         DEFENDANT BROKAW:  You are appointed as trustee.

9         THE COURT:  Please be seated.

10        DEFENDANT VIGIL:  Do you have a claim against me?

11        THE COURT:  Please be seated.

12        DEFENDANT VIGIL:  Do you have a claim against me?

13        THE COURT:  Please be seated.

14        DEFENDANT VIGIL:  Do you have a claim against me?

15        THE COURT:  Ms. Vigil.

16        DEFENDANT VIGIL:  Do you have a claim against me?

17        THE COURT:  We will not play these games.

18        DEFENDANT VIGIL:  Do you have a claim against me?

19        THE COURT:  Please be seated.

20        DEFENDANT VIGIL:  Do you have a claim against me?

21        DEFENDANT BROKAW:  I don't assent to be surety for

22    the trust.  I do not consent to be the surety.

23        THE COURT:  We are waiting for the marshals to come

24    in.

25        DEFENDANT VIGIL:  I do not consent to be surety for

1    the trust.

2           DEFENDANT BROKAW:  I put a statement before the

3    Judge.  Judge, I do not consent to be the surety for the

4    trust.  And you are the trustee.  It is on the record.  It

5    is before the Court.

6           (Court Security Officer speaks with defendants.)

7           DEFENDANT BROKAW:  The United States attorneys

8    brought a claim against us.

9           THE COURT:  The record will reflect the Court

10   Security Officer asked the defendants to be seated.  They

11   have refused.  I have requested the marshals come up, the

12   deputy marshals.  I don't know how to proceed without

13   further disruption, because the defendants refuse to

14   acknowledge that this Court has any jurisdiction over them

15   and they continue to spout the type of statements that are

16   contained in all their filings and, as such, with great

17   reluctance, if they continue and they refuse to tell this

18   Court that they will comply with this Court's proceedings,

19   in a manner that is respectful and not disruptive, this

20   Court will have them gagged.  And if they won't be seated,

21   then I will have them bound and gagged.

22          DEFENDANT BROKAW:  Ma'am, with all due respect, we

23   are trying to be respectful.  We are trying to find out

24   where the claimant is.

25          THE COURT:  We are not going to play your game,

1    okay.  I know you all have a different view of the world

2    than the rest of us do, but I will not play your game.

3    You are here by an Indictment that was issued by a grand

4    jury for tax fraud, essentially.  You submitted claims for

5    reimbursements from the Federal Government to which you

6    are not entitled.

7         The Government has brought this action, and we will

8    not get into all of this about you not being the people

9    who you were born to be.

10        Let the record reflect the marshals have walked in.

11   Sir, this is my problem, we are supposed to start trial.

12   We were supposed to start at 8:30 this morning.  These

13   defendants didn't show up until 8:45.  They have refused

14   to sit.  They continue to disrupt.

15        My view is that if we have to, the Supreme Court

16   has said I can bind and gag them.  I am hoping they can be

17   seated, and I am hoping we don't have to do that, because

18   I don't think that will go over very well with the jury.

19   But I cannot have them being disruptive.

20        So if you want to talk to them and see if you can

21   get them to comply, that is what we will do.  Otherwise,

22   then I will have to ask you to at least gag them so that

23   they cannot interrupt this Court.

24        (Off-the-record discussion had.)

25        THE COURT:  All right.  I understand from the

1    Deputy Marshal, Ms. Vigil, Mr. Brokaw and Mr. Pawelski,

2    that you intend to continue to not comply with this

3    Court's request that you sit down and you allow these

4    proceedings to go forward.  Is that correct?

5          Let the record reflect they're being

6    non-responsive.

7          DEFENDANT VIGIL:  I have a statement I would like

8    to make.

9          THE COURT:  At this point, you cannot make a

10    statement.  We are trying to figure out whether we will

11    move forward with this.

12          DEFENDANT VIGIL:  This has an affect on moving

13    forward.

14          THE COURT:  You may proceed.

15          DEFENDANT VIGIL:  Okay.  I feel I owe the Court an

16    apology, because at the time that this all started, I was

17    unaware of things that I am now aware of and, therefore, I

18    am taking a stand now as the executor for the estate, and

19    I am not consenting to being the surrogate.  So that is

20    where we are at right now, where I should only speak for

21    myself.

22          That is where I am at this point.  That is what is

23    going on.  When this all started, I was not aware.

24    Therefore, I feel that I owe the Court an apology for

25    that, because I was not aware.  I am aware now, and this

1    is why I am standing at this point.

2         THE COURT:  All right.  So, let me ask you this.

3    If you wish to stand throughout this entire trial, I am

4    perfectly fine with that, but I cannot have you

5    disrupting.  Are you willing to not disrupt until it is

6    your turn to ask questions or examine, or are you going to

7    not follow my directions not to speak out of order?

8         DEFENDANT VIGIL:  Does that mean I cannot take

9    exception to things that are being said and done?

10        THE COURT:  No.  You may object at any time.

11        DEFENDANT VIGIL:  All right.  Am I able to state my

12    position?

13        THE COURT:  You may, as we proceed, as long as you

14    are doing it within -- when it is your turn to speak or

15    you have an objection to make, you may proceed.  But I

16    cannot have you disrupting the Court.

17        DEFENDANT VIGIL:  I do not consent to this going

18    forward to a trial.  I do not consent.

19        THE COURT:  All right.  The options are, if you

20    will be disruptive, you have two choices.  I understand

21    you don't consent.  I can have you gagged, which I would

22    have to do to keep you from disrupting.  Or I can have you

23    removed, the way Mr. Brokaw was removed, and you will be

24    in the cell next door.  You can hear the proceedings, but

25    you cannot interact with the proceedings.

1          DEFENDANT VIGIL:  I do not consent to either of

2     those.

3          THE COURT:  All right.

4          DEFENDANT BROKAW:  Likewise, I don't consent to

5     this trial moving forward.  I don't consent to being the

6     surety.  As the trustee, Judge, let's move this thing to

7     settlement.

8          THE COURT:  We are at trial.  At this point there

9     is no settlement.

10          DEFENDANT BROKAW:  There is no settlement?

11          THE COURT:  We are going to trial.

12          DEFENDANT BROKAW:  I don't consent to trial.

13          THE COURT:  All right.

14          DEFENDANT PAWELSKI:  I don't consent to a trial,

15     either.  I am not surety for the unofficial person.

16          THE COURT:  All right.  I understand your

17     positions.  I will allow you to remain as you are at this

18     point, but if you become disruptive, I will ask the

19     marshals to either gag you or remove you.

20          DEFENDANT BROKAW:  I don't know why I am here.  I

21     don't understand why I am here.

22          THE COURT:  Ms. Hartmann, would you please bring in

23     the jury.

24          DEFENDANT VIGIL:  I don't understand why I am here

25     either since I have assigned the reversionary interest

```
1     back to the United States for settlement and closure.

2          DEFENDANT BROKAW:  As I have.

3          DEFENDANT PAWELSKI:  As I have.

4          THE COURT:  I note that for the record.

5          (The following is had in open court, in the hearing

6     and presence of the prospective jurors.)

7          COURTROOM DEPUTY:  Juror No. 730.  Juror No. 463.

8          DEFENDANT PAWELSKI:  For the record, ma'am, I do

9     not accept, and I take exception to seating the jury.

10         THE COURT:  Your objection is noted.

11         DEFENDANT BROKAW:  For the record, I object to the

12    jury being seated also.  I do not consent to this

13    proceeding.

14         THE COURT:  Your objection is noted.  You have

15    already stated that for the Court.

16         DEFENDANT VIGIL:  On and for the record as my

17    trustee, I want you to discharge this matter I am accused

18    of and eliminate the record.

19         THE COURT:  Your objection is noted.  We have

20    already discussed this.

21         COURTROOM DEPUTY:  Juror No. 488.  Juror No. 895.

22    Juror No. 282.

23         DEFENDANT PAWELSKI:  I take exception to these

24    people being seated and being non-peers of mine.

25         THE COURT:  Mr. Pawelski, you have already noted
```

1   that.  I have noted your objection to the jury being

2   seated.  Please do not disrupt the matter any further.

3

4

5        DEFENDANT VIGIL:  I take exception to the jury.

6        THE COURT:  Ms. Vigil, same goes for you.  I have

7   heard the exception.  It is noted.  Do not disrupt these

8   proceedings any further.

9        COURTROOM DEPUTY:  Juror No. 129.

10        DEFENDANT BROKAW:  I take exception likewise,

11   Judge.

12        THE COURT:  I note your objection, Mr. Brokaw.

13        DEFENDANT BROKAW:  I do not consent to the jury

14   being seated or this trial progressing.

15        COURTROOM DEPUTY:  Juror No. 433.

16        THE COURT:  Your objection is noted.

17        COURTROOM DEPUTY:  Juror No. 432.  Juror No. 589.

18   Juror No. 1050.  Juror No. 178.  Juror No. 418.  Juror No.

19   107.  Juror No. 400.  Juror No. 152.  Juror No. 367.

20   Juror No. 666.  Juror No. 776.  Juror No. 304.  Juror No.

21   766.  Juror No. 318.  Juror No. 343.  Juror No. 989.

22   Juror No. 275.  Juror No. 59.  Juror No. 823.  Juror No.

23   131.  Juror No. 786.  Juror No. 537.  Juror No. 70.  Juror

24   No. 816.

25        THE COURT:  All right.  Good morning, ladies and

1    gentlemen.  Welcome to the United States District Court

2    for the District of Colorado.  My name is Judge Christine

3    Arguello, and I am going to be the Judge presiding over

4    these matters.

5         We are convened today to conduct a jury trial in a

6    criminal case, No. 13-cr-00392-CMA, entitled United States

7    of America v. George Thomas Brokaw, John J. Pawelski and

8    Mimi M. Vigil.

9         Before we begin, I would like to introduce you to

10   some of the professionals in the courtroom who will be

11   assisting me during the trial.  You have already met

12   Ms. Hartmann.  She is my courtroom deputy.  She also

13   serves as the bailiff.  She is here to take care of your

14   needs during the course of this trial.  So over the course

15   of the next few days, if you are selected to serve on this

16   jury, you will get to know her quite well.

17        Do not discuss this case with her or with anyone

18   else.  But, if you have any personal problems or issues,

19   you need to let her know and she will bring them to my

20   attention and we can address them.

21        Ms. Darlene Martinez is sitting right below me.

22   She is the court reporter.  She is taking down everything

23   that is said in this courtroom verbatim.

24        Ms. Ashley Broothby is the law clerk who is

25   assisting me with this case.

1          Do any of you know me or any of my courtroom staff?

2     Nobody?

3          Before we proceed any further, I want to thank you

4     all for being here.  I know that many of have you left

5     your jobs, your families, your businesses, to appear here

6     as prospective jurors.  And I know when you got that jury

7     summons in your mailbox you kicked your heels up and

8     jumped for joy, saying, I get to go to jury service.

9          I know how you feel.  I will tell you my story

10    about jury service.  But I want to let you know that your

11    sacrifices are appreciated by all who are connected with

12    this case.  More importantly, however, your appearance

13    here represents your commitment to what I consider to be a

14    remarkable system of criminal justice, and now each of you

15    will have played at least a small role in this, and some

16    of you will play a bigger role than others when we finish

17    here today.

18         But I know for some of you, you believe it is

19    really an inconvenience to be here, to be called to jury

20    duty.  And by their very nature, these cases are very

21    difficult and sometimes unpleasant to have to decide.  But

22    that is how our criminal justice system works.

23         We, as citizens of the United States, have the

24    responsibility to make the sacrifices that are necessary

25    to support and sustain our criminal justice system.  And

1    it takes all of us to do that; the working, the retired,

2    the young, the old, those with children and those without.

3         Without your willingness to participate, our system

4    would not be able to survive, because it depends on people

5    like you who are willing to give up your time.

6         Now, for many of you, this may be your first

7    experience with jury duty.  And it is a solemn duty which

8    makes many people feel nervous and anxious, and that is

9    understandable, especially when you come into a courthouse

10   and a courtroom that is as grand as the one we are

11   fortunate enough to have.

12        I want you to know that I will do my best to make

13   this an experience that you need not fear.  In fact, it is

14   my experience that everyone who has served as a juror in

15   my courtroom has come away believing that it has been one

16   of the most interesting, educational and challenging

17   experiences that they have.

18        Now, I told you I had some experience with jury

19   duty.  Believe me, I know.  I got called to state court

20   about a couple years ago, thinking I would never make it

21   through because I am a Judge, and I have been a lawyer for

22   many, many years.  I was selected to serve on that jury.

23   It was a 4-week criminal trial, not unlike the trial we

24   will be having here.

25        What you will find if you are selected to serve on

1    this jury is it is one of the relatively few situations

2    where you, as an individual, can and will make a

3    difference.  During your service, and especially during

4    your deliberations, you will have occasion to exercise

5    more absolute raw power than at any other time in your

6    life, because you get to decide what the facts in this

7    case are, and then you get to apply those facts to the law

8    that I give you.

9         Now, the first step in the trial is to select a

10   jury.  As I just told you, your job, the jury's job is to

11   determine the facts based on the evidence that is

12   presented.  You will say -- you will decide what actually

13   happened here.  And then you will apply those facts to the

14   law that I give you in written jury instructions that tell

15   you what the law is, and you will come back with a

16   verdict.

17        Now, there are 32 of you sitting here.  We started

18   with Juror No. 730, who is in Chair No. 1.  We go 1

19   through 8, then 9 through 16, and then we go 17 through

20   32.  So that is how you are numbered here.

21        Those of you who are sitting back there in the

22   gallery, you are what I call our ready reserve.  If one of

23   the current members sitting up here is excused, then you

24   may be called to join the panel.

25        Now, you all were selected by random from voter

1    registration, driver's licenses, to come as jurors, and

2    then you were numbered by our computer, who just spit out

3    randomly.  That is how you got your numbers 1 through

4    whatever.  I think we have 55 called here today.

5         If we are going to have to proceed to excuse one of

6    the members up here, then I may call one of you back there

7    to come in and sit and take that place.  So what I will

8    ask you to do is you should have notepads and you should

9    have pencils.  And I will be asking a series of questions

10   that can, for the most part, be answered yes or no by the

11   people who are sitting up here.

12        You need to pay attention to those questions and

13   jot down any question you would answer yes to so that I

14   don't have to repeat all of the questions again and we can

15   make this go more quickly.  Okay?

16        All right.  Now, eventually we will only select 12

17   jurors plus two alternates for this case.  So, therefore,

18   it is obvious we can't even use the people that are all

19   here.  But the parties each have an opportunity to do what

20   we call peremptory challenges.  And they get to say we

21   don't want this person, this person, this person, so we

22   get down to 12, plus two jurors.

23        Now, to give them an opportunity to decide which of

24   you they want to keep or don't want to keep, we go through

25   this process we call voir dire.  And that is French for

1    meaning to speak the truth.  And the purpose of voir dire

2    is to determine which members of the jury could be the

3    most fair and impartial in determining the facts of this

4    case, and then in applying the law to those facts.

5           Now, to accomplish that, as I said, I will be

6    asking you a series of questions.  That will help us

7    identify those that could be more fair and impartial.

8           Now, once voir dire begins, the rules are fairly

9    simple.  First --

10          Excuse me, can we be quiet while I am talking to

11   the jury.

12          DEFENDANT BROKAW:  Judge, the defendant are on the

13   table.

14          THE COURT:  Sir, you cannot leave the courtroom.

15   If you try to leave, I will have the marshals keep you.

16          DEFENDANT BROKAW:  Judge, the defendants --

17          THE COURT:  Mr. Brokaw, you cannot leave the

18   courtroom.

19          DEFENDANT PAWELSKI:  The defendants are on the

20   table, Judge.

21

22

23          DEFENDANT VIGIL:  Defendants are on the table,

24   Judge.

25          THE COURT:  You will sit in the back of the

1    courtroom.  You cannot leave.

2         Sir, please stop.  They cannot leave.

3         THE COURT:  Excuse me, ladies and gentlemen.

4         DEFENDANT BROKAW:  Defendants are on the table,

5    Judge.

6         THE COURT:  All right.  Let the record reflect that

7    the defendants have decided to leave the courtroom.

8         DEFENDANT PAWELSKI:  A claimant or an injured party

9    in this case --

10        (Defendants are removed from the courtroom.)

11        THE COURT:  All right.  Ladies and gentlemen, we

12   will continue.

13        Once voir dire starts, I will be asking you a

14   series of yes or no questions.  What I need you to do is

15   if you would answer yes, I need to you raise your hand,

16   then I will go one by one.  We will answer the questions.

17   And so I will call on one, then say who else raised their

18   hands, and we will continue that way.

19        There is a microphone here, and there is a

20   microphone down there.  So I would ask the juror closest

21   to the microphone here and over there, if you can help and

22   pass the microphone around so that we won't have to delay

23   a long time.

24        I do need you to speak into the microphone because

25   Ms. Martinez has to hear everything being said, okay.

```
 1        All right.  So the rules are you answer each
 2   question completely and truthfully.  If a question applies
 3   to you, as I said, and you are not seated here, just make
 4   note if you would have answered yes so that if you are
 5   called up, we can proceed that way.
 6        If you don't understand my question, let me know.
 7   Sometimes I can get a little wordy, as judges tend to do
 8   that, and I will rephrase.  If you didn't raise your hand,
 9   then you heard somebody else say something and you said, I
10   should have raised my hand, that is perfectly all right,
11   just raise your hand.
12        If you raised your hand and you said something,
13   then you remembered, I should have added something, just
14   raise your hand and say I need to modify my answer.  There
15   are no right or wrong answers.  We are just trying to
16   figure out some of your beliefs, some of what you are.
17        If you do not raise your hand, then I will assume
18   that the answer to the question you would have given would
19   have been no.
20        All right.  So just like a witness in a case, you
21   will be administered an oath to tell the truth.  And you
22   must answer the questions I ask you truthfully and
23   completely.
24        So, Ms. Hartmann, would you please administer the
25   oath.  Everybody here and everybody back there, could you
```

1    stand at this time.

2            COURTROOM DEPUTY:  Please raise your right hand.

3            (The prospective jurors are sworn.)

4            THE COURT:  All right.  You may be seated.

5            All right.  This trial is set for 3 weeks,

6    beginning today.  I don't know it will go 3 weeks.  It

7    depends whether we have any interaction from the

8    defendants or not.  If we don't have any interaction, it

9    will probably go about a week and a half.  If we do, it

10   may go the full 3 weeks.

11           We will go Monday through Friday of each week, with

12   the exception of Tuesday, a week from tomorrow, which is

13   Veteran's Day which is a federal holiday.  The courthouse

14   will be closed, so we won't have trial on that day.

15           Now, as a result of my 4-week service on a jury

16   trial in state court, I came to realize just how difficult

17   it is to sit in those seats and be a juror.  We make you

18   sit there, we make you listen all day, and you can't ask

19   any questions, and you can't talk about the case to anyone

20   until the very end, when I tell you you can go forward and

21   deliberate.  Then there is so much time that seems to be

22   wasted.  Sometimes it is not wasted, we are doing legal

23   things, but sometimes it was.  We got an hour and a half

24   for lunch.  We ate lunch in 15 minutes.  We sat there,

25   twiddled our thumbs and waited.  They would say, we will

1   take a 15-minute break, and that would go into a half an

2   hour or 40 minutes.  And it just seemed to me they could

3   have been more efficient with the use of time.

4         I found by 3 o'clock in the be afternoon, I was

5   pretty much brain dead, if I could keep my eyes open after

6   lunch.  Sometimes I was like almost having to do this

7   (indicating).  I wasn't hearing a whole lot of what was

8   actually being testified to, because it was just kind of

9   going over my head.

10         So as a result of that, I changed completely how I

11   conduct jury trials.  We start earlier.  We start at 8

12   o'clock.  That actually will allow you hopefully to get

13   into downtown Denver before major the traffic rush.  It

14   helps you to get a parking space.  We take shorter breaks.

15   We go for 2 hours.  So we go from 8:00 to 10:00, then take

16   a 15-minute break.  And it is truly a 15-minute break,

17   because I have put snacks and all in the jury deliberation

18   room for your convenience, so you don't need to leave the

19   room.

20         We go for two more hours.  I ask you to bring your

21   lunch.  You only have a half hour for lunch.  Then we come

22   back in, and then I get you out of downtown Denver by 2:30

23   or 2:45, if we start on time.  If we start at 8:00, that

24   allows you, then, if you have businesses to go back to, if

25   you have kids to pick up, if you have errands you need to

1    run, you can get out of downtown Denver with time to do

2    some things in the afternoon.

3          So I've tried to make it the least intrusive as I

4    can on your life.  It's worked out very well.  The jurors

5    have told me they really appreciated the fact we can get

6    you out of downtown Denver before traffic rush actually

7    gears up.

8          So the latest you will be out of here is 2:45, 3

9    o'clock if we start at 8 o'clock, if everybody is here on

10   time.

11         No one will find this convenient, but this is how

12   the judicial system has worked for several hundred years.

13   And for some of you, you will say, well, that is still

14   inconvenient for me.  And I understand that.  It is

15   inconvenient for everybody.  But the question is for some

16   of you, it may be what we call an undue hardship.  And if

17   it is truly an undue hardship, then I understand that.

18         And so at this point, I am going to ask you if you

19   don't think you can spend, if you were selected, you could

20   not spend the next 3 weeks here because it would be not

21   just an inconvenience, but a true hardship.

22         Raise your hand.  Okay.  So let's go ahead pass the

23   microphone to the person next to you.  Go ahead tell me.

24         CHAIR NO. 10:  I have a 4-month old at home who has

25   acid reflux.  Basically makes it very, very challenging to

```
 1    get any sort of sleep at night.  So we are -- we have a
 2    difficult time as it is.  Taking 3 to 4 weeks out of work
 3    would be an extraordinary hardship.
 4         THE COURT:  Do you have a spouse who also helps
 5    with that?
 6         CHAIR NO. 10:  Yes.
 7         THE COURT:  Do both of you work outside the home?
 8         CHAIR NO. 10:  Yes.
 9         THE COURT:  So you have childcare?
10         CHAIR NO. 10:  Yes.
11         THE COURT:  Thank you.
12         Next person?
13         CHAIR NO. 11:  I have -- I am the primary caregiver
14    for my two disabled parents and 4-year-old younger sister.
15    So being away from home for that long would definitely be
16    a bit of an issue.
17         THE COURT:  So do your parents live with you?
18         CHAIR NO. 11:  Yes.
19         THE COURT:  All right.  You say -- how old are
20    they?
21         CHAIR NO. 11:  My parents are both over 40.  My
22    dad, I believe, is turning 50 next year.
23         THE COURT:  They're both disabled at that young
24    age?
25         CHAIR NO. 11:  Yes.
```

 1            THE COURT:  What is the nature of their disability?

 2            CHAIR NO. 11:  My dad has -- my mom has severe

 3    rheumatoid arthritis.  My dad has multiple problems.  I

 4    can get medical records.

 5            THE COURT:  I am just trying to figure out how

 6    severely, because that is very young to be disabled.  I am

 7    trying to figure out how disabled they are.

 8            CHAIR NO. 11:  He is unable to get around the house

 9    on his own without extreme help.

10            THE COURT:  So do you assist him in getting him to

11    the restroom and other places he needs to go?

12            CHAIR NO. 11:  Yes.

13            THE COURT:  Your mother can't help with that?

14            CHAIR NO. 11:  No.  She is more physically disabled

15    than he is.

16            THE COURT:  You said you have a younger child?

17            CHAIR NO. 11:  Yes, my 4-year-old sister.

18            THE COURT:  Okay.  All right.  Thank you very much.

19            Who else?

20            CHAIR NO. 5:  I am a contract worker.  I work from

21    home.  So I won't be doing my work duties if I am here all

22    day.  I will be working at night, in the evening, and into

23    the night.  And I am also mainly responsible for my

24    8-year-old daughter, getting her to and from school.

25            THE COURT:  Do you have a suppose?

 1          CHAIR NO. 5:  I do.  He is a business owner and

 2     works very much.  And I think he is due to travel mid to

 3     end of this month, I believe the 18th.

 4          THE COURT:  Okay.  All right.  And when you say

 5     "contract worker," what kind of contract work do you do?

 6          CHAIR NO. 5:  Graphic design.

 7          THE COURT:  And you would not be able to put that

 8     off for any amount of time?

 9          CHAIR NO. 5:  I am under deadline.

10          THE COURT:  You have a contract right now?

11          CHAIR NO. 5:  Yes, two.

12          THE COURT:  What is the deadline for those

13     contracts?

14          CHAIR NO. 5:  I have a magazine going on press at

15     the end of December for a client.  And I am working three

16     more weeks with another client.

17          THE COURT:  Okay.  All right.  Who else?  All right

18     down here.

19          CHAIR NO. 29:  I have a 2-month-old son whose

20     Baptism is coming up.  We have a ton of family coming

21     home.  I am a stay-at-home dad.  My wife is going back to

22     work soon.  So I don't know how to handle him and being

23     here for the next few weeks.

24          THE COURT:  Now, you are the stay-at-home care

25     taker?

1          CHAIR NO. 29:  I am.

2          THE COURT:  And your wife is still at home?

3          CHAIR NO. 29:  She is at home until the middle of

4     November.

5          THE COURT:  Okay.  When do you have --

6          CHAIR NO. 29:  I think it was 2 more weeks on

7     maternity leave.

8          THE COURT:  Who else?  If we can pass -- you have

9     the microphone, wonderful.

10          CHAIR NO. 20:  I am a 1099 worker for two

11     professional speakers.  I'm an administrative assistant,

12     sole sport of my family.  And if I don't work for 3 weeks,

13     I don't make rent.

14          THE COURT:  Okay.  Anybody else?

15          All right.  Would the Government please approach

16     the bench.

17          (A bench conference is had.)

18          THE COURT:  What do you think?

19          MR. KIRSCH:  Your Honor, the only one I wasn't

20     positive about in terms of the true undue hardship is 589,

21     with 4-month old with acid reflux.  But under the

22     circumstances, we don't have any objection to all four of

23     them leaving, if the Court feels we have enough folks

24     here.

25          THE COURT:  We have five.

 1          MR. KIRSCH:  I am sorry, you are right, we do have

 2     five.

 3          THE COURT:  I think we will be okay because we will

 4     not have to have the defendants' strikes, so I think we

 5     should excuse them.

 6          MR. KIRSCH:  No objection, Your Honor.  Thank you.

 7          (The following is had in open court.)

 8          THE COURT:  All right.  Ladies and gentlemen, the

 9     five who indicated it would be an undue hardship, we

10     believe that would be an undue hardship, and I will excuse

11     you at this point.

12          Ms. Hartmann, what do we need to do?

13          COURTROOM DEPUTY:  They can leave, but they need to

14     check back on that telephone on your summons, the

15     telephone number for the rest of the month.

16          THE COURT:  So you are still on call for the rest

17     of the month.

18          Now, if they went through this and been excused, do

19     they still have to do that?

20          COURTROOM DEPUTY:  Yes, Your Honor.

21          THE COURT:  Okay.  Sorry.  Thank you very much,

22     ladies and gentlemen.  I appreciate it.  I think they need

23     to turn their buttons in downstairs.

24          COURTROOM DEPUTY:  Yes, they do.

25          THE COURT:  Ms. Hartmann, would you call

1    replacement jurors, please.

2         COURTROOM DEPUTY:  Chair No. 5 in the back, juror

3    No. 889.  Juror No. 616.

4         THE COURT:  Probably easier for you to come around

5    this way so you are not climbing over so many legs.

6         COURTROOM DEPUTY:  Juror 882, Chair 11.

7         Fourth seat in the front here, Juror No. 941, chair

8    No. 20.  And last seat here, 934, that is Chair No. 29.

9         THE COURT:  All right.  For the five of you just

10   seated, is there any request from you to be excused for

11   undue hardship?

12        All right.  Pass the microphone right down here.

13        CHAIR NO. 20:  My husband and I had a baby back in

14   May, and he passed away in June.  And I am very much

15   overcome with grief and sadness.  I have a hard time

16   focusing on a day-to-day basis, I am just very emotional.

17   It is all I could do to get here this morning.

18        THE COURT:  All right.  Anybody else?  All right.

19   If the Government has no objection, I am going to go ahead

20   and excuse Juror No. 941.

21        MR. KIRSCH:  No objection, Your Honor.

22        THE COURT:  Thank you, ma'am, I appreciate that,

23   and my condolences.

24        CHAIR NO. 20:  Thank you very much.

25        THE COURT:  Ms. Hartmann, would you call a

1    replacement juror.

2              COURTROOM DEPUTY:  Juror 586, Chair No. 20.

3              THE COURT:  Juror 586, any request for you to be

4    excused for undue hardship?

5              CHAIR NO. 20:  No.

6              THE COURT:  All right.  Thank you.

7              All right.  Do any of you have any physical

8    problems that would limit or hamper your services as a

9    juror, such as impaired hearing, which we can adjust

10   with -- we have earphones you can use, or eyesight or

11   other problems that would prevent you from being able to

12   sit for about 2 hours at a time?  Nobody?

13             All right.  Before we proceed any further, I want

14   to introduce you to the parties, and I want to tell you a

15   little bit more about the issues in this case.

16             Now, the Government is represented by Agent Adam

17   Rutkowski.  Does anybody know Agent Adam Rutkowski or any

18   member of his family?  Nobody?

19             The attorneys for the Government are Mr. Matthew

20   Kirsch and Ms. Martha Paluch.  Do any of you know either

21   of them or their families?

22             All right.  The defendants, who you saw earlier

23   excused themselves from the courtroom, are Mr. George

24   Thomas Brokaw, Mr. John J. Pawelski, and Ms. Mimi M.

25   Vigil, all of whom have chosen to represent themselves in

1    this case, and that is their constitutional right to do.

2          Now, they work in the Colorado Springs area.  Do

3    any of you know any of the defendants, Mr. Brokaw,

4    Mr. Pawelski, or Ms. Vigil?  Nobody?

5          All right.  Now, I have advised the defendants that

6    they may be at a disadvantage in representing themselves

7    since they are not trained as attorneys.  The law does not

8    allow me to assist them or to relax the rules that apply

9    to them in a case like this.

10          Likewise, the attorneys for the United States must

11    treat them as if they were trained attorneys.  Further,

12    the fact that they have chosen to represent themselves

13    must not enter into your deliberations.  If you are chosen

14    as a juror in this case, will the fact that the defendants

15    are representing themselves cause anyone on the panel to

16    be less than fair and impartial as a juror to both sides

17    of this case?  Okay.  Everybody could be fair and

18    impartial to both sides?  Okay.

19          Would any of you hold the Government to a higher

20    burden of proof because the defendants have made the

21    choice to represent themselves?  Nobody?

22          Would any of you be more or less sympathetic to the

23    defendants because they have made this choice?  Nobody?

24    You could be objective to both sides?  All right.

25          Now, I want to tell you a little bit more about

1    this case.  Now, what I am about to tell you is intended

2    to serve as an introduction only.  My remarks are not

3    intended to serve as a substitute to the detailed

4    instructions on the laws which I will give you at the

5    close of the case after the evidence has been presented.

6         The case we are about to try is a criminal case, as

7    opposed to and distinguished from a civil case.  This case

8    has been brought by the United States Government.  And I

9    will sometimes refer to the Government as the prosecution.

10        By a first Superseding Indictment, the Grand Jury

11   has charged Mr. Brokaw, Mr. Pawelski and Ms. Vigil with

12   committing the following offenses:

13        First, each defendant is charged with one count of

14   conspiracy to file false claims for refunds, in violation

15   of 18 United States Code Section 286.  And we will give

16   you the language of that law when we go forward.

17        Second, each defendant is charged with one or more

18   counts of filing a false claim or claims for refund, in

19   violation of that statute Section 287.

20        Third, each defendant is charged with one count of

21   conspiracy to corruptly endeavor to obstruct or impede the

22   due administration of the internal revenue laws, in

23   violation of Section 371.

24        And, finally, each defendant is charged with one

25   count of corruptly endeavoring to obstruct or impede the

1    due administration of the internal revenue laws.

2         Now, the Indictment is simply a description of the

3    charges made by the Government against Mr. Brokaw,

4    Mr. Pawelski, and Ms. Vigil.  You need to keep in mind

5    these are only allegations at this time, and they do not

6    constitute evidence of any guilt or anything else.

7         The mere fact that charges have been brought

8    against Mr. Brokaw, Mr. Pawelski, and Ms. Vigil does not

9    establish their guilt.

10         As to all of the charges, Mr. Brokaw, Mr. Pawelski,

11    and Ms. Vigil have pled not guilty, and the burden of

12    proof is on the Government, on the United States, to prove

13    each charge against them beyond a reasonable doubt.

14         Now, has anyone heard anything about this case?

15    Okay.

16         Now, as I told you, the Indictment that is filed in

17    this case is only the way that the Government gives notice

18    to the defendants of what charges have been brought

19    against them.  And without the Indictment, charges cannot

20    be brought to trial.  However, it is never to be taken as

21    evidence of guilt.

22         Is there anyone here who feels merely because the

23    defendants have been charged with the criminal offenses in

24    this case, that probably means that they are guilty?

25    Nobody?  Okay.

```
 1            Now, as I told you, this criminal case involves
 2    allegations that the defendants filed false claims for tax
 3    refunds.  And they attempted to obstruct the due
 4    administration of the internal revenue laws.  Do any of
 5    you hold any beliefs, feelings, or prejudices against this
 6    type of prosecution such that you could not sit as a fair
 7    or impartial juror?  Nobody?
 8            Do any of you feel that because of the subject
 9    matter of this case, the people involved, or similar
10    experiences you or your family or friends might have had
11    to the issues in this case, that you could not be fair and
12    impartial to both sides?  Nobody?
13            Have you or any member of your family or anyone
14    close to you ever been the subject of an audit, been
15    assessed a penalty, or had similar action, such as a fine,
16    lien, levy, or garnishment taken by the Internal Revenue
17    Service?
18            All right.  Let's pass the microphone down here in
19    front.
20            CHAIR NO. 19:  Yes, Your Honor.  I have been
21    audited.  I had an accountant relative of mine represent
22    me, and ended up being cleared.  But, yes, I was audited
23    just a couple years ago.
24            THE COURT:  And in your opinion -- let me ask you
25    this.  Back up.  Is there anything about that experience
```

1    that would prevent you from being fair and impartial to

2    the Government in this case?

3         CHAIR NO. 19:  It certainly biased me a bit because

4    it turned out to be a spurious charge, and I thought it

5    was unfounded.  It turned out to be unfounded.  It cost me

6    a lot of time and money to get it straightened out.

7         THE COURT:  Would that prevent you from being fair

8    and impartial to the issues in this case?

9         CHAIR NO. 19:  I would like to say it would not

10   prevent me from being so, but you can't be sure.

11        THE COURT:  But you believe you could be fair and

12   impartial?

13        CHAIR NO. 19:  I would like to think so.

14        THE COURT:  All right.  Very good.

15        CHAIR NO. 19:  That is the best I can say.

16        CHAIR NO. 20:  I had income that my tax attorney

17   did not include in my tax statement.  We filed a late

18   return after the Government noticed that we hadn't done

19   that.  We paid a penalty, fine.

20        THE COURT:  Okay.  Is there anything about that

21   experience that would prevent you from being fair and

22   impartial to both sides?

23        CHAIR NO. 20:  No.

24        THE COURT:  All right.  Very good.  Thank you.

25        Who else?  All right.  Pass the microphone right

1    behind you.

2         CHAIR NO. 11:  I have been audited twice now over

3    the last, probably, 15 years.  I have 1099 sales

4    representative.  Basically, received some milage,

5    different things like that.  But I can be impartial as far

6    as going through these proceedings.

7         THE COURT:  Nothing that would prevent you from

8    being fair and impartial?

9         CHAIR NO. 11:  Not at all.

10         THE COURT:  Who else?  Pass the microphone right

11    behind you.

12         CHAIR NO. 2:  My husband was audited before we were

13    married, so I don't know any details.  He was a drugstore

14    owner.

15         THE COURT:  Is there anything, then, about that

16    experience that would prevent you from being fair and

17    impartial?

18         CHAIR NO. 2:  No.

19         THE COURT:  All right.  Very good.  Who else?

20         All right.  Pass the microphone down there.

21         CHAIR NO. 25:  Yes.  Basically, I was audited a few

22    years back, just for proof of children purposes.  But,

23    yeah, I am not impartial.

24         THE COURT:  You are impartial.  You could be fair

25    and impartial?

1           CHAIR NO. 25:  Yes, absolutely.

2           THE COURT:  Thank you.  Pass the microphone to the

3     woman behind you.

4           CHAIR NO. 13:  My husband and I have been audited.

5     His mom did our taxes, and she just left off the per diem

6     per day.  We have paid the taxes.  I could be impartial.

7           THE COURT:  Okay.  Very good.  All right.

8           CHAIR NO. 30:  My husband was assessed a fine on a

9     stock, I believe, that was cashed.  That tax had not been

10    paid on.  So he had to pay the fine for it.

11          THE COURT:  Is there anything about that experience

12    that would prevent you from being fair and impartial?

13          CHAIR NO. 30:  No.

14          THE COURT:  All right.  Thank you.

15          I think the gentleman right behind you.

16          CHAIR NO. 15:  Yes.  My parents have been audited.

17    They have been through a lot of things.  But I feel it

18    will not impair my objectivity.

19          THE COURT:  Pass it to the woman in front of you.

20          CHAIR NO. 27:  I am not sure if this applies, but

21    it was like 15 years ago, I was a 1099 worker and did not

22    submit a form, overlooked it.  It was a small job.  They

23    sent me a statement saying I had to pay the tax.  I paid

24    it.  I don't know if that is what you are asking for.

25          THE COURT:  It interacts with the IRS.  That is

1     fine.  Anything about that experience that would prevent

2     you from being fair and impartial?

3          CHAIR NO. 27:  Not at all.

4          CHAIR NO. 5:  I had a minor fine many years ago,

5     but nothing that would cause me to be not impartial.

6          THE COURT:  If you can pass the microphone down.

7          CHAIR NO. 3:  My father-in-law, I think, had tax --

8     was convicted of something with finances in some way, but

9     I don't even know the details.  So I don't think I could

10    not be impartial.

11         THE COURT:  Okay.  So it wouldn't affect you in any

12    way?

13         CHAIR NO. 3:  No.

14         THE COURT:  All right.  Thank you.

15         CHAIR NO. 7:  I had a garnishment about 7 years ago

16    just for paying.  I owed taxes, and I paid late.

17         THE COURT:  Is there anything about that experience

18    that would prevent you from being fair and impartial?

19         CHAIR NO. 7:  No.

20         THE COURT:  All right.  Anybody else?

21         Okay.  Other than those that you have already

22    testified to, have you or any family member or anyone

23    close to you had any other experiences with the Internal

24    Revenue Service that would affect your ability to be fair

25    and impartial in this case?  Nobody?

1           All right.  Do any of you have a disagreement with

2     any of the internal revenue laws of the United States or

3     hold any personal belief that the United States should not

4     regulate the payment of income taxes or that the Internal

5     Revenue Service should not investigate or audit taxpayers

6     or tax preparers?  Anybody?

7           Nobody?  Do any of you believe the income tax laws

8     of the United States are unconstitutional?  Nobody?

9           Do any of you believe that the laws which require a

10    person to report his or her income on a tax return

11    infringe upon the person's rights in any way?  Nobody?

12          Do any of you disagree with the idea that everyone

13    has a duty to obey the income tax laws, as well as all

14    other laws of our country?  Nobody?

15          All right.  Have you, a family member, or anyone

16    close to you ever been a member of or affiliated with any

17    group or organization whose members engage in the study

18    of, protest against, or otherwise express dissatisfaction

19    with the substance, form, or administration of federal tax

20    laws or federal tax policies generally?

21          All right.  If you could pass the microphone back

22    there.

23          CHAIR NO. 15:  Yes.  I have been loosely affiliated

24    with the Zeitgeist movement.

25          THE COURT:  Which movement is that, I am sorry?

1          CHAIR NO. 15:  It is basically the part of the

2     Venus Project, whom I am a senior software engineer for.

3     But I feel I fairly disengage from a lot of the consensus

4     from that movement, and I do not feel it will impair my

5     objectivity.

6          THE COURT:  Okay.  All right.  Thank you.

7          Anybody else?

8          Have you or any close friends or relatives attend a

9     lecture, seminar, discussion, group organized on or

10    attended by people who've protested the substance, form or

11    administration of federal tax laws or federal tax policy

12    generally?  Nobody?

13         Do any of you hold the belief or have family

14    members or close friends who hold the belief that you are

15    not subject to the laws and ordinances of the federal,

16    state, and local government?  Nobody?

17         Do any of you believe that a person living in the

18    United States has the ability to declare himself or

19    herself independent sovereign and immune from duly-enacted

20    laws and ordinances of the United States?  Nobody?

21         Have any of you ever belonged to any organizations

22    who call themselves "patriot" organizations?  Nobody?

23         Now, the United States will call witnesses who are

24    employed by the Internal Revenue Service and/or the

25    Treasury Inspector General for Tax Administration.  Do any

```
1    of you have any prejudice or bias against such agents or

2    officers such that you could not serve as fair and

3    impartial jurors?  Nobody?

4          Do any of you or any member of your family or close

5    business -- I am sorry, do any of you or any member of

6    your family or anyone close to you hold any personal

7    belief against the criminal laws of the United States such

8    that you could not sit as a fair and impartial juror?

9    Nobody?

10         Do any of you or any member of your family or

11   anyone close to you hold any personal belief against the

12   laws generally of the United States or any belief that the

13   United States has no authority over its citizens such that

14   you could not sit as fair and impartial jurors?  Nobody?

15         Have any of you been arrested, charged, or

16   convicted of any crime, whether it is felony or

17   misdemeanor, other than minor traffic violations?  And

18   this does include drunk driving.  And I forgot to tell you

19   at the beginning, if anything is too personal to you to

20   answer publicly, let me know I will allow you to come up

21   here so the whole room doesn't hear.

22         If we can pass the microphone right up there.

23         CHAIR NO. 4:  I was convicted of a DUI in 2003.

24         THE COURT:  Did you successfully complete your

25   sentence?
```

1          CHAIR NO. 4:  Yes.

2          THE COURT:  Is there anything about that experience

3    that would prevent you from being fair and impartial in

4    this case?

5          CHAIR NO. 4:  No.

6          THE COURT:  All right.  Who else?

7          CHAIR NO. 11:  I had a DUI 20-some-odd-years ago.

8          THE COURT:  Did you successfully complete your

9    sentence?

10         CHAIR NO. 11:  Yes I did.

11         THE COURT:  Anything about that experience that

12   would prevent you from being fair and impartial?

13         CHAIR NO. 11:  No.

14         THE COURT:  All right.  Pass the microphone down to

15   the front row.

16         CHAIR NO. 19:  I was arrested on a charge several

17   years ago.  I prefer not to speak in open court.

18         THE COURT:  If you want to come forward.  Go ahead

19   leave the microphone there.

20         (A bench conference is had.)

21         CHAIR NO. 19:  I was arrested about 10 years ago in

22   the State of Florida for marijuana possession, and I

23   believe it was lewd and lascivious behavior.  It was found

24   out to be unfounded charges.  I was beaten severely by the

25   police; suffered a broken rib, concussion.  And although I

1    was not guilty of the charges, I ended up accepting a PTI

2    agreement, pre-trial intervention, to avoid a trial.

3          THE COURT:  Okay.  Is there anything about that

4    experience that would prevent you from being fair and

5    impartial to this?

6          CHAIR NO. 19:  I would like to say I could be

7    impartial, but I have a bias toward law enforcement

8    generally as a result.  I am sorry, I want to be honest.

9          THE COURT:  That is absolutely -- that is all we

10   ask of you.  Okay.

11         CHAIR NO. 19:  Thank you.

12         MR. KIRSCH:  Your Honor, while we are here, can I

13   ask the Court, we will have Peggy Bowdouris from our

14   office operating our computer system.  She is a staff

15   member, but I wanted to make the Court aware of that name

16   to ask the jury about that name, as well.

17         THE COURT:  All right.  Thank you.

18         (The following is had in open court.)

19         CHAIR NO. 23:  I just happen to think my brother,

20   who lives in Texas, may have had some problems with the

21   IRS, but I don't really know any details about it.

22         THE COURT:  And as a result of your not knowing,

23   would that cause you not to be able to be fair and

24   impartial?

25         CHAIR NO. 23:  No.

```
1            THE COURT:  If you remember something as we go on,

2    just come back to it let me know.

3            Anybody else with respect to any criminal

4    convictions?

5            Okay.  Have you or any member of your family ever

6    had an experience with any law enforcement officer that

7    would prevent you from being fair and impartial?

8            Okay.  And you already responded.

9            Anybody else?

10           All right.  Have you or any members of your family

11   ever had any interaction with the United States Attorney's

12   Office, either here in Colorado or elsewhere?  While I am

13   at it, I was informed there will be another member of the

14   U.S. Attorney's Office, Peggy Bowdouris, who will be

15   operating the computers for them.  Does anybody know

16   Ms. Bowdouris?  Nobody?  Okay.

17           CHAIR NO. 5:  Could you define interaction?  Could

18   you define interaction?

19           THE COURT:  Have you met, been introduced.  Is

20   there something that you think you might know her?

21           CHAIR NO. 5:  No, no, no.

22           THE COURT:  With law enforcement?

23           CHAIR NO. 5:  About the interaction with.

24           THE COURT:  If it is anything that you think needs

25   to be disclosed because it might impact whether you can be
```

```
 1    fair and impartial, that we need to know?

 2         CHAIR NO. 28:  Could you repeat?

 3         THE COURT:  Have you or any members of your family

 4    ever had any interaction with the United States Attorney's

 5    Office, either here in Colorado or elsewhere?

 6         CHAIR NO. 28:  It was maybe 10 years ago, my

 7    father, he had gotten his leg cut off in Granby.  They

 8    ended up suing.  They did have it here in this courthouse.

 9         THE COURT:  That would have been a civil case.

10    That probably wouldn't have been with the U.S. Attorney's

11    Office.

12         CHAIR NO. 28:  I wasn't sure.

13         THE COURT:  That would have been a civil case.

14    Would that experience prevent you from being fair and

15    impartial in this case?

16         CHAIR NO. 28:  No.

17         THE COURT:  All right.  Anybody else?  Let's pass

18    the microphone right there.

19         CHAIR NO. 1:  I am not sure if this is pertinent,

20    but I am a professional editor, proofreader for court

21    stenographers for 27 years.  So in terms of viewing

22    countless cases, that has been my encounter.  You know, it

23    has no effect, it is just the experience.  And I am not

24    sure what you are asking.

25         THE COURT:  All right.  You probably read a lot of
```

1    interesting stories, then.  And I will ask you all later

2    to talk to me a little bit more about your experience with

3    legal or your employment.  We will get to that in a bit.

4    All right.  Thank you.

5         All right.  Have you or any member of your family

6    or anyone close to you ever worked in law enforcement?

7    All right.  Let's go ahead and --

8         CHAIR NO. 1:  My brother-in-law is officially

9    retired now from the Arapahoe County.

10         THE COURT:  All right.

11         CHAIR NO. 1:  It's not something that affects my

12    opinions one way or another.

13         THE COURT:  So you could continue to be fair and

14    impartial?

15         CHAIR NO. 1:  Yes.

16         THE COURT:  All right.  Who else?  Pass the

17    microphone down.

18         CHAIR NO. 11:  My best friend is a police officer

19    in Fredrick, Colorado.

20         THE COURT:  Is there anything about his service

21    that would prevent you from being fair and impartial?

22         CHAIR NO. 11:  I don't believe so.

23         THE COURT:  All right.  Thank you.  Who else?

24         CHAIR NO. 13:  My dad is a retired traffic cop from

25    Pueblo.  And I have several cousins down there.

1          THE COURT:  In law enforcement?

2          CHAIR NO. 13:  Uh-huh.

3          THE COURT:  Is there anything about their service

4   in law enforcement that would prevent you from being fair

5   and impartial to both sides?

6          CHAIR NO. 13:  No.

7          THE COURT:  Who else?

8          CHAIR NO. 14:  My brother-in-law is a police

9   officer.

10          THE COURT:  Is there anything about his being a

11   police officer that would prevent you from being fair and

12   impartial?

13          CHAIR NO. 14:  No, ma'am.

14          THE COURT:  Pass the microphone to the woman in

15   front of you.

16          CHAIR NO. 27:  Growing up, my dad was a constable

17   for Harris County in Houston.  And my cousin is married to

18   a sheriff deputy for Arapahoe County.  And nothing that

19   would prevent me.

20          THE COURT:  All right.

21          CHAIR NO. 19:  I have three cousins in New York;

22   one New York City detective, one New York City patrolman.

23   I don't think that would affect any objectivity on my

24   part.

25          THE COURT:  Thank you.  Anybody else?  Pass the

1    microphone down there.  Row behind you, all of the way to

2    the end.

3          CHAIR NO. 16:  My father is a state cop in

4    Michigan.

5          THE COURT:  Okay.  Would that prevent you from

6    being fair and impartial?

7          CHAIR NO. 16:  No.

8          THE COURT:  All right.  Are you or is anyone in

9    your immediate family employed by the United States

10   Government, state or local government, or federal, state,

11   county or municipal law enforcement agency, other than

12   what you have already told me?  This is your immediate

13   family?

14         If you can pass the microphone.

15         CHAIR NO. 15:  My mother, my oldest brother and

16   myself, we are IT engineers for the Governor's Office,

17   information technology.

18         THE COURT:  Is there anything about that employment

19   that prevents you from being fair and impartial here?

20         CHAIR NO. 15:  No, Your Honor.

21         THE COURT:  All right.  Thank you.  Who else?  Pass

22   the microphone.

23         CHAIR NO. 5:  I work for University of Colorado,

24   but no issues with impartiality.

25         THE COURT:  All right.  Very good.  Pass the

1    microphone all of the way down.

2         CHAIR NO. 28:  Employed by Northern Water in

3    Berthoud, a government agency.

4         THE COURT:  Anything about your employment that

5    would prevent you from being fair and impartial?

6         CHAIR NO. 28:  No.

7         THE COURT:  Anybody else?

8         CHAIR NO. 13:  I work for the Weld County District

9    Attorney's Office as a legal secretary.

10        THE COURT:  Okay.  And would that experience

11   prevent you from being fair and impartial in this case?

12        CHAIR NO. 13:  No.

13        THE COURT:  All right.  Anybody else?  Okay.

14        CHAIR NO. 23:  You are asking if family worked for

15   state or government?

16        THE COURT:  Immediate family.

17        CHAIR NO. 23:  My father worked for the State

18   Highway Department.  He is deceased now.

19        THE COURT:  Is there anything about his employment

20   that would prevent you from being fair and impartial?

21        CHAIR NO. 23:  No.

22        THE COURT:  Anybody else?

23        CHAIR NO. 17:  I work for the University of

24   Colorado Hospital.

25        THE COURT:  Okay.

```
 1            CHAIR NO. 17:  No.

 2            THE COURT:  Wouldn't prevent you from being fair

 3    and impartial.  Okay.

 4            Do any of you have strong feelings, either negative

 5    or positive, about men and woman who have chosen law

 6    enforcement as their profession, including policemen,

 7    sheriff deputy, U.S. Marshal, or FBI agents?  And the

 8    question really is such that it would impact your ability

 9    to be fair and impartial?  Nobody?

10            Okay.  Do any of you know any of the other members

11    of this jury panel, at least before you walked in the door

12    this morning?  Okay.

13            Now, the following are the names of witnesses who

14    may testify during this trial.  Please listen carefully.

15    I will try not to go too fast.  After I finish reading

16    their names, raise your hand if you believe you know any

17    of these prospective witnesses, either socially or

18    professionally.

19            Michael Pryor, with the IRS.  Troy Parker, who is

20    with the IRS.  Christy Morgan, who is with the IRS.

21    William Frankel, who is with -- it is TIGTA, but I don't

22    remember what it stands for.

23            MR. KIRSCH:  Treasury Inspector General for Tax

24    Administration.

25            THE COURT:  If I say TIGTA, that is what it is.
```

```
 1    Stacie Gleeson, who is with the United States District
 2    Court.  Peter Lee, with the Department of Treasury.  Tamie
 3    Lucas, with the IRS.  Mike Gorham, with Wells Fargo.
 4    Howard Beck, with Beck & Cassinis.  David Silverman, with
 5    the Silverman Law Firm.  David Riordan, IRS.  Leland
 6    Deering, IRS.  John Maloney, TCF National Bank.  Mike
 7    Quinn, Chrysler Financial.  Marilyn Alvarez, Colorado
 8    Department of Public Safety.  Toni Payne, FBI.  Brian
 9    Canty, TIGTA.  Paul Danley, TIGTA.  Stacy Ebert, Key Bank.
10    Mario Morales, American Express.  Dulce Marroquin, Bank of
11    America.  Ginger Wray, IRS.  Pam Combe, TIGTA.  Cyndi
12    Wood, First National Bank of Las Animas.  Linda Chavez,
13    Security Service Federal Credit Union.  Annetta Perea, El
14    Paso County DA.  Lynette Cornelius, El Paso County Court.
15    Susan Skovgaard, Credit Systems.  Darcy Emme, First
16    Premiere Bank.  Kelly Hanson, Compass Bank.  Anthony
17    Dillman, Citibank.  Terry Gearhart, Discover Card.
18    Timothy O'Malley, JP Morgan Chase.  Kymberly Johnson,
19    Capital One.  Maureen Green, IRS.  Klaton Knabb, TIGTA.
20    Greg Flynn, IRS.  Kevin Tebedo, I am not sure who with.
21    Renee VonderHaar, FBI.  Jacqueline Siegal, TIGTA.  Peter
22    Hunkar, FBI.  Curtis Morris and Art Kimbrel.
23              Any of those names sound familiar to anybody?
24    Nobody?
25              Okay.  Now, this case was investigated by -- never
```

1     mind.

2          Do any of you believe that the United States is a

3     corporation and not a legitimate Government?

4          All right.  Do any of your families or anyone close

5     to you hold any personal belief that the United States has

6     no authority over its citizens?  Nobody?

7          Have you or anyone in your immediate family ever

8     studied law or had any training or experience in law?  All

9     right.  Let's pass the microphone.

10         CHAIR NO. 10:  My brother is an attorney.

11         THE COURT:  In litigation?

12         CHAIR NO. 10:  In Alabama.

13         THE COURT:  Do you talk to him about his cases?

14         CHAIR NO. 10:  Yes.

15         THE COURT:  Anything about his experience that

16    would prevent you from being fair and impartial?

17         CHAIR NO. 10:  No.

18         THE COURT:  All right.  Pass the microphone to the

19    front row.

20         CHAIR NO. 25:  I am a certified paralegal.  Not

21    currently working.

22         THE COURT:  Did you ever work as a certified

23    paralegal?

24         CHAIR NO. 25:  Not besides my internship.

25         THE COURT:  Is there anything about your experience

1    there that would prevent you from being fair and impartial

2    in this case?

3        CHAIR NO. 25:  No.

4        THE COURT:  All right.  Who else?

5        CHAIR NO. 36:  My daughter is going to college to

6    be a peace officer.

7        THE COURT:  Is there anything about her doing that

8    that would prevent you from being fair and impartial?

9        CHAIR NO. 36:  No.

10       THE COURT:  Pass the microphone down to the end.

11       CHAIR NO. 32:  I work as a paralegal for an

12   attorney, who the bulk of her work, she represents

13   bankruptcy trustees.

14       THE COURT:  Okay.  Anything about that experience

15   that would prevent you from being fair and impartial in

16   this case?

17       CHAIR NO. 32:  I don't think so.

18       THE COURT:  Anybody else?

19       Okay.  Have you or any member of your family or

20   anyone close to you ever been trained or have experience

21   in bookkeeping, accounting, or tax preparation?

22       All right.  Let's go ahead and pass the microphone

23   back down this way.

24       CHAIR NO. 22:  My sister in Iowa, she does all of

25   the bookkeeping, taxes, payroll.

1           THE COURT:  Do you talk to her about what she does

2      there, and would that prevent you from being fair and

3      impartial?

4           CHAIR NO. 22:  No.

5           CHAIR NO. 27:  I have my own business for 7 years.

6      I do bookkeeping and taxes and such.

7           THE COURT:  Anything about that that would prevent

8      you from being fair and impartial in this case?

9           CHAIR NO. 27:  No.

10          CHAIR NO. 23:  I have been an administrative

11     assistant for 25 years or more, and I have done basic

12     bookkeeping and accounting and those things.

13          THE COURT:  Is there anything about that experience

14     that would prevent you from being fair and impartial in

15     this case?

16          CHAIR NO. 23:  No, Your Honor.

17          CHAIR NO. 13:  My mother-in-law prepares taxes.

18     She worked for H & R Block this past tax season.

19          THE COURT:  Anything about her experience that

20     would prevent you from being fair and impartial?

21          CHAIR NO. 13:  No.

22          THE COURT:  All right.

23          CHAIR NO. 12:  I'm an executive director of a

24     non-profit.  So I do bookkeeping, some of the tax forms.

25          THE COURT:  Anything about that experience that

1     would prevent you from being fair and impartial?

2              CHAIR NO. 12:  No.

3              THE COURT:  All right.  Pass the microphone back

4     here.  Right there.

5              CHAIR NO. 4:  My mother is an auditor for a

6     company.

7              THE COURT:  What kind of stuff does she audit?

8              CHAIR NO. 4:  I don't know.

9              THE COURT:  Okay.  The next question, would her

10    experience doing that prevent you from being fair and

11    impartial in this case?

12             CHAIR NO. 4:  No.

13             THE COURT:  All right.  Pass the microphone down.

14             CHAIR NO. 3:  My father-in-law prepares taxes.  And

15    for a time, my husband worked for him doing the

16    bookkeeping.  That was years ago.  I don't think it would

17    affect my impartiality.

18             THE COURT:  All right.  Thank you very much.  Pass

19    the microphone down here.

20             CHAIR NO. 1:  My father was a taxman and beneficial

21    finance manager for many years in Colorado Springs.

22             THE COURT:  Okay.

23             CHAIR NO. 1:  It will not affect my impartiality.

24             THE COURT:  All right.  Thank you very much.

25             Down at the end, I believe did I see a hand down

1    there.

2         CHAIR NO. 30:  I did bookkeeping for a short time

3    for a family practice.

4         THE COURT:  Okay.  Would that experience prevent

5    you from being fair and impartial in this case?

6         CHAIR NO. 30:  No, ma'am.

7         THE COURT:  Anybody else?  All right.  Who here is

8    familiar with or has used or been involved with the use of

9    IRS Form 1099?  I know a couple of you kind of mentioned

10   that.  Okay.  I will not ask you all.  Could you raise

11   your hands so we can see.  Okay.

12        So you have a familiarity with what that form is

13   for.  Okay.  You will be hearing some about 1099s in this

14   case, so that may be helpful to you.

15        Unless the Government wants me to ask any further

16   questions on that, I will let it go at that.

17        MR. KIRSCH:  No, thank you, Your Honor.

18        THE COURT:  Okay.  Have any of you ever served as a

19   juror in a prior case?  Okay.  We can hand the microphone.

20   You have it.

21        CHAIR NO. 1:  I have served on four juries.

22        THE COURT:  Oh, my.

23        CHAIR NO. 1:  Two in Adams County.  Two in

24   Jefferson County.

25        THE COURT:  All right.  How long ago were those?

1          CHAIR NO. 1:  Last one, 9 years.

2          THE COURT:  So it has been awhile.  Do you remember

3     if those were civil or criminal cases?

4          CHAIR NO. 1:  One civil, three criminal.

5          THE COURT:  Okay.  Were you the foreperson in any

6     of those cases?

7          CHAIR NO. 1:  No, Your Honor.

8          THE COURT:  On the criminal cases, do you remember

9     what the verdict was?

10          CHAIR NO. 1:  All were convicted.

11          THE COURT:  All were guilty.  Is there anything

12     about those experiences that would prevent you from being

13     fair and impartial in this case?

14          CHAIR NO. 1:  No, Your Honor.

15          THE COURT:  All right.  Who else?  We can pass the

16     microphone down the row.

17          CHAIR NO. 12:  I was a juror in 1985 in Aspen for a

18     drunk driving case.

19          THE COURT:  Okay.  And were you the foreperson?

20          CHAIR NO. 12:  No.

21          THE COURT:  Do you recall the verdict?

22          CHAIR NO. 12:  Yes.  Not guilty.

23          THE COURT:  Not guilty.  Okay.  Anything about that

24     experience that would prevent you from being fair and

25     impartial in this case?

```
 1            CHAIR NO. 12:  No.

 2            THE COURT:  All right.

 3            CHAIR NO. 16:  Three trials.  I have served on a

 4   jury for three trials.

 5            THE COURT:  Civil or criminal?

 6            CHAIR NO. 16:  All criminal.

 7            THE COURT:  How long ago were those?

 8            CHAIR NO. 16:  The most recent one was 5 or 6 years

 9   ago.

10            THE COURT:  Were you the foreperson in any of those

11   trials?

12            CHAIR NO. 16:  Yes.

13            THE COURT:  And how many of them?

14            CHAIR NO. 16:  One.

15            THE COURT:  Do you recall the verdicts that were

16   rendered?

17            CHAIR NO. 16:  They were all found guilty.

18            THE COURT:  They were all guilty.  Is there

19   anything about that experience that would prevent you from

20   being fair and impartial?

21            CHAIR NO. 16:  No.

22            THE COURT:  All right.  Thank you.  Who else?

23            CHAIR NO. 23:  I served on a jury several years

24   ago, maybe 8.  I was not a foreperson.  We came back with

25   a guilty verdict.
```

1              THE COURT:  Okay.

2              CHAIR NO. 23:  It wouldn't make me impartial.

3              THE COURT:  Do you remember what the charges were?

4              CHAIR NO. 23:  Prostitution.

5              THE COURT:  Prostitution.  There is nothing about

6       that experience that would prevent you from being fair and

7       impartial?

8              CHAIR NO. 23:  No.

9              CHAIR NO. 22:  I was on a jury about 7 or 8 years

10      ago.  I believe it was a civil case.  It was a car

11      accident.  He was found guilty.

12             THE COURT:  Liable?

13             CHAIR NO. 22:  Liable.  I was not the foreperson.

14             THE COURT:  Anything about that experience that

15      would prevent you from being fair and impartial in this

16      case?

17             CHAIR NO. 22:  No.

18             THE COURT:  Pass the microphone down.

19             CHAIR NO. 20:  I was on a jury on a gambling case 7

20      or 8 years ago.  Verdict was guilty.  And I was not the

21      foreperson.

22             THE COURT:  Okay.

23             CHAIR NO. 20:  I don't think it will affect me.

24             THE COURT:  Very good.  Anybody else?

25             All right.  Have you or any members of your

```
 1    immediate family, other than what you have already told me
 2    about the DUIs, otherwise been involved in a criminal case
 3    as a victim, a witness, or otherwise?
 4         Okay.  Pass the microphone down.  You have it
 5    there.
 6         CHAIR NO. 20:  My husband was convicted when he was
 7    like 26 of a drug charge.  I wasn't married to him then.
 8    I don't know the details.
 9         THE COURT:  Okay.  Is there anything about that
10    experience that would prevent you from being fair and
11    impartial?
12         CHAIR NO. 20:  No.
13         THE COURT:  Okay.  Pass the microphone down.
14         CHAIR NO. 23:  My brother has a felony conviction.
15         THE COURT:  Okay.  How long ago was that?
16         CHAIR NO. 23:  Maybe 20 years ago.
17         THE COURT:  Okay.  May I ask, if it is not too
18    embarrassing, what the felony is for?
19         CHAIR NO. 23:  I would rather speak privately.
20         THE COURT:  Does the Government need to know?
21         CHAIR NO. 23:  He lives in Texas.
22         MR. KIRSCH:  I don't think we do, Your Honor.
23         THE COURT:  Then we are fine.  Anything about his
24    experience that would prevent you from being fair and
25    impartial?
```

1          CHAIR NO. 23:  No, ma'am.

2          THE COURT:  All right.

3          CHAIR NO. 26:  I was a victim in a case of

4     attempted murder; my daughter, me, and one of my daycare

5     providers.

6          THE COURT:  How long ago was that?

7          CHAIR NO. 26:  About 15 years ago.

8          THE COURT:  Did it ever go to trial?

9          CHAIR NO. 26:  We want to trial.  He has life

10    imprisonment.

11         THE COURT:  Did you testify at trial?

12         CHAIR NO. 26:  Yes.

13         THE COURT:  Is there anything about that experience

14    that would prevent you from being fair and impartial in

15    this case?

16         CHAIR NO. 26:  I don't think there is.

17         THE COURT:  All right.  Thank you.

18         Who else?

19         CHAIR NO. 15:  My sister was involved in a violent

20    crime case about 2 years ago.  It would not impair my

21    objectivity.

22         THE COURT:  All right.  Pass the microphone down

23    this way.  You can leave the mic on all of the time.

24         CHAIR NO. 12:  Last year our family was involved in

25    a criminal case.  My daughter was the victim of sexual

1    molestation as a minor.  He was -- he pled guilty and is

2    in prison now.

3            THE COURT:  Anything about that that would prevent

4    you from being fair and impartial in this case?

5            CHAIR NO. 12:  Well, I really liked the prosecutors

6    in that case a lot.  So I sort of feel like I have a bias

7    against defendants right now.  Not the subject matter of

8    the defendants, but I really liked our district attorney

9    in Boulder.

10           THE COURT:  It is a positive experience, but could

11   you be fair and impartial to both sides in this case?

12           CHAIR NO. 12:  I am not sure.  I am not sure.  I

13   think so, but I am not sure.

14           THE COURT:  Okay.  All right.  Who else?  Pass the

15   microphone if front.

16           CHAIR NO. 23:  I am sorry, I was a witness in a

17   trial.

18           THE COURT:  A criminal case?

19           CHAIR NO. 23:  Yes.

20           THE COURT:  How long ago was that?

21           CHAIR NO. 23:  1985.  It was robbery of a local gas

22   station.

23           THE COURT:  Okay.

24           CHAIR NO. 23:  They were found guilty.

25           THE COURT:  Is there anything about that experience

```
 1     that would prevent you from being fair and impartial?

 2            CHAIR NO. 23:  No, ma'am.

 3            THE COURT:  All right.

 4            CHAIR NO. 30:  I was a victim in a case.  May I

 5     speak privately about that?

 6            THE COURT:  You may come forward.

 7            (A bench conference is had.)

 8            CHAIR NO. 30:  It was a domestic abuse case that I

 9     was the victim of.

10            THE COURT:  How long ago was that?

11            CHAIR NO. 30:  That was last year.  Almost a year

12     ago.

13            THE COURT:  What county?

14            CHAIR NO. 30:  Adams County.  I am sorry, Jefferson

15     County.

16            THE COURT:  And is there -- what was the end result

17     of that case?

18            CHAIR NO. 30:  He pled guilty, and he was given a

19     year probation.

20            THE COURT:  Okay.  Is there anything about that

21     experience that would prevent you from being fair and

22     impartial?

23            CHAIR NO. 30:  No.

24            THE COURT:  Anything further?

25            MR. KIRSCH:  No.  Thank you, Your Honor.
```

```
 1              (The following is had in open court.)

 2         THE COURT:  All right.  Anybody else?  Pass the

 3    microphone.

 4         CHAIR NO. 6:  Repeat the question.

 5         THE COURT:  Have you or any member of your

 6    immediate family been involved in a criminal case, whether

 7    as victim, a witness, or otherwise?

 8         CHAIR NO. 22:  I had a sister who was robbed at gun

 9    point.

10         THE COURT:  Okay.

11         CHAIR NO. 22:  It never came to trial.  He was

12    never caught.

13         THE COURT:  They were never caught?

14         CHAIR NO. 22:  Then I have a brother who, I believe

15    he was convicted of several DUIs.  But he is deceased.  I

16    don't know the history of the case.

17         THE COURT:  Any of those experiences prevent you

18    from being fair and impartial?

19         CHAIR NO. 22:  No.

20         THE COURT:  All right.  Anybody else?  Pass the

21    microphone back.

22         CHAIR NO. 13:  My husband and I have been a victim

23    twice.  The first time someone broke into our garage and

24    stole items.  The guy was found guilty.  And the second

25    one is ongoing.  Someone stole batteries from our camper.
```

1          THE COURT:  Have they found out who he was?

2          CHAIR NO. 13:  Yes.  He was arrested.

3          THE COURT:  Anything about those experiences that

4     would prevent you from being fair and impartial?

5          CHAIR NO. 13:  No.

6          THE COURT:  Anybody else?  Okay.

7          CHAIR NO. 12:  Excuse me, Your Honor, I forgot, I

8     have been subpoenaed as a witness in a case associated

9     with that other one, but it is on hold right now, so --

10         THE COURT:  What court is that in?

11         CHAIR NO. 12:  Boulder.  Failure to report the

12    pastor of a church there.

13         THE COURT:  All right.  Anybody else?

14         Okay.  Have any of you or any member of your

15    immediate family been involved in a civil case against

16    anyone, either as a party, an attorney, or a witness?  So

17    civil is where people are suing each other or a

18    corporation or suing each other.  No Government involved,

19    unless they are one of the civil parties.

20         CHAIR NO. 27:  My mother had a car accident.  It

21    was a civil case brought against the insured auto company.

22         THE COURT:  Okay.

23         CHAIR NO. 27:  And that doesn't affect my ability.

24         THE COURT:  How long ago was that?

25         CHAIR NO. 27:  Five years ago.

```
 1              THE COURT:  All right.  Thank you.

 2              CHAIR NO. 22:  I have sister who is an office

 3     manager who fired a person, and they went to litigation

 4     for unemployment.

 5              THE COURT:  Okay.

 6              CHAIR NO. 22:  But other than that.

 7              THE COURT:  That would not affect your ability to

 8     be fair and impartial?

 9              CHAIR NO. 22:  No.

10              THE COURT:  Anybody else?

11              CHAIR NO. 28:  Mine was what I told you when my

12     father got his leg cut.

13              THE COURT:  All right.  How long ago did you say

14     that was?

15              CHAIR NO. 28:  I don't know, 15, maybe 20 years.

16              THE COURT:  Did you play any real role in that?

17              CHAIR NO. 28:  No.

18              THE COURT:  Okay.  Thank you.

19              CHAIR NO. 12:  Can I approach the bench?

20              THE COURT:  Sure.  Come forward.

21              (A bench conference is had.)

22              CHAIR NO. 12:  My daughter sued the church, and it

23     is civil.

24              THE COURT:  Still ongoing?

25              CHAIR NO. 12:  It settled.
```

```
 1              THE COURT:  All right.  And I was just -- want to
 2     make clear on the record, you kind of said, I am not sure
 3     I can be fair and impartial.  I need to push you on that.
 4     Because the defendants aren't here, I will make sure I
 5     protect their rights, as well.  Do you think you could be
 6     fair and impartial, or do you think I should excuse you?
 7              CHAIR NO. 12:  I think I have a bias against
 8     defendants right now.
 9              THE COURT:  On taxes or anything?
10              CHAIR NO. 12:  Yeah.
11              (The following is had outside the hearing of all
12     prospective jurors.)
13              THE COURT:  All right.  I am going to go ahead and
14     excuse her.
15              MR. KIRSCH:  No objection, Your Honor.
16              THE COURT:  I won't do it right away, but when we
17     get through.  You may take your seat.
18              I am not inclined to seat somebody else.  I don't
19     think we will get through all of these.
20              MR. KIRSCH:  I don't believe we will have that many
21     challenges.  Is the Court is going to attempt to offer the
22     defendants any opportunity to make challenges?
23              THE COURT:  I will.  I will.
24              MR. KIRSCH:  Thank you, Your Honor.
25              (The following is had in open court.)
```

 1          THE COURT:  All right.  The defendants are, by law,

 2    presumed innocent.  Can all of you presume them to be

 3    innocent of all of the charges?  Everybody can do that?

 4    Is there anyone who cannot?

 5          Okay.  The burden is always on the Government, the

 6    prosecution, to prove beyond a reasonable doubt the

 7    defendants' guilt on each count.  And that burden never

 8    shifts to the defendants throughout the trial.  Is there

 9    anyone here who feels that the defendants should have to

10    prove their innocence?  Nobody?

11          The defendant in a criminal matter has the absolute

12    right not to testify.  Because of this, and because of the

13    presumption of innocence, a defendant is never required to

14    testify at trial.  Is there anyone here who would hold it

15    against the defendants if they did not testify at trial?

16    No one?

17          Now, the law also never imposes upon a defendant in

18    a criminal case the burden or duty of calling any

19    witnesses or producing any evidence.  If the defendants

20    decide not to call witnesses or produce any evidence,

21    would that cause any of you to conclude that they are

22    guilty?

23          CHAIR NO. 3:  I just have a question.  I mean --

24          THE COURT:  Can we pass the microphone.

25          CHAIR NO. 3:  I don't know if this really affects

 1    anything, but just the display this morning, I don't know

 2    at what point that weighs into my impartiality.

 3         THE COURT:  Well, and I have warned the defendants

 4    about that.  And they made the choice to go ahead and

 5    proceed.  So, I mean, your decision, if you are chosen as

 6    a juror, is to just take in all of the facts.  You will

 7    have to judge credibility and all of that.  And the way

 8    people behave is a part of that.

 9         CHAIR NO. 3:  Okay.

10         THE COURT:  Okay.  All right.  Pass the microphone

11    down here.

12         CHAIR NO. 27:  This is kind of along those lines.

13    But with discovery -- they left.  I know they made that

14    choice to leave.  But jury selection, do they -- both

15    parties get a chance to eliminate people.  So does that --

16    are they going to be able to have documentation?

17         THE COURT:  I will give them the opportunity.

18    They're next door.  They can hear what is going on.  And I

19    explained to them what would happen if they chose to

20    remove themselves from the courtroom, that is where I

21    would put them.  They could not leave, but they could go

22    next door and wait there and hear what is going on.

23         I will give them the opportunity, if they wish, to

24    come in and participate in the striking process.

25         CHAIR NO. 27:  But no video camera is displaying

1     what is going on?

2          CHAIR NO. 5:  Are they required to sit here through

3     the whole trial?

4          THE COURT:  As you can see, I can't force them to

5     do anything if they don't want to.  If they don't want to

6     participate here, they have the choice to remove

7     themselves.  They can't leave the courtroom.  They can go

8     next door and listen.  All right.

9          All right.  So, my question was, if the defendants

10    decide not to call any witnesses or produce any evidence,

11    would that cause any of you to conclude that they are

12    guilty?  Do you understand the Government has to prove

13    that they are guilty beyond a reasonable doubt?

14         Now, this is a criminal trial.  And it is my duty

15    as the Judge to determine what punishment, if any, may be

16    imposed in the event that you return a guilty verdict.  Do

17    any of you have a problem with the concept that sentencing

18    is left entirely and exclusively up to me as the Judge in

19    the event that you render a conviction?  Nobody has a

20    problem with that?

21         All right.  Your job as jurors will be to determine

22    whether or not the defendant is guilty, each of the

23    defendants is guilty of the crimes charged in the

24    Indictment based on the evidence that is presented.

25         Would you be able to assess the evidence in this

1    case and render a verdict without consideration as to the

2    type of sentence or punishment which ultimately may be

3    imposed as a result of the verdict?  You all can do that?

4    Is there anybody who cannot?

5          All right.  The law requires that you hear the

6    evidence, then base your verdict on the facts as you find

7    them.  In contrast, the law precludes your consideration

8    of factors such as sympathy, prejudice, vengeance,

9    hostility, or other emotions.

10          Is there anyone who feels that he or she cannot put

11   feelings of sympathy, including age, health, religious

12   affiliation, family circumstances or occupation,

13   prejudice, vengeance, hostility or other emotions out of

14   his or her mind in deliberating a verdict in this case?

15   Nobody?

16          Okay.  Do any of you have any religious, moral,

17   ethical, or philosophical reservations about sitting as a

18   juror in a criminal case or passing judgment on another

19   person?  Nobody?

20          If you are selected as a juror in this case, you

21   must have the ability and the willingness to discuss the

22   facts of this case with your fellow jurors during the jury

23   deliberations.  Is there anyone who thinks they cannot do

24   this?  Nobody?

25          If you are a juror in this case, you must have the

1    ability to make your own independent decision about

2    whether the defendant is guilty or not guilty.  Is there

3    anyone who thinks they could not do this?  Nobody?

4        If you are selected as a juror in this case, you

5    will be instructed that if you find that the Government

6    has proven beyond a reasonable doubt every element of each

7    offense with which each defendant is charged, it is your

8    duty to find the defendant guilty of that offense.

9        On the other hand, if you find that the Government

10   has failed to prove any element of any offense beyond a

11   reasonable doubt, you must find the defendant not guilty

12   of that offense.  Is there anyone who has a problem

13   following this instruction?  Nobody?

14       The law requires that the Government must prove

15   each element or each part of every charge beyond a

16   reasonable doubt.  In other words, if the Government only

17   proves a portion of a crime but does not successfully

18   prove to your individual and unanimous satisfaction beyond

19   a reasonable doubt each and every part of the crime

20   charged, as a juror you are obligated under law to find

21   the defendant not guilty.

22       Do any of you disagree with the proposition that

23   the Government must demonstrate the defendants' guilt

24   beyond a reasonable doubt?  That does not mean beyond all

25   doubt or beyond all shadow of a doubt.  And I will give

1    you an instruction on that.  Anybody who couldn't follow

2    that instruction?  Nobody?

3         If the evidence proves beyond a reasonable doubt

4    that the defendants -- that each defendant committed each

5    of the offenses charged, will you follow the law and

6    instructions as explained by me as the Judge even if you

7    disagree with the nature of the offense?  Everybody can do

8    that?

9         All right.  Now, undoubtedly you are going to have

10   to decide which witnesses and evidence to believe.  We

11   judge and determine credibility on a daily basis, whether

12   it involves our children, advertisers, politicians or

13   others.  The attorneys and defendants may have to ask

14   tough questions of the witnesses.  Will any of you hold

15   that against them?  Nobody?

16        Do you understand that you have to withhold

17   consideration and judgment in this case until all of the

18   evidence is in, until I have instructed you on the law,

19   and until closing arguments have been made?  In short, we

20   will make you sit there and wait and wait and wait until I

21   tell you it is okay to go forward.  Does anybody have a

22   problem with that?

23        Okay.  Do any of you have a problem with the

24   concept that you have to follow the law as I instruct you

25   regardless of whether you agree with that law or you

1    understand the rationale for that law?  Anybody who

2    doesn't understand that?

3           All right.  Do any of you -- I am sorry, during

4    deliberations, if you have formed an opinion, would it be

5    difficult for you to keep an open mind and listen to the

6    opinion of others?  Anybody?  Okay.

7           If you come to the -- I am sorry, if a majority of

8    other jurors reached a different conclusion from you after

9    considering all of the evidence, would any of you be more

10   likely to change your opinion to conform to theirs simply

11   because their opinion was in the majority?  Nobody?

12          If you come to the conclusion that the Government

13   has not proven the guilt of the defendants beyond a

14   reasonable doubt, and you found that a majority of the

15   jurors believe that the defendants were guilty, would you

16   change your verdict only because you were in the minority?

17   Nobody?

18          If you conclude that the defendants did something

19   wrong, but that was not the crime charged, would you be

20   capable of disregarding your conclusion and acquitting the

21   defendants because the evidence did not prove them guilty

22   of the crime charged?  Could everybody do that?  Anybody

23   who could not?

24          All right.  Would any of you prefer not to sit as a

25   juror on this case for any reason?

 1          All right.  That is the reason you spoke to us up

 2    here.  All right.  At this point, I am going to go ahead

 3    and excuse you.  Just be sure to call in and check to see

 4    if you have to come back in.

 5          CHAIR NO. 12:  Thank you very much.

 6          THE COURT:  All right.  At this time there will be

 7    on your screens -- if you push your screens, for those of

 8    you in the box, there are going to be questions that come

 9    up.  I need to start with Juror No. 1, or 730.  If you can

10    get the microphone over here.  There you go.  Then, if we

11    can have the microphone -- actually, just leave the

12    microphone on this end, maybe down here.

13          What I need you to do is answer each of those

14    questions on the screen.  We will go in order.  And don't

15    give your address, just what county or city you are from.

16          CHAIR NO. 1:  My number is 730.  I live in

17    Jefferson County, 18 years.  I am a proofreader for court

18    stenography for 30 years.  I am a retired teacher with a

19    degree in English and journalism.

20          I am single.  I have two children; 44 and 39.  One

21    is a teacher, and one is a software engineer.

22          My hobbies are swimming, reading, and bridge.

23          Yes, I would base a verdict on the evidence

24    presented.  I can follow instructions as to the law.  And

25    I have nothing else regarding impartiality.

1            THE COURT:  Okay.  Thank you.

2            CHAIR NO. 2:  I am 463.  I live in Castle Rock.  I

3    have lived there 4-and-a-half years.  Before that I lived

4    in Centennial.

5            I am a retired teacher.  I was an elementary

6    teacher for about 10 years.  My background is I graduated

7    from college.

8            I am married.  And my husband is a retired

9    pharmacist.  And he worked there all of his life as a

10   pharmacist.  I have two children.  And their ages are 39

11   and 43.  My son is in technology, and my daughter is a

12   stay-at-home homemaker.

13           My hobbies are tennis and golf and reading.

14           And I would base my verdict wholly on the evidence

15   presented.  And I would follow any instructions as to the

16   law.  And I don't have any other information that would

17   call attention on my ability to be fair and impartial in

18   this case.

19           THE COURT:  All right.  Thank you.

20           CHAIR NO. 3:  My number is 488.  I live in

21   Westminster.  I have been there for the past 12 years.

22           I am a school teacher.  And I have done that for

23   the past 8 years.  I have my bachelor's degree in

24   elementary education.

25           I am married.  My husband and I belong to a church

 1    founded 10 years ago.  So he is a pastor.  We have three

 2    children, ages 15, 17 and 19.  The 19-year-old is in

 3    college and not working.  That is okay.

 4         I enjoy watching my children do their activities.

 5    That is one of my hobbies.  I also enjoy going to the gym

 6    and wine tasting.  That is good, too.

 7         I would base my verdict wholly on the evidence

 8    presented.  And I am a rules girl, so I would follow

 9    instructions.  I have no other information that I would

10    like to call attention to here.

11         THE COURT:  All right.  Thank you.

12         CHAIR NO. 4:  I am Juror 895.  I currently reside

13    in Wash Park, and I have lived there for 13 months.

14    Before that I lived in the City Park area.  And I lived

15    there for a year.  Before that I was in the Highlands.  I

16    have lived in Denver for only about 4 years.  Originally

17    from St. Louis, Missouri.

18         I currently work at a brokerage firm.  I've worked

19    there for 8 years.  I attended the University of Missouri,

20    Columbia.  Bachelor's degree in finance.

21         I am not married.  Single.  Do not have any

22    children.

23         Hobbies would include football, baseball, exercise.

24         I would to question 7.  Yes, I would be able to

25    base the verdict wholly on the evidence presented.  I

 1   would follow the instructions as to the law.  And I do not

 2   have any other information to call to your attention.

 3            THE COURT:  Thank you.

 4            CHAIR NO. 5:  Juror 889.  Castle Rock.  I have been

 5   there for 6 years.

 6            I am a librarian for 6 years.  I have a master's

 7   degree.

 8            I am married.  My wife is a librarian at the

 9   University of the Rockies.  We don't have children.  We

10   have two cats.

11            I enjoy video games, sports, recreational things,

12   exercise.

13            Yes, to Questions 7 and 8.  And, no, I wouldn't

14   have any other information that would bear on my ability

15   to be fair in this case.

16            CHAIR NO. 6:  I am Juror 124.  I reside in

17   Centennial, 7 years.

18            Right now I am working for Littleton Adventist

19   Hospital as a janitor, basically.  Did that for a year

20   now.  Retired from the Postal Service, mail carrying for

21   the last 33 years.  High school education.

22            Married.  I am married.  She is not employed.  She

23   works hard at home.  And, let's see.  Got one daughter.

24   She is 10 years old.

25            Hobbies are basically drawing, reading, walking,

1    hiking, a little bike riding, and watching sports.

2         Question 7, I would do my best.  And Question 8, of

3    course, I would.  And Question 9, no other information,

4    no.

5         THE COURT:  Thank you.

6         CHAIR NO. 7:  My Juror No. is 129.  I live in

7    Littleton.  I have lived there the past 8 years.

8         I am a materials engineering technician.  My

9    education is just high school background.

10        I am married.  My wife works for a medical and

11   billing and coding company.  She has only worked there for

12   6 months now.   I have one child, he is 9 years old.

13        My hobbies are basketball, football, baseball; all

14   sports, basically.

15        I would base my evidence wholly -- base my verdict

16   wholly on the evidence presented.  And would follow any

17   instructions of the law.  And no further information.

18        THE COURT:  All right.  Thank you.

19        CHAIR NO. 8:  I am No. 433.  I live in Denver.  I

20   have lived there for 10 years.

21        I am a department chair for the School of Pharmacy

22   at Regis School of Pharmacy in Denver.  I have been there

23   about 7 years.  I am a doctor of pharmacy.  Professional

24   doctor.

25        I am not married.  I have three kids; 28, 27 and

1    25.   Two are in school at college, and one is in the Air

2    Force.

3          I like anything outside; biking, hiking, running,

4    those sorts of things.

5          Yes, I would base my verdict wholly on the evidence

6    presented and would follow the instructions of the law.

7    And I don't have any other information.

8          THE COURT:  All right.  Pass the microphone, we

9    will start there coming this way.

10         CHAIR NO. 16:  No. 152.  I live in Park Hill,

11   Denver.  Been there 32 years.

12         I am a register nurse for 21 years.  I have a

13   bachelor's degree.

14         I am married.  My wife is a retired elementary

15   music school teacher.  She still does subbing and singing

16   with several paid groups.  No children.

17         Travel, outdoor activities of all kinds, reading.

18         I would base my verdict on the evidence.  I would

19   follow the instructions.  And no other information.

20         CHAIR NO. 15:  Juror 400.  I am currently in

21   Westminster.  Before that I lived in Denver.  And before

22   that, a long time in Centennial, Colorado.

23         My occupation, I am a software engineer.  I have

24   worked in that field for about 6 years.  Educational

25   background, no higher than high school.

 1          Not married.  No children.

 2          Hobbies:  Music production, mountain biking.

 3          I would base my verdict wholly on evidence

 4   presented and follow instructions as to the law.  And no

 5   further information.

 6          THE COURT:  Thank you.

 7          CHAIR NO. 14:  I am Juror 107.  I live in

 8   Johnstown.  We've lived there 6 years.

 9          I am a registered nurse, just under 3 years.

10   Associate's degree.

11          I am married.  My spouse works in water

12   immunization for his group.  I believe he's worked there 8

13   years.  I have one daughter, she is 13.

14          I enjoy reading and paddle boarding.

15          I would base my verdict wholly on the evidence

16   presented, and I would follow instructions as to the law,

17   and I don't have any other information.

18          CHAIR NO. 13:  I am No. 418.  I live in Evans, and

19   I have lived there for 10 years.

20          I am a legal secretary with the Weld County

21   District Attorney's Office.  And I have a bachelor's

22   degree.

23          I am married.  My husband works a welding company.

24   He has been there for 10 years.  We have no children.

25          I like to read, watch sports, do 5Ks.

1      Yes, I would base my verdict on the evidence

2   presented, and I would follow any instructions as to the

3   law, and I have no other information that would affect my

4   ability to be fair and impartial.

5      CHAIR NO. 11:  I am No. 882.  I live in Firestone,

6   Colorado.  We have lived there for the last 7 years now.

7      My occupation is territory sales manager.  I have

8   been doing that last 7 years.  My educational background

9   is high school education with some college.

10      I am married.  And I have been married the last 20

11   years.  She is an operations' manager for Public Services.

12   She has been there the last 3 years.  I have three

13   children.  My son is 12.  My daughters are 15 and 17.  My

14   oldest is employed with Carbon Valley Rec Center.  And she

15   is more or less front desk.

16      Hobbies:  I am a competitive baseball coach.  I

17   love to play golf, softball, and any activity my kids are

18   doing.

19      I would base my verdict wholly on the evidence

20   presented.  And I will follow the instructions as to the

21   law.  I do not have any further information.

22      THE COURT:  Thank you.

23      CHAIR NO. 10:  616.  I've lived in Littleton for 8

24   years.

25      I work for a hospital.  Last 3 months in health

1    benefits, advising people what their insurance would pay.

2    I have high school, nurse's training, and some college.

3        Not married.  I have a daughter, she is 29.  She is

4    employed in a Cherry Creek hair salon.

5        I like to watch movies.  Shop.

6        I would base my verdict on the evidence presented.

7    And I would be happy to follow instructions.  And nothing

8    else to add.

9        THE COURT:  All right.  Thank you.

10       CHAIR NO. 9:  I am 432.  I live in Aurora,

11   Colorado.  I have lived there 2 years.  Before that I

12   lived in Denver.

13       I do data analytics for a health care networking

14   company.  I have been in IT for 8 years now.  I have my

15   bachelor's degree in business management.

16       I am not married.  I don't have any children.

17       I like a lot of fitness-related things and riding

18   motorcycles and snowboarding.

19       I would base my verdict wholly on the evidence.  I

20   will also follow all of the instructions to the law.  And

21   that's it.

22       THE COURT:  Thank you.

23       CHAIR NO. 17:  I am No. 367.  I live in Denver.  I

24   have lived there for 3 years now.  Before then I lived in

25   Golden.

1          I work at the University of Colorado Hospital as a

2     scrub tech and also as a medical technician.  Worked in

3     that field for about 5 years.  I have my bachelor's

4     degree.

5          Not married.  No kids.

6          Skiing and snowboarding, and biking in the summer

7     are my hobbies.

8          To 7, yes.  8, yes.  And 9, no, I don't have any

9     additional information.

10         CHAIR NO. 18:  I am lucky No. 666.  I live in

11    Parker.  I've lived there about 6 years.

12         I work in human resources.  I've worked in human

13    resources for about 8 years.  I have a master's degree.

14         I am married.  My husband is a mechanical engineer.

15    I have one daughter, she will be 2 years old in January.

16         Hobbies include camping and hiking.

17         Yes, I would base my verdict on the evidence

18    presented.  And, yes, I would follow instructions.  And I

19    don't have any other information.

20         CHAIR NO. 19:  No. 776.  I live in boulder.  Been

21    there a little over 3 years.  In Douglas County prior to

22    that.

23         Currently employed as network engineer for Wells

24    Fargo.  I have been there for 6 years.  Been an engineer

25    for 25 years.  Electrical engineering degree.

1          My spouse works for a company called NOA in

2     Lafayette.  She is a project manager.  She actually

3     started today, so she's worked there about 3 hours.  No

4     children.

5          Bicycling racing, Nordic back country skiing for

6     hobbies.

7          Yes, to 7.  Yes, to 8.  Nothing other than what we

8     discussed for 9.

9          CHAIR NO. 20:  No. 580.  I've lived in Jefferson

10    County for over 30 years.

11         I am a registered nurse.  I am project director.  I

12    have been project director for the last 2 years.  In

13    project management for software implementation in

14    hospitals for documentation and billing for the last 21

15    years.  I have a master's degree in oncology nursing,

16    bachelor's in nursing.

17         I am married.  I have -- my spouse just quit in

18    August to be a stay-at-home dad and to start his own

19    business.  He is a massage instructor.  And he is going to

20    teach massage, hot stone massage.  I have two children.

21    The oldest is my adopted daughter, she is 18.  She works

22    in a fast food restaurant somewhere in Mississippi.  And

23    we have a 7-year-old.  She is, of course, in school.

24         My hobbies are gardening, reading, and anything the

25    kids want to do.

1          Yes, I would listen to the evidence and follow

2     instructions.  And I don't have anything else that would

3     make me impartial.

4          CHAIR NO. 21:  I am 766.  I live in Weld County.

5     Been there about 6 years.

6          I work at a tobacco shop.  I have been there 2

7     years.  High school would be my educational background.

8          I am not married.  I have two kids.  I have a

9     19-month-old baby and a baby on the way.

10         Hobbies would be hanging out with my baby girl.

11    Football.

12         I would base the verdict on the evidence.  I can

13    follow instructions to the law.  I do not have any other

14    information.

15         CHAIR NO. 22:  I am 318.  Lived in Aurora,

16    Colorado, for the last 20 years.

17         I work as an administrative assistant.  I have been

18    there for the last 10 years.  I have an associate of arts

19    degree.

20         I have never been married.  I have no children.  I

21    have been a foster parent for 6 years previously.

22         My hobbies are cooking, working out, volunteering.

23         Yes, I would base my verdict wholly on the

24    evidence.  And I would follow the law -- the instructions

25    as to the law.  And I have no other information.

1          CHAIR NO. 23:  My Juror No. is 343.  I reside south

2     of Parker.  We have lived there 9 years.

3          I am currently a receptionist at an engineering

4     firm.  I actually started there the end of March.

5     Previously I was at home for 8 years and home schooled

6     three of those.  And before that, 25 years as an

7     administrative assistant in various positions.  I have a

8     high school education and a couple years of college.  No

9     degree.

10          I am married.  My spouse is employed at the same

11     engineering consulting firm that I am employed at.  He is

12     a civil structural engineer.  He has been with them about

13     27 years.  We I have two children, and together we have

14     one.  My oldest boy is 35, he works at Rocky Mountain

15     Harley Davidson as a service rider.  My middle son is 33,

16     he works at a UPS store off of Colorado Boulevard.  My

17     17-year-old works at a UPS store in Castle Rock.

18          My hobbies are scrapbooking, reading, hiking.

19          For No. 7, I would say yes.  And 8, yes.  And, 9,

20     no.

21          CHAIR NO. 24:  I am Juror 989.  I live in Fort

22     Collins now.  I have been there 4 years.  Before that I

23     lived in Boulder for almost 30 years.

24          I am a retired college professor.  I was on faculty

25     at Metropolitan State University, Denver, for about 20

1    years.  I have a doctorate, Ph.D. in philosophy.

2            I am not married.  I don't have children.

3            I spend my time, hobbies, I belong to a couple of

4    book clubs.  Most of the other is outdoor recreation,

5    cycling, in particular, hiking.  And then staying fit

6    enough to do those things.

7            Yes, to 7 and 8.  And, no, for other information.

8            THE COURT:  All right.  Thank you.

9            CHAIR NO. 25:  My Juror No. Is 275.  I have resided

10   in Arapahoe County for the last 13 years.

11           I have been in human resources.  I have worked in

12   human resources for the past 3 years.  Worked with my

13   company for the past 12.  So I have done various jobs

14   throughout the company.  I have an associate's degree and

15   a paralegal certificate.

16           I am married.  My wife is disabled.  She has three

17   autoimmune diseases.  So she stays at home.  I have three

18   stepchildren and two biological children; 20, 16, 14, 9

19   and 4.

20           My hobbies are, I am a music artist here in Denver,

21   Colorado.  I love sports and anything that my children are

22   doing, I have to take them to, so --

23           I would base my verdict on the evidence presented.

24   I would follow the instructions of the law.  And I do not

25   have any further information.

           1              CHAIR NO. 26:  My number is 59.  I reside in
           2      Arvada.  I have lived there for 40 years.
           3              I am retired.  But before that I did day care.  I
           4      have education in K-12 and 3 years of college.
           5              I am divorced.  I have three children; ages 51, she
           6      is going to college to be a police officer.  She works at
           7      7-Eleven.  The two younger ones work at the same business,
           8      which makes your water bottles.
           9              Hobbies:  I make crafts, cooking, gardening.
          10              With respect to 7 and 8, I would do my level best
          11      for the presented evidence and follow the law.  And, no, I
          12      have no further information.
          13              THE COURT:  All right.  Thank you.
          14              CHAIR NO. 27:  I am Juror 823.  I've resided in
          15      Arapahoe County the last 10 years.
          16              This past year I worked as a contract employee.
          17      Prior to that I had my own business for 6 or 7 years.  My
          18      educational background, I have a degree in mass
          19      communication.
          20              I am married.  My husband works for DaVita.  And I
          21      have two children, ages 12 and 9.
          22              And I enjoy obviously being a soccer mom, dance
          23      mom, volleyball, photography, et cetera.
          24              And I would base my verdict wholly on the evidence
          25      presented.  And I do follow instructions, just ask my

1    husband.  We built a shed this weekend.  I followed the
2    instructions to a tee.  He did not.  The shed still
3    stands.
4            I do not have any other information to add.
5            THE COURT:  Thank you.
6            CHAIR NO. 27:  My new number is 131.  I reside in
7    Larimer County, west of Loveland.  I've lived there 39
8    years.
9            My occupation, worked at Northern Colorado Water
10   Conservancy District.  Worked as a cattle rancher.  Got my
11   own -- we have our own ranch, about 350 head of cattle.
12   We raise and put up hay.  Educational background is just
13   high school education.
14           I am married.  My spouse is employed at Longmont
15   Community Hospital.  And she has been there for probably 6
16   years, I am guessing.  And I do have children.  I got twin
17   boys that are 12, and a girl that is 8.  And they are not
18   employed.
19           Our hobbies:  We enjoy hunting, team roping.  I
20   haul the kids to the rodeos.  I enjoy watching them.
21           And I would base the verdict wholly on the evidence
22   and would follow the instructions.  And I don't have
23   anything further.  Thank you very much.
24           CHAIR NO. 29:  My number is 934.  I reside in
25   Longmont, Colorado.  I have been there about 24 years.

1        I work in a grocery retail sales shop right now.  I

2   have been there a little over 7 years.  I am going to

3   college or in college right now.  Pursuing my associate of

4   arts.  Eventually hoping to transfer to a 4 year.

5        I am not married.  I have no kids.

6        I like watching sports and reading, when the time

7   permits it.

8        I would base my verdict wholly on the evidence.  I

9   would follow the instructions as to the law.  And I do not

10  have any other information.

11       THE COURT:  Thank you.

12       CHAIR NO. 30:  I am Juror 537.  I've resided in

13  Jefferson County for the past 7 years.

14       I work as a medical coder and dealer.  I have done

15  that 6 years.  Past 3 years in Boulder Community Health.

16  Educational background is high school, with some college.

17       I am married.  My spouse works for Xcel Energy.

18  And he's worked there about 3 years.  I have two children,

19  and they are 4 and 6 years old.

20       My hobbies are running, hiking, reading, watching

21  my sons play sports.

22       I would base the verdict wholly on the evidence

23  presented.  I would follow instructions as to the law.

24  And I do not have any other information.

25       THE COURT:  Thank you.

1          CHAIR NO. 31:  I am No. 70.  I have lived in

2     Aurora, Colorado, for 41 years.

3          Currently I am attending college, went back to

4     school.  Prior to that I worked for 14 years for a

5     financial company, Mutual Fund.  As I said, I am currently

6     trying to get my associate's.

7          I am divorced.  I have one child, who is 18.  And

8     he is employed with Tokyo Joe's, also attending college.

9          My hobbies are snow sports, camping, rafting,

10    reading, martial arts.

11         And, yes, to 7.  Yes, to 8.  And, no, I don't have

12    any other information.

13         THE COURT:  Thank you very much.

14         CHAIR NO. 32:  I am Juror No. 816.  I live in Park

15    Hill.  Have lived there for 30 years.

16         I am a paralegal, and currently have been in this

17    position 8 years.  And was a paralegal prior to children.

18    And I have a BA and paralegal certificate.

19         I am married.  My husband is an asset manager for a

20    bank, and has been with them for 7 years.  I have two

21    children; 25 and 21.  The 25 year old is in grad school.

22    And the 21 year old is an under grad.  So both still on

23    the parent payroll.

24         And I enjoy yoga, exercising reading, traveling,

25    and trying new restaurants.

1        And I would definitely try to base my verdict

2    wholly on the evidence presented and follow the Judge's

3    instructions as to the law.  And I do not have any other

4    information to add.

5        THE COURT:  All right.  Thank you very much.

6        All right.  Have each of you heard and understood

7    everything I have said to you and everything I have asked

8    of you here today?

9        All right.  Do any of you need an opportunity to

10   change, modify, supplement or amend any answer you had

11   previously given?  Nobody?

12       Do any of you have any matter that you would like

13   to take up outside of the hearing of the other prospective

14   jurors?  Nobody?

15       Now, if you rendered a verdict right now, do you

16   understand that it would have to be not guilty, because

17   you have heard no evidence in this case?  Everybody

18   understands that?

19       If selected, can you and will you, to the best of

20   your ability, render a fair and impartial verdict based

21   solely on the evidence presented in this courtroom and the

22   law I instruct you on after the end of the evidence?  All

23   of you can do that?

24       All right.  We have been sitting for quite awhile,

25   and we need to take a break.  I need to talk to the

 1    defendants and see if they wish to participate in the

 2    selection.  So it may be a longer than 15-minute break.  I

 3    apologize for that.  But I would like to get those of you

 4    who aren't going to serve out before the lunch hour, so I

 5    don't want to break too long.

 6         We will take probably a 20-minute break, but it may

 7    be a bit longer.  Please bear with me.  You cannot talk to

 8    each other about this case or anything.  I know it will be

 9    hard because you just sat here.  We will lock the doors so

10    only the defendants and the Government and I can talk

11    about some matters in here.

12         Then we will bring you back in and go through what

13    we call the jury selection process, the peremptory

14    challenges, where each side is allowed to strike a certain

15    number of you for any reason whatsoever.

16         Actually, before I do that, I should have asked the

17    Government, do you have any challenges for cause?

18         MR. KIRSCH:  We do have one challenge for cause.  I

19    also have three proposed follow-up questions.

20         THE COURT:  All right.  I am sorry.  I apologize.

21    I jumped the gun on this.  Please approach.

22         (A bench conference is had.)

23         MR. KIRSCH:  Your Honor, our challenge for cause

24    would be to Juror No. 776.  He is the person who indicated

25    that he had been beaten by the police, and he indicated --

1    I thought he indicated that he thought he would be biased

2    against law enforcement witnesses as a result of that

3    experience.

4           THE COURT:  Okay.

5           MR. KIRSCH:  The questions are directed -- one

6    directed to him.

7           THE COURT:  Do you want to go ahead and ask the

8    questions?

9           MR. KIRSCH:  I would be happy to do that.

10          THE COURT:  Why don't I let you go ahead and do

11   that so we can move it through, and then I am inclined --

12   do you want to do a follow-up?  I think he said he thought

13   he could be fair and impartial, but he wasn't sure.  And

14   he is so far down the list, I don't know if we will get to

15   him.

16          MR. KIRSCH:  I can do that real quickly if that is

17   all right with the Court.

18          THE COURT:  All right.  I will let you do very

19   brief follow up.

20          MR. KIRSCH:  Yes, Your Honor.

21          (The following is had in open court.)

22          THE COURT:  The Government has a few questions they

23   would wish to ask, just follow up, where I didn't go deep

24   enough in the answers you gave me.

25          Mr. Kirsch, you may proceed.

1          MR. KIRSCH:  Thank you, Your Honor.

2                **VOIR DIRE EXAMINATION**

3    **BY MR. KIRSCH:**

4          First, Juror No. 776, you indicated, I think, that

5    you were currently employed by Wells Fargo as a network

6    engineer?

7          CHAIR NO. 19:  That's correct.

8          MR. KIRSCH:  It is likely you will hear testimony

9    from an employee of Wells Fargo about some documents

10   related to Wells Fargo.

11         CHAIR NO. 19:  I heard the name.

12         MR. KIRSCH:  Do you know that person?

13         CHAIR NO. 19:  I don't know the name.

14         MR. KIRSCH:  Would the fact that Wells Fargo is

15   somehow at issue in this case, would that present any

16   problem for you with respect to being fair and impartial?

17         CHAIR NO. 19:  I don't believe it would.

18         MR. KIRSCH:  Without going into any details, I want

19   to go back to the conversation that we had at the bench

20   earlier.  Did you indicate that as a result of the

21   experience that you described there, do you think you

22   would have any bias with respect to witnesses from law

23   enforcement agencies who would be testifying?

24         CHAIR NO. 19:  Based on my experience, potentially,

25   yes.

1            MR. KIRSCH:  Do you think that you would be able to

2     evaluate the testimony of law enforcement witnesses in the

3     same way and with the same fairness and impartiality that

4     you could the testimony of other witnesses?

5            CHAIR NO. 19:  I would do my best.  Honestly, you

6     can't tell what your sub conscience is doing.  But I

7     believe consciously I would make my best effort to do so

8     and be impartial.

9            MR. KIRSCH:  All right.  Thank you.

10           And then Juror No. 400, could you just explain a

11     little bit more?  You mentioned something called the Venus

12     Project, if I did understand that correctly.  Can you

13     explain a little bit more about what that project or the

14     Zeitgeist Movement, what you mentioned those are about.

15           CHAIR NO. 15:  So the Venus Project is a research

16     center in Venus, Florida.  I volunteer for that research

17     facility.  The research is conducted in socioeconomics,

18     sociopolitical research, technology specialty.  And the

19     right arm of the Venus project is Zeitgeist.  They're much

20     more engaged with the political realm.  They have annual,

21     you know, Z days, they call them.

22           Essentially they, you know, they're peaceful

23     protests for things that many people in the movement

24     apparently feel are worth contesting.  But I feel that my

25     objectivity is a little bit, you know -- I guess what I

1    would say is I can recognize a cognitive bias within the

2    movement.  And I feel I am -- I do not aline fully with

3    all of their, you know, ideologies.  I don't think it

4    would be an issue personally.

5         MR. KIRSCH:  Could you give an example of the kinds

6    of things that that movement might protest?

7         CHAIR NO. 15:  Yes.  Definitely one of the more

8    prevalent topics they contest is the monetary system,

9    itself, global in and of itself.  You know, our research

10   from the Venus Project, we are coming up with forecasts

11   for the future.  So all of the protests are, you know, I

12   guess, precautionary.  And most have been peaceful, as far

13   as any perception I have had of the protest, itself.

14        MR. KIRSCH:  Thank you, sir.

15        Your Honor, I had one question for the entire

16   panel, if I might.  Also probably unnecessary, but I just

17   wanted to ask whether all of you felt that even if the

18   defendants were to chose to remain outside of the

19   courtroom for the entire duration of the proceedings,

20   would any of you have a problem still understanding that

21   your verdict had to be based solely on the evidence

22   presented in the courtroom here, without regard to whether

23   or not the defendants were in the courtroom or out of the

24   courtroom or some combination thereafter throughout the

25   trial.  Thank you.

1        Thank you, Your Honor, I appreciate the

2   opportunity.

3        THE COURT:  All right.  We are going to now take a

4   probably 15, maybe 20, 25 minute break.  As I mentioned,

5   you cannot talk to each other about this case, although

6   you don't know a whole lot about it.  There are bathrooms

7   out there.  I will let you back in when we are ready to

8   proceed.

9        Hopefully I can have you out of here shortly after

10  noon if you are not going to be on the jury.  If you are

11  on the jury, I will let you go for lunch, and then we will

12  reconvene this afternoon.  So the jury is excused.

13       I am sorry, those of you, the two back there, I

14  appreciate your attentiveness here.  You are free to

15  leave.  I won't need you for the jury.  So you can go

16  ahead and leave.  The rest of you do have to come back

17  until we do the jury selection.

18       I am going to go ahead and take a break.  When they

19  bring the defendants back in, you can call me back in.

20       MR. KIRSCH:  Can we go ahead and take our break

21  quickly?

22       THE COURT:  If you want to use the restrooms back

23  this way so you are not with the jurors, you are perfectly

24  fine, we will let you in and out.

25       MR. KIRSCH:  Thank you, Your Honor.

1          (A break is taken from 11:18 a.m. to 11:36 a.m.)

2          (The following is had in open court, outside the

3    hearing and presence of the prospective jurors.)

4          THE COURT:  You may be seated.

5          All right.  Back in session.

6          We have conducted the questioning of the jurors.

7    The Court will note for the record that the defendants,

8    Brokaw, Pawelski, and Vigil are back in the courtroom

9    after having walked out and being taken to the holding

10   cell next door.

11         Now, Mr. Brokaw, Mr. Pawelski and Ms. Vigil, in

12   prior court proceedings, you all have insisted I terminate

13   your appointed counsel and allow you to proceed pro se.

14   Because you have the right to waive the assistance of an

15   attorney and represent yourself, following a full colloquy

16   under Farretta v. California, I did allow you to proceed

17   pro se.

18         I did not appoint you stand-by counsel because you

19   indicated you did not want stand-by counsel.  Mr. Pawelski

20   was the only one who wanted counsel.  He only wanted

21   advisory counsel.  I did appoint him advisory counsel, but

22   this morning -- last week he chose to file a motion, and

23   this morning I granted his motion to dismiss advisory

24   counsel.

25         Now, right after we brought the jury in this

1    morning, you all three chose to voluntarily absent

2    yourselves from this trial proceeding.  You attempted to

3    walk out the courtroom doors.

4

5

6         DEFENDANT VIGIL:  I was under duress.  I take

7    exception.  That was under duress.

8         THE COURT:  Ms. Vigil, you can have your say at the

9    end when I finish, but do not interrupt me again.

10        You chose to walk out the door.  I told you to --

11   you could not leave the courtroom, so you were taken to

12   the holding cell next door.  You can hear next door.  I

13   had told you that before, but you cannot see what is going

14   on in this courtroom.

15        Now, we are now at the stage in jury selection

16   where you would be able to strike 11 jurors for any

17   reason.  I hope you have changed your mind and you intend

18   to participate in this trial.  My question to you is, do

19   you want to participate in the peremptory challenges of

20   the jurors, yes or no?

21

22

23        DEFENDANT VIGIL:  I do not consent to the jury

24   trial in the first place.

25        THE COURT:  All right.  So that is a no.

1

2

3          DEFENDANT VIGIL:  I wish to be compensated for a

4    hundred thousand dollars in redemption.

5          THE COURT:  Mr. Brokaw?

6          DEFENDANT BROKAW:  I do not consent to a jury

7    trial.

8          THE COURT:  You do not wish to participate in jury

9    selection?

10          DEFENDANT BROKAW:  I do not consent to be surety

11    for the trust.

12          THE COURT:  All right.  Mr. Pawelski?

13          DEFENDANT PAWELSKI:  I do not consent to any type

14    of trial, whether it be jury or by the judge.  I am not

15    the surety for the artificial person.  You are the

16    trustee.  You have the power and the ability to settle and

17    close this matter.

18          THE COURT:  Now, do you want to be present in the

19    courtroom for the trial, or do you wish to continue to be

20    held in the holding cell next door?

21          DEFENDANT PAWELSKI:  I do not consent to be

22    anywhere in this courtroom.

23          THE COURT:  Are you going to be disruptive in this

24    trial as you were when the jury was brought in?

25          DEFENDANT BROKAW:  You have the right, Judge, as

1    trustee, to resolve this matter and dismiss it right now.

2          THE COURT:  Do you understand that by refusing to

3    participate in trial, there is going to be no one to

4    present or argue your side during the entire trial?  There

5    was no one present to represent you during jury selection,

6    although I did all of the questioning with the exception

7    of some minor matters that Mr. Kirsch asked of the jury.

8          I am giving you the opportunity now to participate

9    in the peremptory challenges for this jury.  You are

10   indicating to me you do not wish to participate in that.

11   There is going to be no one to call witnesses for you, to

12   question witnesses against you, or to present evidence on

13   your own behalf.

14         I am not sure what you want to do with respect to

15   whether you intend to testify, but if you are absent from

16   the trial, that is not going to happen, either.  There is

17   going to be no one to object to the evidence submitted by

18   the Government.  There is going to be no one to provide

19   your objections on the jury instructions that I am going

20   to give to the jury.  There is not going to be anyone who

21   is going to be making closing argument on your behalf or

22   to object to any improper argument by the prosecutor.  And

23   there is no one here to ensure any errors committed during

24   trial are properly preserved for appellate review later by

25   a higher court.

 1          So do you understand the dangers and disadvantages

 2    of your refusing to participate in this trial?

 3          DEFENDANT BROKAW:  I don't understand why I am

 4    here, because I don't consent to it.

 5

 6

 7          DEFENDANT VIGIL:  We do not understand or stand

 8    under this Court's jurisdiction.

 9          THE COURT:  I understand that is your position.

10    You know my position.  I have ruled on those matters.  Are

11    you continuing to refuse to participate in this trial?

12

13

14          DEFENDANT VIGIL:  I do not consent.  I do not

15    consent to be the surety for the artificial person.

16          DEFENDANT BROKAW:  I do not consent to be the

17    surety for the artificial person, either.

18          DEFENDANT PAWELSKI:  I do not consent to be surety

19    for the artificial person.

20          THE COURT:  The Court recognizes a criminal

21    defendant who has completely invoked the right to appear

22    pro se may mount a defense consisting of nothing more than

23    a protest against the Court's legitimacy and refusal to

24    attend trial, and he has no Sixth Amendment right to be

25    protected from the prejudice that may result.

```
1          Clark v. Perez, 510 F.3d 382, Second Circuit 2008,

2    also United States v. Lawrence 161 F.3d 250, Fourth

3    Circuit, 1998.  There are a number of other cases.  In

4    McKaskle v. Wiggins, 465 U.S. 168, 1984, the United States

5    Supreme Court stated that "participation by stand-by

6    counsel without the defendant's consent should not be

7    allowed to destroy the jury's perception that the

8    defendant is representing himself."

9          Also in Faretta, 422 U.S., at 820, the Supreme

10   Court stated that "the language and spirit of the Sixth

11   Amendment contemplates that counsel, like the other

12   defense tools guaranteed by the amendment, shall be an aid

13   to a willing defendant, not an organ of the state

14   interposed between an unwilling defendant and his right to

15   defend himself personally."

16          These defendants have the right to represent

17   themselves in light of their decision to refuse to

18   participate in this trial, and they have previously

19   adamantly refused to allow this Court to appoint any

20   counsel to represent them.  And the Court is reluctant to

21   act on its own in a way that is contrary to the wishes of

22   these defendants.

23          The Second Circuit has stated that "just as the

24   district court should not compel a defendant to accept a

25   lawyer she does not want, they should not interfere with
```

1    the defendant's chosen method of defense."  Torres v.

2    United States, 140 F.3d 392, 1998.

3           Similarly, the Fourth Circuit has held that a

4    defendant who represents himself and is present at the

5    beginning and end of his trial can be permitted to absent

6    himself voluntarily from trial during the period between

7    the calling of the case and the return of the verdict.

8    United States v. Lawrence, 161 F.3d 250, Fourth Circuit,

9    1998.

10          In Lawrence, the Court stated that "because the

11   defendant was present at the beginning of his trial and

12   voluntarily absented himself, there is no error" in

13   allowing him to be absent.

14          Now, I guess I will ask you one more time, are you

15   all certain that you want to continue to refuse to

16   participate in this trial?

17          DEFENDANT PAWELSKI:  I take exception to any type

18   of trial, any type of hearing here in this building.  You

19   are the trustee.  You have the power to do the settlement

20   of this case.

21          DEFENDANT BROKAW:  Likewise, I take exception to a

22   trial and any hearing in this building.  And as trustee,

23   you have the power and the authority to dispose of this

24   case right now, Judge.

25

1

2          DEFENDANT VIGIL:  I also take exception.  I am the

3    beneficiary of the trust and I am appointing you as the

4    trustee to settle and close this case.

5          THE COURT:  All right.  The defendants have each

6    previously knowingly and voluntarily exercised their

7    respective rights under the case of <u>Faretta</u> and its

8    progeny to represent themselves in these proceedings.  The

9    defendants are each now asserting their right not to

10   participate in this trial and refusing to allow this Court

11   to have them in this trial.

12         The Court has made inquiry of the defendants

13   regarding their refusals, and has advised the defendants

14   of the risks and limitations of refusing to participate in

15   this trial.  The Court finds that the defendants;

16   Mr. Brokaw, Mr. Pawelski, and Ms. Vigil, have knowingly,

17   voluntarily, and intelligently waived -- intentionally

18   waived their respective rights under the United States

19   Constitution to be present during this trial and have

20   knowingly -- I am sorry strike that.

21         Now, do you wish to remain in the courtroom or do

22   you wish --

23         DEFENDANT BROKAW:  I take exception to your last

24   remark there, Judge.  I have not knowingly waived any of

25   my constitutionally-protected and God-given rights.  I

```
1    have not knowingly ever waived any of those.  That is my
2    defense in this whole process.
3              THE COURT:  All right.
4
5
6              DEFENDANT VIGIL:  I take exception also.
7              THE COURT:  You waive your rights under the
8    Constitution to be present in this trial?
9
10
11             DEFENDANT VIGIL:  We have not waived any unlienable
12   rights.
13             THE COURT:  Inalienable?
14
15
16             DEFENDANT VIGIL:  Unlienable.
17             THE COURT:  Do you all wish to remain in the
18   courtroom, or do wish to be held in the holding cell next
19   door?
20             DEFENDANT BROKAW:  I don't consent to either.
21
22
23             DEFENDANT VIGIL:  I don't consent to either one.
24             THE COURT:  Are you going to be respectful and not
25   disruptive of the court proceedings going forward?
```

1          DEFENDANT BROKAW:  Judge, we came in here honorable

2     today, and we intend to remain that way.

3          THE COURT:  All right.  So do you wish to remain in

4     the courtroom or not?

5          DEFENDANT BROKAW:  I think we need to discuss that

6     and take it under advisement.

7          THE COURT:  All right.  You may.

8          DEFENDANT BROKAW:  You mean right now?

9          THE COURT:  Yes, because I have to bring the jury

10    back in so we can proceed.  So you all may discuss it if

11    you wish.

12         DEFENDANT BROKAW:  I don't wish to participate in

13    the jury instruction.

14

15

16         DEFENDANT VIGIL:  I need to make a phone call.

17         THE COURT:  We're not making phone calls right now.

18    We are in the middle of trial.

19         So, Mr. Brokaw has indicated he doesn't wish to

20    participate in the jury selection process; is that

21    correct?

22         DEFENDANT BROKAW:  That's correct.  I do not

23    consent.

24         THE COURT:  Mr. Pawelski, what is your --

25         DEFENDANT PAWELSKI:  I do not consent to any jury

```
 1    trial or process in this building.
 2            THE COURT:  Ms. Vigil?
 3

 4

 5            DEFENDANT VIGIL:  I do not consent to any type of
 6    trial, jury trial or any trial.
 7            THE COURT:  Mr. Brokaw has indicated he does not
 8    want to participate.  Do you want to participate or be in
 9    the cell next door?
10            DEFENDANT BROKAW:  Are you asking me?
11            THE COURT:  You have already responded, Mr. Brokaw.
12    Mr. Pawelski?
13            DEFENDANT PAWELSKI:  What was my choice?
14            THE COURT:  Your choice was do you wish to sit in
15    the courtroom and participate or sit in the courtroom and
16    not participate or go to the holding cell next door?
17            DEFENDANT PAWELSKI:  I do not consent to either
18    one.  I consent that I should leave and go home, me and
19    the defendants.
20            THE COURT:  You are not going to be allowed to go
21    home.  We are -- you have to remain here at the courthouse
22    during your trial.
23            DEFENDANT PAWELSKI:  If I am not participating,
24    what is the difference whether I am here or not?
25            THE COURT:  You need to be here.
```

119

1        DEFENDANT PAWELSKI:  I need to be here.  I see.

2

3

4        DEFENDANT VIGIL:  The defendant needs to be here?

5   We are not consenting to the surety.

6        THE COURT:  I understand that is your position,

7   Ms. Vigil.  The question is, will you be quiet and

8   respectful as we go through this process?  Because I don't

9   want to have you removed in front of the jurors because

10   that is not going to help you at all.

11        If you are not going to be quiet and respectful, it

12   is better probably for you not to be in the courtroom,

13   because I don't want to have the jurors seeing you walk

14   out the way they did this morning.  It is not helping your

15   case.  That is what I am trying to decide is whether you

16   should remain here or whether you want to go into the

17   holding cell.

18        (Off-the-record discussion had.)

19        DEFENDANT BROKAW:  Judge, I don't seen how I can

20   participate.  I don't consent to participating in this

21   trial.

22        THE COURT:  I understand you don't want to

23   participate.  I have had other defendants who didn't

24   participate who sat at counsel table quietly and not

25   disruptively.  I have had other defendants who have asked

```
 1    to be removed and said they did not want to be in the

 2    room, they went into the holding cell.  Those are

 3    essentially your two choices.

 4         DEFENDANT BROKAW:  I don't consent to either, so I

 5    don't know what to.

 6         THE COURT:  So my question is, are you going to be

 7    quiet and respectful or disruptive?

 8         DEFENDANT PAWELSKI:  I believe we have been

 9    respectful all day.

10         THE COURT:  Except for interrupting the Court while

11    it is trying to do the voir dire.  If you wish to remain,

12    then I ask you to be seated.  We will bring the jury in.

13    We will do the selection process.  You can do your

14    strikes, or you can just ignore the form.

15         DEFENDANT BROKAW:  I don't consent to be present.

16         THE COURT:  All right.  You do not wish to be

17    present?

18         DEFENDANT PAWELSKI:  I can't see any real good

19    reason to be present either.

20         THE COURT:  All right.  Ms. Vigil?

21

22

23         DEFENDANT VIGIL:  I do not consent to be present

24    either, then.

25         THE COURT:  So then we will put you again next door
```

1    in the holding cell.  I am also going, because I have

2    concern now that these defendants, because they don't wish

3    to be here, are a flight risk.  I am going to, at the end

4    of the trial, remand them downstairs to the duty

5    magistrate judge for a detention hearing, because I think

6    their detention hearing has to be reconsidered based on

7    their positions in this court today.

8         So if the marshals would please escort them to the

9    holding cell.  I do want to remind you, if you ever decide

10   you want to come back and participate in this trial,

11   Mr. Brokaw, Mr. Pawelski, Ms. Vigil, all you have to do is

12   let the deputy marshals know that you want to participate

13   and I will allow you to come back into the courtroom.

14        (The defendants are removed from the courtroom.)

15        All right.  Ms. Hartmann, would you please bring

16   back in the jury.

17        MR. KIRSCH:  Your Honor, while she is getting the

18   jury, can I ask, does the Court intend to recess earlier

19   today in order to allow the detention hearing?

20        THE COURT:  We will probably recess about 4

21   o'clock.

22        MR. KIRSCH:  Thank you, Your Honor.

23        (The following is had in open court, in the hearing

24   and presence of the prospective jurors.)

25        THE COURT:  All right.  Welcome back, ladies and

1   gentlemen.  I am sorry we had to keep you so long.

2          We are at the stage where each party is allowed to

3   exercise what we call peremptory challenges, which are

4   essentially challenges to jurors.  Essentially, we call it

5   a strike list.  They will strike you for any reason they

6   believe they need to strike you.

7          This is the method that the law has established for

8   jury selection to ensure that both sides have an

9   opportunity to actually participate in the jury selection.

10          Now, the defendants have chosen to voluntarily not

11   participate in this selection, so they are not going to be

12   taking part in this.

13          If you are excused from here, don't feel that

14   somehow your honesty or integrity is being questioned, it

15   is not.  We are just trying to get the best jury for this

16   trial.

17          So, at this time, Ms. Hartmann, would you please

18   pass the strike sheet to the Government.  And we'll note

19   that the defendants are absent from this portion of jury

20   selection.

21          All right.  Ladies and gentlemen, if I read your

22   number, that means that you will be serving on this jury

23   today and for the next couple of weeks, at least.  If you

24   do not hear your number, that means you will not be

25   serving on this jury, and I want to thank you for your

```
 1     time this morning.

 2           Do they need to call in, also?

 3           COURTROOM DEPUTY:  They do need to call in.

 4           THE COURT:  You need to continue to check to

 5     monitor whether you are going to be on another jury.  If

 6     you have notepads or anything, leave them on your chair,

 7     and then you are free to leave for the rest of the day.

 8           And the other jurors, if I call your number, that

 9     means you need to be here, remain, and I will give you

10     instructions, then I will let you go to lunch.  So these

11     are the jurors who will be serving.  Juror No. 463, 488,

12     895, 889, 124, 129, 433, 432, 616, 882, 418, 107, 152, and

13     367, you will be our jurors serving on this jury.

14           The rest of you may leave with my thanks, and you

15     can go ahead and find your way out.

16           CHAIR NO. 10:  Can I ask a question?  If I

17     weren't -- if I do jury duty with you, I won't have any

18     money.  I am an hourly-paid person.

19           THE COURT:  That is what I asked at the very

20     beginning, if there was an undue hardship.  I am sorry.

21     All right.  Sorry about that, that is what we asked about,

22     hardship, at the beginning.

23           CHAIR NO. 10:  I didn't think about financial

24     hardship.

25           THE COURT:  All right.  At this time, would the
```

1     jurors please stand.

2          Ms. Hartmann, would you administer the oath to the

3     jury.

4          COURTROOM DEPUTY:  Please raise your right hand.

5          (The jury panel is sworn.)

6          THE COURT:  All right.  You may be seated.  I am

7     going to read you one preliminary instruction that is

8     about how you need to comport yourself during the course

9     of this trial.

10          To ensure fairness, you must obey the following

11     rules.  First, do not talk to each other about this case

12     or about anyone involved with this case until the end of

13     the trial when you go to the jury room to decide your

14     verdict.  This rule applies even when the Court is not in

15     session and when there is a recess of the trial.

16          Second, do not talk to anyone else about this case

17     or about anyone involved with this case until the trial

18     has ended and you have been discharged as jurors.  Anyone

19     else includes members of your family and your friends.

20          You can tell anyone who needs to know, such as

21     family members, employers, employees, teachers, et cetera,

22     that you are a juror in a case and the judge has ordered

23     you not to discuss the case until you have been discharged

24     from the case.

25          Three, outside the courtroom do not let anyone tell

1   you anything about the case or about anyone involved with

2   the case until the trial has ended.  If someone should try

3   to talk to you about the case during the trial, please

4   report it to Ms. Hartmann immediately.

5        Four, during the trial, you should not talk with or

6   speak to any of the parties, lawyers, or witnesses

7   involved in this case.  You should not even pass the time

8   of day with any of them.  It is important not only that

9   you do justice in this case, but that you also give the

10  appearance of doing justice.

11       If any lawyer, party, or witness does not speak to

12  you when you pass in the hall, ride the elevator, or the

13  like, remember, it is because they are not supposed to

14  talk or visit with you, either.

15       Fifth, during the course of the trial, you will

16  receive all of the evidence you legally may consider to

17  try the case that and you may consider to decide the case.

18  You, as jurors, must decide this case based solely on the

19  evidence presented here within the four walls of this

20  courtroom.  This means that during the trial you must not

21  conduct any independent research about this case, the

22  matters in the case, and the individuals involved in the

23  case, including the lawyers, the parties, and the

24  witnesses.

25       In other words, you should not consult dictionaries

 1    or reference materials, search the internet, websites,

 2    blogs, or use any other electronic tools to obtain

 3    information about this case or to help you decide the

 4    case.  Please do not try to find out information from any

 5    source outside the confines of this courtroom.

 6           As I told you, until you retire to deliberate, you

 7    may not discuss this case with anyone, even your fellow

 8    jurors.  After you retire to deliberate, you may begin

 9    discussing the case with your fellow jurors, but you

10    cannot discuss the case with anyone else until you have

11    returned a verdict and the case is at an end.

12           I hope that for all of you this case will be

13    interesting and noteworthy.

14           I know that many of you use cell phones,

15    Blackberries, the internet and other tools of technology.

16    You may not, under any circumstances, have your cell

17    phones, Blackberries, iPhones or the like on when court is

18    in session or while you are deliberating.

19           You also must not talk to anyone about this case or

20    use these tools to communicate electronically with anyone

21    about the case.  This includes your family and friends.

22    You may not communicate with anyone about this case on

23    your cell phone, through e-mail, Blackberry, iPhone, text

24    messaging, Twitter, blogs, websites, or through any

25    internet chatroom or by way of any other social networking

1    like Facebook, My Space, Linkedin, and You Tube.

2         Researching or gathering any information on your

3    own that you think might be helpful is against the law and

4    would be a violation of your oath.

5         Violation of this instruction could cause a

6    mistrial, meaning all of our efforts over the course of

7    the trial would have been wasted, and we would have to

8    start all over again with a new trial before a new jury.

9         If you were to cause a mistrial by violating this

10   order, you could be subject to paying all of the costs of

11   these proceedings, and you could also be punished for

12   contempt of court.

13        Now, I wish I didn't have to dwell on this, but we

14   had, a few years back, a juror who violated this order,

15   and we had to declare a mistrial because she looked up

16   some maps on the internet that were not part of the

17   evidence that were here, and she was subject to having to

18   pay the fines, pay the costs, which was not an

19   insignificant amount.

20        Her action compromised a year-long investigation

21   and prosecution, violated the defendant's right to know

22   and confront all of the evidence against him, and wasted

23   all of the time that the Court, the attorneys, and the

24   witnesses and the fellow jurors had committed to that

25   case.

1        So fairness to all requires that all of us

2    connected with this case deal with the information and

3    nothing other than the information produced in this

4    courtroom.

5        Sixth, do not decide during the trial what the

6    verdict should be.  Keep an open mind throughout the

7    trial, including your conclusion, only after you have gone

8    to the jury room to decide the case and you and your

9    fellow jurors have discussed all of the evidence.

10       Seventh, if you need to tell me something, simply

11   give a note to Ms. Hartmann, and she will give it to me.

12       With that being said, I am going to excuse you for

13   lunch.  If you wish to go across the street, there is the

14   999 building right as you walk out of the courthouse.  In

15   there is a Quizno's, a Baja Fresh, a couple other

16   restaurants.  There is a Starbucks.  And if you walk a

17   couple blocks up the street to 16th Street Mall, there are

18   restaurants all up and down there.

19       I would like you to be back by 1:15.  So you have a

20   little more -- well, we have to do 1:30 because

21   Ms. Hartmann, before you leave, she will take you back to

22   or jury deliberation room, she will give you some

23   instructions, she will give you passes so you can come

24   back through the doors and into the jury deliberation

25   room.  So that will take about 10 minutes.  So I will give

1    you until 1:30 for lunch.

2           So we will see you back at 1:30.  Court will be in

3    recess.

4           (Lunch is taken from 12:46 p.m. to 1:21 p.m.)

5           (The following is had in open court, outside the

6    hearing and presence of the jury.)

7           THE COURT:  Okay.  Back on the record.  I am sorry,

8    you may be seated.  Juror No. 161 -- I am sorry, 616, as

9    you may recall at the end of selection, said I can't sit

10   here for three weeks because I support my family.  We have

11   two alternates.

12          I don't think -- if this case is not going to take

13   three weeks, we need to have two alternates.  I would be

14   inclined to let her go.  She is really upset about being

15   here.  I don't know why she didn't mention that before.

16   But I wanted to make sure there was no objection by the

17   Government.  I am inclined to go ahead and excuse her.

18          MR. KIRSCH:  We talked about that, as well, Your

19   Honor.  We don't have any objection to that.

20          THE COURT:  Ms. Hartmann, can you tell her she is

21   excused.  She has to report back because she should be in

22   the pool with everybody else.

23          COURTROOM DEPUTY:  The other issue, Your Honor,

24   about the juror being approached.

25          THE COURT:  We also have a problem with one of the

```
 1    jurors being approached by the woman who is sitting in the

 2    back with whom they left their stuff.  Apparently the

 3    juror was approached and asked if he was an excused juror.

 4    He said, I can't talk to you.  And that apparently was the

 5    extent of the conversation.

 6          COURTROOM DEPUTY:  Yes, Your Honor.

 7          THE COURT:  So my inclination in proceeding is if

 8    they show up again, I am going to address them on that.

 9          MR. KIRSCH:  That is fine with the Government, Your

10    Honor.  Thank you.

11          THE COURT:  All right.  I will make it clear that

12    even people who are associated with the defendants also

13    cannot approach the jurors.

14          MR. KIRSCH:  And I don't -- I can't envision any

15    way in which that contact could prejudice the jurors

16    against the defendants, either, Your Honor.

17          THE COURT:  All right.  And we still don't have all

18    of our jurors back yet?

19          COURTROOM DEPUTY:  I will to double check, Your

20    Honor.

21          THE COURT:  All right.  Why don't you go ahead.

22          MR. KIRSCH:  Your Honor, we have done a little bit

23    of rearranging.  I think we will have witnesses to get us

24    at least until 3:30 today.

25          THE COURT:  Actually, we will probably then recess
```

 1    at the end of whenever your witnesses are done.

 2        MR. KIRSCH:  Thank you, Your Honor.

 3        THE COURT:  Before we bring the jury in, I want to

 4    address an issue that came to my attention after lunch.

 5        Ma'am, could you step to the podium, please.  It

 6    was reported to me by a juror after -- when I excused them

 7    for lunch, that you approached one of them and tried to

 8    talk to them about the case.  Would you state your name

 9    for the record, please.

10        SPECTATOR:  Debra Brokaw.

11        THE COURT:  You are Mr. Brokaw's wife?

12        SPECTATOR:  Yes, I am.

13        THE COURT:  Any order to not communicate to the

14    jurors extends to you, as well, as one of the relatives of

15    the defendants.  So I just want to let you know that what

16    you did was improper.  Fortunately the juror reported to

17    me that he told you he could not talk to you.  And so I

18    wanted to just let you know that you cannot approach the

19    jurors in the future, and if you do, you will be in

20    violation of my order, and I will have to take further

21    action.

22        SPECTATOR:  Can I speak to that?

23        THE COURT:  You may.

24        SPECTATOR:  I can't see very well from here.  I

25    thought he was one of the jurors that was excused.

```
 1          THE COURT:  You have no authority or right to
 2   approach any of the jurors who are on this panel today.
 3          Spectator:  He wasn't a juror if he was excused.
 4          THE COURT:  He was on the panel today.  So you
 5   cannot be approaching the jurors.  If you do, you will be
 6   in violation of my order.
 7          SPECTATOR:  I will not approach the jurors.  Like I
 8   said, I thought he was someone who was excused.  He said
 9   something I had a mutual interest in, and I had a
10   question.
11          THE COURT:  You cannot talk to the jurors about
12   anything.  All right.  You may be seated.
13          All right.  Before we bring in the jury, I just
14   want to note that the defendants remain absent.  They have
15   been advised that if they wish to re-enter the courtroom
16   and participate in their trial, they are free do so at any
17   time.  They need to let one of the deputy marshals or
18   court security officers know and I will allow them to do
19   that.
20          All right.  Would you please bring in the jury.
21          (The following is had in open court, in the hearing
22   and presence of the jury.)
23          THE COURT:  All right.  You may be seated.
24          Welcome back, ladies and gentlemen.  Hope you had a
25   good lunch.  I need to read you one additional preliminary
```

1    instruction that will tell you a little bit more about how

2    this case will proceed, then we will begin the trial.

3           Preliminary Instruction No. 2, the trial

4    proceedings.  We are about to begin the trial of the case

5    you heard about during jury selection.  Before the trial

6    begins, I am going to give you these instructions that

7    will help you to understand what will be presented to you

8    and how you should conduct yourself during the trial.

9           During the trial you will hear me use a few terms

10   that you may not have heard before.  Let me briefly

11   explain some of the most common to you.  The party who

12   sues -- oops, I apologize, I have the wrong script in

13   front of me.  I apologize for that.  I put the wrong one

14   in here.

15          All right.  Sorry about that.  Strike everything I

16   said up to this point, members of the jury.

17          At the end of the trial, I will give you detailed

18   guidance on the law and about how you will go about to

19   reach your decision.  Now, I want to simply describe how

20   the trial will proceed.  This criminal case has been

21   brought by the United States Government.  I will sometimes

22   refer to the Government as the prosecution.

23          The Government is assisted, or the Government is

24   represented by Assistant United States Attorneys

25   Mr. Matthew Kirsch and Ms. Martha Paluch.  The defendants,

1    as I mentioned, are representing themselves.

2         By a First Superseding Indictment, the Grand Jury

3    has charged defendants Brokaw, Pawelski, and Vigil with

4    the following offenses:  First, each defendant is charged

5    with one count of conspiracy to file false claims for a

6    refund, in violation of 18 United States Code Section 286.

7         Second, each defendant is charged with one or more

8    counts of filing a false claim or claims for refund, in

9    violation of 18 United States Code Section 287.

10        Third, each defendant is charged with one count of

11   conspiracy to corruptly endeavor to obstruct or impede the

12   due administration of the internal revenue laws, in

13   violation of 18 United States Code Section 371.

14        Fourth, each defendant is charged with one count of

15   corruptly endeavoring to obstruct or impede the due

16   administration of the internal revenue laws, in violation

17   of 26 United States Code Section 7212(a).

18        To these charges, defendants Brokaw, Pawelski, and

19   Vigil have entered not guilty pleas.

20        The Indictment is simply the description of the

21   charge made by the Government against the defendants.  It

22   is not evidence of guilt or anything else.  Defendants

23   Brokaw, Pawelski, and Vigil have pleaded not guilty and

24   are presumed innocent.

25        Defendants Brokaw, Pawelski, and Vigil may not be

135

 1   found guilty by you unless all 12 of you unanimously find

 2   that the Government has proved his or her guilt beyond a

 3   reasonable doubt.

 4          Now, there are 13 of you, so you might be wondering

 5   how that works.  I think at the beginning I told you that

 6   one of you at the end of this trial will be the alternate,

 7   and that alternate will not participate.  We don't know

 8   who that will be, but I need you here in the event

 9   somebody else gets sick or can't make it, we need to have

10   12 jurors minimum.  All right.

11          Now, the first step in the trial will be the

12   opening statements.  The Government, in its opening

13   statement, will tell you about the evidence which it

14   intends to put before you.  Just as the Indictment is not

15   evidence, neither is the opening statement.  Its purpose

16   is only to help you understand what the evidence will be.

17   It is the roadmap to show you what is ahead.

18          After the Government's opening statement, the

19   defendants could make an opening statement or they could

20   wait until the end of the presentation of the Government's

21   case before they make an opening statement.  At this time,

22   the defendants have chosen not to participate.

23          Evidence will be presented from you -- I am sorry,

24   evidence will be presented from which you will have to

25   determine the facts.  The evidence will consist of the

 1    testimony of the witnesses, documents, and other things

 2    received into the record as exhibits, and any facts about

 3    which the lawyers agree or to which they stipulate.  In

 4    this case, it will be the lawyers or parties agree or to

 5    which they stipulate.

 6         The Government will offer its evidence.  After the

 7    Government's evidence, the defendants may present

 8    evidence, but they are not required to do so.  I will

 9    remind you that the defendants are presumed innocent, and

10    it is the Government that must prove the defendants' guilt

11    beyond a reasonable doubt on each of the counts.

12         If the defendants submit evidence, the Government

13    may introduce rebuttal evidence.  At times during the

14    trial, a lawyer or a defendant may make an objection to a

15    question asked by another lawyer or defendant or to an

16    answer by a witness.  This simply means that the lawyer or

17    party is requesting that I make a decision on a particular

18    rule of law.

19         Do not draw any conclusion from such objections or

20    from my ruling on those objections.  If I sustain an

21    objection to a question, the witness may not answer it.

22    Do not attempt to guess what the answer might have been if

23    I allowed the answer.  If I overrule the objection, treat

24    the answer as any other.  If I tell you not to consider a

25    particular statement, you may not refer to that statement

1    in your later deliberations.  Similarly, if I tell you to

2    consider a particular piece of evidence for a specific

3    purpose, you may consider it only for that purpose.

4         During the course of the trial, I may have to

5    interrupt the proceedings to confer with the attorneys or

6    the parties about the rules of law that should apply.

7    Sometimes we will talk briefly at the bench, as we did in

8    voir dire.  But some of these conferences might take more

9    time, so I will excuse you from the courtroom.

10         I will try to avoid those interruptions whenever

11    possible, but please be patient, even if the trial seems

12    to be moving slowly, because conferences often actually

13    save time in the end.

14         You are to consider all of the evidence received in

15    this trial.  It will be up to you to decide what evidence

16    to believe and how much of any witness' testimony to

17    accept or reject.

18         After you have heard all of the evidence on both

19    sides, I will instruct you on the rules of law that you

20    are to use in reaching your verdict, and then the

21    Government and the defendants will each be given time for

22    their final arguments.

23         The court reporter, Ms. Martinez, is making

24    stenographic notes of everything that is said.  This is

25    basically to assist on any appeals.  A typewritten copy of

 1    this testimony will not be available to you to use during

 2    your deliberations, so you have -- do they have pads to

 3    take notes?

 4         COURTROOM DEPUTY:  They are back in the jury room,

 5    Your Honor.

 6         THE COURT:  When we finish opening statements, I

 7    will allow you to get the notebooks.  You are allowed to

 8    take notes, if you want to.  You are not required to do

 9    so.  And we will provide you with pen and pad to do that.

10         On the other hand, you are not required to take

11    notes if you prefer not to do so.  Each of you needs to

12    make your own decision on whether or not to take notes.

13         If you decide to take notes, be careful not to get

14    so involved in the note taking that you become distracted

15    from the proceedings, because your notes should only be

16    used as memory aides.  You should not give your notes

17    precedence over your independent recollection of the

18    evidence.  And if you do not take notes, you should rely

19    upon your own independent recollection of the proceedings

20    and you should not be unduly influenced by the notes of

21    the other jurors.

22         Notes are not entitled to any greater weight than

23    the memory or impression of each juror as to what the

24    testimony may have been.  Whether you take notes or not,

25    each of you must form and express your own opinion as to

1     the facts of this case.

2           As I instructed you immediately after you were

3     sworn in as jurors, during the course of the trial you

4     should not talk with any witnesses or with the defendants

5     or with any of the other lawyers at all.

6           In addition, during the course of the trial, you

7     should not talk about the trial with anyone else.  Also,

8     you should not discuss this case among yourselves until I

9     have instructed you on the law and you have gone to the

10    jury room to make your decision at the end of the trial.

11          It is important that you wait until all of the

12    evidence is received and you have heard my instruction on

13    the controlling rules of law before you deliberate among

14    yourself.  In addition, as I instructed you immediately

15    after you were sworn in as jurors, you will receive all of

16    the evidence you may consider to decide this case,

17    including any exhibits admitted into evidence.

18          Because of this, you should not attempt to gather

19    any information on your own that you think might be

20    helpful.  Do not engage in any outside reading on this

21    case.  Do not attempt to visit any places mentioned in the

22    case.  And do not in any other way try to learn about the

23    case outside the courtroom.  This includes electronic

24    research.  You are not to Google or do any other type of

25    computer or electronic research.

1        Now that the trial has be begun, you must not hear

2   or read about it in the media.  The reason for this is

3   your decision in this case must be made solely on the

4   evidence presented at the trial.

5        With that introduction, Ms. Paluch, you may present

6   your opening statement on behalf of the Government.

7        MS. PALUCH:  Thank you, Your Honor.

8                         **OPENING STATEMENT**

9   **BY MS. PALUCH:**

10       Members of the jury, for over 4 years the

11  defendants tried to get out of paying money that they owed

12  to the Government, and they tried to get money they were

13  not entitled to.  That is what this case boils down to.

14  The defendants' attempts to cheat the Government

15       They tried to avoid paying what they owed by

16  submitting to the Internal Revenue Service and to the

17  Department of Treasury worthless bonds and other fake

18  documents that they created attempting to pay their tax

19  debt.

20       They tried to get money they were not entitled to

21  by filing false tax returns, claiming they were entitled

22  to refunds in the amounts of hundreds of thousands, and

23  even millions of dollars.

24       They ignored repeated warnings from the IRS that

25  they needed to pay their taxes and stop filing false tax

 1    returns.  The defendants also submitted documents intended

 2    to influence and intimidate IRS employees.

 3         The defendants would not stop their obstructive and

 4    abusive conduct, and that is why we are here in this

 5    courtroom today.

 6         There are two sets of counts in this case.  One set

 7    charges George Brokaw, John Pawelski, and Mimi Vigil,

 8    along with a woman named Clara Mueller, with conspiring or

 9    agreeing with each other to obstruct the administration of

10    the issue revenue laws.  And they did this by filing the

11    false bonds and other false documents, trying to wipe out

12    their tax debt.

13         They also attempted to harass and intimidate te IRS

14    and other Department of Treasury officials who were trying

15    to enforce the tax laws.  Each defendant is also

16    individually charged with engaging in this obstructive

17    conduct.

18         The second set of counts in this case charge George

19    Brokaw, John Pawelski, and Mimi Vigil, along with Clara

20    Mueller, and a man named Curtis Morris, with conspiring or

21    agreeing to assist each other in the filing of false tax

22    returns.

23         Each defendant is also individually charged with

24    filing false claims for refund.  Now let's start with the

25    fake documents that the defendants submitted trying to get

1    out of paying their taxes.  Examples of the fake documents

2    you will see during this trial are labeled by the

3    defendants as Private Registered Bonds for Set Off,

4    private Registered Indemnity Bonds, and Registered Bonded

5    Promissory Notes.

6         These are all documents made up by the defendants.

7    The United States did not issue these documents.  No

8    financial institution issued these documents.  They took

9    real words like "registered" and "bonded" and "promissory

10   notes" and they put them together in a way to make them

11   sound official, and they put them on fancy paper; fancy

12   paper like this, found at George Brokaw's home.  They took

13   these fake pieces of paper and they typed up words on

14   them, submitted them, and tried to write off their tax

15   debts through documents like this.

16        Here is an example of one such piece of paper that

17   Mr. Brokaw submitted to Mr. Timothy Geithner, the then

18   Secretary of the Treasury.  Mr. Brokaw called this

19   worthless piece of paper a Private Registered Bond for Set

20   Off.  This is a bogus document.  There is no such thing.

21   The amount Mr. Brokaw listed on this bond is $100 billion.

22   $100 billion.  That is an amount of money that is

23   difficult to comprehend.

24        The two richest people in the world are a man named

25   Carlos Slim, of Mexico, and Bill Gates.  And they each

1    have net worths of under $80 billion.

2         Under the words "Pay to the Order of," you see

3    "Bond Order."  And Mr. Brokaw is directing the Department

4    of Treasury to take this $100 billion -- and I am reading

5    from the second paragraph there.  "Please adjust any

6    bills, taxes, or claims and the like against George Brokaw

7    --."  Then you see the second sentence, "- to zero.

8    Charge, settle, enclose any such account and return the

9    interest and the principal to George Brokaw."  And you see

10   on this document that Mr. Pawelski signed the document as

11   a surety.  Ms. Vigil certified she mailed this document to

12   Mr. Geithner for Mr. Brokaw on April 1, 2009.

13        Now, on the exact same day that Mr. Brokaw

14   submitted this bond, this $100 billion bond, Mr. Pawelski

15   submitted his own $100 billion bond to Mr. Geithner.  Days

16   later, Ms. Vigil submitted her own $100 billion bond to

17   Mr. Geithner.  And each of the defendants' names appears

18   at least once on the bond or on the paperwork related to

19   these bonds for each of the other defendants' bonds.

20        This is an example of how these defendants worked

21   together in the witnesses and the signing and the

22   notarizing and the mailing of these documents for each

23   other.

24        Mr. Peter Lee, a Department of Treasury official,

25   will testify about these false bonds and other false

1   documents received by the Department of Treasury from

2   these defendants.

3        Ms. Kristy Morgan, an IRS official, will testify

4   about similar false documents received by the IRS from

5   these defendants.

6        Now, the defendants also submitted fraudulent

7   documents trying to wipe out the tax debt of other people.

8   Here is an example.  On this piece of paper, Mr. Pawelski

9   labeled it as a Registered Bonded Promissory Note.  You

10  see that this bonded promissory note is in the amount of

11  $767,551.15.  And through this bond, Mr. Pawelski was

12  trying to wipe out the tax debt owed by a woman named

13  Nancy Berryman.  Ms. Vigil certified that she mailed this

14  packet of documents, to include that bond, to a revenue

15  officer named Ginger Wray, at her then home address in

16  Dillon, Colorado.

17       Now, Ms. Wray will testify that she was not the

18  collection officer assigned to Mr. Pawelski's case.  She

19  was assigned to Ms. Berryman's case.  And she will talk

20  about how concerned she was about receiving this type of

21  mail at her home address.

22       Yet, if Mr. Pawelski needed to mail legitimate

23  correspondence to Ms. Wray, one would expect he would send

24  it to the IRS's official business address.  The evidence

25  will show Mr. Pawelski mailed it to her home address in an

1       attempt to intimidate and harass and influence Ms. Wray.

2               The evidence will also show that Mr. Pawelski and

3       Mr. Brokaw obtained home addresses and personal

4       information regarding other IRS employees.

5               Another tactic employed by these defendants

6       designed to intimidate and harass IRS employees was to

7       send fake documents to them, entitled Final Notices of

8       Default and Demand for Payment, as well as liens to the

9       IRS employees assigned to their cases.  These are just

10      made up pieces of paper where the defendants claim that

11      these employees somehow personally owed the defendants

12      outrageous sums of money for doing their jobs.

13              IRS operations' manager Maureen Green will testify

14      about receiving a document from Mr. Brokaw entitled Final

15      Notice.  And in this fake document, Mr. Brokaw claimed

16      that Ms. Green owed him $72 million for her alleged libel

17      of Mr. Brokaw.  Mr. Brokaw claimed that this libel

18      occurred while Ms. Green was just supervising IRS

19      employees who were trying to collect taxes from

20      Mr. Brokaw.

21              IRS officer Leland Deering will testify about

22      receiving documents, personal delivery of documents from

23      Mr. Brokaw, Mr. Pawelski, and Ms. Vigil at the IRS office

24      in Colorado Springs.  And included in that packet of

25      documents were fake liens or demands from payment -- for

1    payment against IRS employee Michael Pryor and Ms. Maureen

2    Green, both of whom were involved in legitimate collection

3    efforts with respect to Mr. Brokaw.

4         However, according to Mr. Brokaw, these legitimate

5    efforts somehow meant that Mr. Pryor and Ms. Green owed

6    him 1.1 and 2.2 billion dollars, respectively.  For doing

7    their jobs, they owed them between 1 and 2 billion

8    dollars.

9         You will hear about federal tax liens and payment

10   vouchers that were sent to the defendants on which the

11   defendants would hand write the words "Accepted for

12   Value," or they would label these documents as money

13   orders payable to the IRS to be credited towards their tax

14   liability, and then they would then mail those same

15   documents back to the IRS.

16        Yet another of the defendants' methods of

17   obstructing the administration of the internal revenue

18   laws was to submit to the IRS what they called EFTs.  An

19   EFT normally stands for electronic funds transfer.  It is

20   another example of the defendants taking legitimate words

21   and using them in an illegitimate way.  In reality, the

22   defendants, what they called EFTs, were nothing more than

23   checks drawn on closed bank accounts.

24        Mr. Brokaw sent one such check to the Clerk of the

25   United States District Court, and this check is in the

1    amount of $5,978,973.  In this check, Mr. Brokaw was

2    trying to pay off his friend's -- I am sorry, it was in

3    connection with a civil case that has written -- the case

4    number is written over "Paid to the Order of."  So

5    Mr. Brokaw was trying to pay off his friend's almost $6

6    million judgment from a separate tax case.

7         It is easy to be that generous when you are writing

8    a worthless check on a closed bank account.  Ms. Stacie

9    Gleeson, an employee from the U.S. District Court, will

10   testify that her office received this check from

11   Mr. Brokaw, and a representative from Wells Fargo will

12   testify that this account was closed.

13        What a deal it would be if a person could simply

14   write checks in any amount they wanted to on closed bank

15   accounts and expect the banks to honor those checks.  It

16   is not a deal, it is fraud.

17        He is trying -- it is trying to cheat and trying to

18   avoid paying what you owe, and it is trying to get money

19   you are not entitled to.  Trying all of these methods to

20   avoid paying their taxes was not enough for these

21   defendants.

22        And this leads us to the second group of charges in

23   this case, and that is the defendants conspiring or

24   agreeing to assist each other and filing false tax returns

25   to the IRS claiming that they were entitled to refunds in

1   the amounts of hundreds of thousands, and in

2   Mr. Pawelski's case, millions of dollars.

3         The defendants base their false returns on

4   fraudulent forms 1099.  A common 1099 is a 1099 INT, which

5   reports interest earned on a bank account or other

6   interest-bearing accounts to the IRS.  The type of 1099 at

7   issue in this case is called a 1099 OID.  OID stands for

8   Original Issue Discount.  Forms 1099 OID are supposed to

9   be used to earn -- to report a particular kind of income

10  earned on an investment.

11        This is income that the taxpayer has to pay taxes

12  on.  And financial institutions and businesses use forms

13  1099 OID to report that income to the IRS.  And they send

14  one copy to the IRS, and they send one copy to the

15  investor for use in preparation of their taxes.

16        Everything about the way the defendants tried to

17  use forms 1099 OID is backward.  Instead of receiving

18  these forms from a business, they created the forms

19  themselves, or they directed Mr. Curtis Morris to create

20  the forms for them.  Instead of reporting income on which

21  they owed taxes, they submitted these forms and claimed

22  that the IRS owed them money.

23        They claimed that businesses had withheld money

24  from them and sent that money over to the IRS, and that

25  the IRS had to then turn around and pay them that money.

1    In fact, the defendants owed money to the majority of the

2    businesses listed on these form 1099 OIDs.

3         They took their debt, for example, their mortgage

4    debt, their credit card debt, and they listed that debt on

5    these forms, and they sent it to the IRS and said, IRS,

6    pay me the money I owe to my mortgage company.  IRS, pay

7    me the money I owe on my credit card.

8         The forms 1099 OID that you will see in this case

9    make no sense.  They were created by the defendants.  They

10   list outrageous sums of money, the majority of them do.

11        Mr. Brokaw, Mr. Pawelski, and Morris and Ms. Vigil

12   communicated by e-mail with each other to discuss the

13   creation of these form 1099 OIDs.  And they provided

14   information to Mr. Morris so he could create these 1099

15   OIDs.

16        This is how the defendants tried to get money, how

17   they tried to cheat the Government out of money they are

18   not entitled to.  Representatives from the financial

19   institutions listed on these forms will come to court and

20   testify that they did not issue these forms, they did not

21   withhold money from these defendants and send it to the

22   IRS.  In fact, they would never issue a form 1099 OID for

23   the type of debt that is listed on those forms.

24        Here is an example of a false claim for refund.

25   This is a tax return submitted by Mr. Pawelski for the

1    year 2006.  And on this return he claimed that he earned

2    over $14 million.  The second page of this return, he

3    claimed that he was entitled to a refund from the United

4    States in the amount of $9,189,983.58.  And he claimed

5    that nine separate entities had withheld money from him,

6    and that amounted to that $9 million.

7         Here is an example of two such form 1099 OIDs

8    Mr. Pawelski submitted with his 2006 return.  And you see

9    that these forms were allegedly created by the Colorado

10   Department of Public Safety.  The amounts listed on both

11   of these forms is $1 million.  You will see in the

12   description he lists summons, and those summons are off by

13   one number.  There are two different summons listed here

14   on both of these forms.

15        So somehow there is a summons in Mr. Pawelski's

16   name somehow connected to the Colorado Department of

17   Public Safety, and he is saying that that agency withheld

18   a total of $2 million from him, and that the IRS now must

19   pay him that money.

20        And an accountant from the Colorado Department of

21   Public Safety will testify that her agency did not create

22   these forms and they did not withhold that money from

23   Mr. Pawelski.

24        Mr. Brokaw filed false claims for refund for the

25   years 2003 through 2008, totaling $358,218.  Ms. Vigil

1    filed a false claim for refund for the year 2005 in the

2    amount of $372,169.  And Mr. Pawelski filed false claims

3    for the years 2004 through 2007, in the total amount of

4    approximately $22 million.

5         You will see certified copies of each tax return

6    submitted by these defendants to the IRS.  What was the

7    IRS doing during this time?  You will hear evidence of

8    notices sent, letters sent to these defendants, advising

9    them that they owed taxes and that there were penalties

10   associated with the failure to pay those taxes, and there

11   were penalties associated with the filing of these

12   fraudulent tax returns.

13        You will hear about the revenue officers assigned

14   to the defendants' cases when the defendants would not

15   respond to those notices.  You will hear about meeting

16   schedule about federal liens, federal tax liens being

17   filed, all to no avail.

18        Despite the IRS giving these defendants multiple

19   opportunities to solve their tax problems, the defendants

20   would not stop their obstructive conduct.

21        After hearing all of the evidence in this case,

22   there will be no reasonable doubt in your mind that these

23   defendants conspired with each other and others to submit

24   false claims for refund, and that each individual -- each

25   defendant individually filed the false claims for refund

1    as charged.

2          There will be no reasonable doubt in your mind that

3    these defendants conspired and agreed with each other to

4    obstruct the due administration of the internal revenue

5    laws by filing all of the false bonds and other false

6    documents; that they filed and submitted, intending to

7    eliminate their tax debt and the tax debt of others and,

8    in fact, that each defendant individually did just that.

9    And at that time, the United States will ask that you

10   return verdicts of guilty on all counts.

11          THE COURT:  Thank you very much.

12          The Government may call its first witness.

13          MR. KIRSCH:  Thank you, Your Honor.  The Government

14   calls Michael Pryor.

15          COURTROOM DEPUTY:  Your attention please.

16          Please raise your right hand.

17                         **MICHAEL PRYOR**

18   having been first duly sworn, testified as follows:

19          COURTROOM DEPUTY:  Please be seated.

20          Please state your name, and spell your first and

21   last names for the record.

22          THE WITNESS:  My name is Michael John Pryor.

23   M-I-C-H-A-E-L P-R-Y-O-R.

24          THE COURT:  You may proceed.

25          MR. KIRSCH:  Thank you, Your Honor.

1                       **DIRECT EXAMINATION**

2     **BY MR. KIRSCH:**

3     Q.   Mr. Pryor, are you still employed?

4     A.   No, sir, I'm retired.

5     Q.   And from what position did you retire?

6     A.   I was a revenue officer for the Internal Revenue

7     Service.

8     Q.   How long did you hold that position?

9     A.   For 32 years.

10    Q.   And how long have you been retired, then?

11    A.   Since July 1st.

12    Q.   Congratulations.

13    A.   Thank you.

14    Q.   So, can you explain to the jury what your duties were

15    as a revenue officer for the Internal Revenue Service?

16    A.   Yes.  As a revenue officer, we are entrusted with

17    contacting people who haven't filed their tax returns or

18    paid their taxes and weren't responding to letters and

19    mailings.  And if we can't resolve it, then it is

20    incumbent upon us to take and enforce collection action,

21    such as issuing levies to bank accounts and employers, and

22    to file liens and seize property if necessary.

23    Q.   Let me ask you just a little bit about a couple of

24    those things that you mentioned there.  First of all, you

25    mentioned a levy.  Can you explain just a little bit more

1    about what a levy is?

2    A.    A levy is a document that would be sent to a bank or

3    employer or somebody who was giving out a contract to a

4    taxpayer.  And the levy would intercept income or

5    contractual proceeds, or the levy would force the bank to

6    turn over the moneys in the taxpayer's name over to the

7    IRS.

8    Q.    And when would something like a levy get filed in

9    relation to an assessment of tax due and owing being made

10   for a particular taxpayer?

11   A.    That would only happen after multiple attempts to

12   contact the taxpayer, work out payment agreement of some

13   sort, and only if the taxpayer just refuses to cooperate

14   and refuses to pay the taxes due.

15   Q.    You also mentioned, I think, a tax lien?

16   A.    Yes.

17   Q.    Can you explain a little bit more what that is,

18   please?

19   A.    A tax lien is filed with the county courthouse or the

20   Secretary of State.  And it is a tool by which the

21   Government encumbers real property and personal property,

22   in the instance of a corporation, from other liens,

23   getting ahead of the Government's right to the equity in

24   that property, like a mortgage.

25   Q.    And when you were engaged in this sort of work as a

```
 1    revenue officer, were you doing -- were you making the tax

 2    assessments yourself, or were you just working on the

 3    collection side?

 4    A.   I just worked on the collections side.

 5    Q.   Okay.  At some point when you were working as a

 6    revenue officer, were you assigned to work on a case

 7    involving a person named George Thomas Brokaw?

 8    A.   Yes, sir.

 9    Q.   Do you recall approximately when you got that

10    assignment?

11    A.   I think it was in the fall of 2008.

12    Q.   Okay.  And when you were assigned to the case, had

13    there already been some initial collection activities that

14    had taken place?

15    A.   Yes.  The case had already been in the field

16    collections for a year, or maybe two.  I don't remember

17    exactly.

18    Q.   All right.  So when you got the case, did you -- what

19    did you do?

20    A.   I reviewed the case, of course, for actions that had

21    already happened, and for what needed to be done per the

22    code and the manual at that point in time.

23    Q.   Did you attempt to determine whether or not

24    Mr. Brokaw owned property or otherwise was an appropriate

25    candidate for the filing of a lien?
```

1    A.    Yes, sir.

2    Q.    And did you determine that he was?

3    A.    Yes.

4    Q.    And did you, in fact, prepare and then file a lien

5    with respect to Mr. Brokaw?

6    A.    Yes.

7    Q.    I want to ask you to look, please, at what is marked

8    for identification as Government Exhibit 250.  Do you have

9    that in front of you now, Mr. Pryor?

10   A.    Yes, sir.

11   Q.    Do you recognize that document?

12   A.    Yes.

13   Q.    What is that document?

14   A.    A Notice of Federal Tax Lien regarding taxpayer

15   George Brokaw.

16   Q.    Is that the lien that you prepared?

17   A.    Yes.

18         MR. KIRSCH:  Your Honor, I move to admit and

19   publish Government Exhibit 250.

20         THE COURT:  Exhibit 250 is admitted, and you may

21   publish.

22         (Exhibit No. 250 is admitted.)

23         MR. KIRSCH:  Thank you, Your Honor.

24         Could we have the computer from the back table,

25   please.  Thank you.  Can we expand just the top half of

1    that down to right there.  Thank you.

2    Q.   (BY MR. KIRSCH) All right.  Mr. Pryor, can you see

3    what is displayed on the screen there now?

4    A.   Yes, sir.

5    Q.   So walk us through, if you could, name of the

6    taxpayer and residence.  What information goes in those

7    boxes?

8    A.   The name of the taxpayer here was George Brokaw,

9    would the person who is on the IRS roles for owing the

10   tax.  The residence would be the last known address we

11   have for the taxpayer at the time the lien is prepared.

12   Q.   Okay.  And then the three entries listed below that

13   begin on the far left with "Kind of Tax."  What are those

14   entries?

15   A.   Column 8, "Kind of Tax," is the tax return form

16   applicable to these amounts.  This is 1040 taxes, income

17   taxes.

18   Q.   Okay.  How about the "Tax Period Ending"?

19   A.   "Tax Period Ending" indicates the final date of the

20   taxable period.  As these are income taxes, they are

21   December 31st for 2004, 2005 and 2006.

22   Q.   And then what is in the "Identifying Number" column

23   C?

24   A.   That would be a redacted version of the taxpayer's

25   Social Security number.

1   Q.   Then I will just jump over to column F.  What is

2   reflected there in column F?

3   A.   The unpaid balance of assessment would be the taxes,

4   penalties and interest assessed at the point of time of

5   the making of the assessment.

6   Q.   Okay.  So the amount for 2004 at that time in 2008

7   was what?

8   A.   $128,244.74.

9   Q.   What was the amount for 2005?

10  A.   $65,125.24.

11  Q.   Then finally for 2006?

12  A.   $32,979.16.

13       MR. KIRSCH:  Can we expand back to that entire

14  document, please.  And then can we expand the lower half

15  of it.

16  Q.   (BY MR. KIRSCH)  I want to direct your attention now

17  to the box marked "Place of Filing."  Can you explain what

18  that means, Mr. Pryor?

19  A.   Yes.  This lien was filed with the Clerk and Recorder

20  for El Paso County, as El Paso County would be the

21  governing seat regarding the address of the taxpayer at

22  the time.

23  Q.   Okay.  And then down in the bottom it says that -- we

24  have talked before about you preparing this notice, but

25  there is an indication that it was prepared in Seattle,

```
1    and that looks like somebody else's signature there.  How
2    does that process work?
3    A.   The lien, the physical lien processing and mailing is
4    centralized through, I think, two places in the country.
5    And we, as revenue officers, would make the determination
6    and generate the lien on our computer, then they are
7    physically mailed.  This one was from Seattle.
8    Q.   Okay.  Where was it that you worked when you were
9    with the IRS, at least back in 2008, 2009?
10   A.   In the Lakewood office on West Colfax Avenue.
11   Q.   Here in Colorado?
12   A.   Yes.
13   Q.   Did you have personal contact with Mr. Brokaw during
14   the time when you were preparing and getting this lien
15   filed?
16   A.   Undoubtedly I sent the mailings, required letters,
17   such as Final Demand, Follow Up and Reminder of Taxes Due.
18   I don't remember ever speaking to him.
19   Q.   In person?
20   A.   In person.  I don't remember.
21   Q.   Okay.  Now I want to ask you -- thank you.  We are
22   finished with that exhibit.
23        I will ask you now, Mr. Pryor, to take a look at
24   what is marked as Government's Exhibit 258.  Do you have
25   that in front of you?  You don't have anything in it?
```

1    A.   An empty folder.

2    Q.   That will not help you very much.

3         MR. KIRSCH:  Can I ask to just display that to him

4    electronically, but not show it to the jury, please.

5         THE COURT:  You may.

6    Q.   (BY MR. KIRSCH)  Okay.  Can you see that on your

7    screen, Mr. Pryor?

8    A.   Yes, sir.

9    Q.   Is it large enough for you to read, or should we make

10   it bigger for you?

11   A.   It is fine.

12   Q.   Is that a document you recognize?

13   A.   Yes.

14   Q.   And how is it that you recognize that document?

15   A.   It was brought to my attention several years back by

16   a special agent of the Treasury Inspector General's

17   Office.

18   Q.   And was it something that you learned about during

19   the time that you were engaged in collection activity with

20   respect to Mr. Brokaw?

21   A.   Yes.

22   Q.   Does this document have your name on it up in the top

23   left?

24   A.   Yes, it does.

25        MR. KIRSCH:  Your Honor, I move to admit

1    Government's Exhibit 258 and to publish it.

2         THE COURT:  Exhibit 258 is received, and you may

3    publish.

4         (Exhibit No. 258 is admitted.)

5         MR. KIRSCH:  Thank you, Your Honor.

6         Obviously we will make sure there is something

7    actually in the folder before we try to send it back to

8    the jury.

9         THE COURT:  All right.

10   Q.   (BY MR. KIRSCH)  I think we have that on your screen

11   again now.  We mentioned your name, Mr. Pryor.  Is that in

12   the box under "Name of Vessel"?

13   A.   Yes.  And it appears to identify me as U.S. MV

14   Michael J. Pryor.

15   Q.   Do you know what that means?

16   A.   No, sir.

17   Q.   Is that your -- was that your title there in the next

18   box, "Unique Identifier"?

19   A.   Yes.  Revenue officer, Internal Revenue Office was my

20   title.

21   Q.   Then what was listed under the name and address of

22   claimant?

23   A.   George Thomas Brokaw, 2260 Palm Drive, Colorado

24   Springs, Colorado.

25   Q.   Was that the same address that you used on the lien

1    that you prepared for Mr. Brokaw?

2    A.   I think so, yes.

3         MR. KIRSCH:   Okay.   Can we expand the lower half of

4    that document now, please.

5    Q.   (BY MR. KIRSCH)   What is the amount of damages that

6    was put on this form or this form lien that was prepared

7    in your name, Mr. Pryor?

8    A.   Looks like 1,126,650,000 and no cents.

9    Q.   And what sort of property was listed in box 7 as

10   property that might -- your property that might be subject

11   to this claim by Mr. Brokaw?

12   A.   Bank accounts, safety deposit boxes, certificates of

13   deposit, retirement funds, 801Ks, 401Ks, real estate,

14   stocks, bonds of any type.

15   Q.   I will interrupt you.   I don't need you to read the

16   entire document.   Is it fair to say that is a

17   comprehensive list?

18   A.   Yes, sir.

19   Q.   And are you able to read the name that appears over

20   signature of claimant?

21   A.   Yes.

22   Q.   What name is that?

23   A.   George Thomas Brokaw.

24   Q.   How about the name that appears in the stamp for the

25   notary public?

1    A.    That is Clara M. Mueller.

2    Q.    Was Ms. Mueller a person you otherwise had any

3    dealings with in your course of work as a revenue officer?

4    A.    No.

5    Q.    Okay.  I am finished with that document, thank you.

6          Now I want to ask you to look at what is marked as

7    Government's Exhibit 265.  Do you have that one,

8    Mr. Pryor?

9    A.    I don't have that.  I have a 267 and 272.

10         MR. KIRSCH:  I may have given the clerk bad

11   information before you got there.  I think that I can just

12   do this one electronically, as well, so I don't think you

13   need to look for that, madam clerk.

14         Can I ask to display just to the witness, Your

15   Honor, Government Exhibit 265, page 2.

16         THE COURT:  You may.

17         MR. KIRSCH:  Can I have just one moment, please,

18   Your Honor?

19         THE COURT:  You may.

20         MR. KIRSCH:  I will ask to display page 12, please.

21   And can you enlarge just the middle of that.

22   Q.    (BY MR. KIRSCH)  Does your name appear on that page

23   of that document, Mr. Pryor?

24   A.    Yes, it does.

25   Q.    And then I will ask you to look at the next page,

1   page 13.  Does your name appear on that document?  Let's

2   go to page -- page 14.  Does your name appear on that

3   document --

4   A.   Yes.

5   Q.   -- as well?  Is that document a document that you

6   would have received as a part of your -- when you were

7   engaged in collection activity against Mr. Brokaw?

8   A.   Yes.

9   Q.   Let me direct your attention now to page 30 of that

10  document.  Does your name appear on that page of the

11  exhibit, as well?

12  A.   Yes.

13  Q.   Is that a document that you would have received

14  during the course of your attempts to collect taxes from

15  Mr. Brokaw?

16  A.   Yes.

17  Q.   Is there a reference in that document, or the

18  previous document that we looked at, to you owing

19  Mr. Brokaw $36 million?

20  A.   Yes.

21  Q.   Had you ever had any dealings with Mr. Brokaw other

22  than your attempts to collect taxes that had been assessed

23  against him by the IRS?

24  A.   No.

25  Q.   Mr. Brokaw had never otherwise obtained a judgment

1    against you in any sort of civil action or anything like

2    that?

3    A.    No.

4    Q.    Are you aware, then, of anything that you could have

5    done that would have caused you to owe Mr. Brokaw

6    somewhere between 36 million and 1.1 billion dollars?

7    A.    No.

8    Q.    Let me ask you a little bit more about your general

9    practices as a revenue officer.  When you were a revenue

10   officer, did you share your home address or your home

11   telephone number with people from whom you were trying to

12   collect taxes?

13   A.    Never.

14   Q.    Why is that?

15   A.    It's unprofessional.  And any dealings I would have

16   with the taxpayer or vice versa need to be through the

17   office or through the government telephone.

18   Q.    Would you have had any concerns if you had learned

19   that people from whom you were attempting to collect taxes

20   had your home address or your home telephone number?

21   A.    Yes.

22   Q.    Would that have caused you to feel threatened?

23   A.    Yes, to some degree.

24   Q.    Did you have -- ever have any experiences while you

25   were a revenue officer in which people from whom you were

1    trying to collect misused your home address?

2         Let me ask you a different question.  Did you ever

3    have any liens filed against your home by people from whom

4    you were attempting to collect taxes?

5    A.   Yes, I did.

6    Q.   I want to ask you now to look at what is marked as

7    Government Exhibit 267.

8         THE COURT:  Were you going to admit 265?

9         MR. KIRSCH:  Not yet, Your Honor.  Thank you.

10        THE COURT:  Okay.  Can we not show this one to the

11   jury yet, please?  Are we already there?

12   Q.   (BY MR. KIRSCH)  So 267, we have it on the screen and

13   there in front of you.  Do you have it there, Mr. Pryor?

14   A.   Yes.

15   Q.   Does your name appear on that document?

16   A.   Yes.

17   Q.   Does your home address appear on that document?

18   A.   Yes.

19   Q.   Other than in the course of preparation for trial, is

20   that a document that you have seen before?

21   A.   No.

22   Q.   Can I also ask you to look at what is marked for

23   identification as Government Exhibit 272.  Does your -- do

24   you have that one in front of you now?

25   A.   Yes.

1    Q.   Does your name appear on that document?

2    A.   Yes.

3    Q.   What about your home address?

4    A.   Yes.

5    Q.   Same question I asked you a minute ago.  Other than

6    in the course of trial preparation, is that a document

7    that you have ever seen before?

8    A.   No.

9    Q.   Did you ever, in the course of your work attempting

10   to collect taxes from Mr. Brokaw, ever provide your home

11   address, either to Mr. Brokaw or to Mr. Pawelski?

12   A.   No.

13   Q.   How about your home telephone number?

14   A.   No.

15   Q.   Would you have had any concerns if you had learned

16   that Mr. Brokaw and/or Mr. Pawelski were making attempts

17   to obtain your home address and home telephone number?

18   A.   Yes.

19   Q.   Why is that?

20   A.   It seems threatening and possibly a precursor to

21   other actions against me personally.

22        MR. KIRSCH:  Can I have one moment, please, Your

23   Honor?

24        THE COURT:  You may.

25        MR. KIRSCH:  Thank you, Your Honor.  No other

1    questions for Mr. Pryor.

2            THE COURT:  All right.  Thank you very much,

3    Mr. Pryor, you may step down.

4            Ms. Paluch, you may call your next witness.

5            MS. PALUCH:  Thank you, Your Honor.  The United

6    States calls Troy Parker.

7            COURTROOM DEPUTY:  Please remain standing.

8            Your attention, please.

9            Please raise your right hand.

10                           **TROY PARKER**

11   having been first duly sworn, testified as follows:

12           COURTROOM DEPUTY:  Please be seated.

13           Please state your name, and spell your first and

14   last names for the record.

15           THE WITNESS:  Troy Blake Parker.  T-R-O-Y, Parker,

16   P-A-R-K-E-R.

17                       **DIRECT EXAMINATION**

18   **BY MS. PALUCH:**

19   Q.   Good afternoon, Mr. Parker.

20   A.   Good afternoon.

21   Q.   How are you employed?

22   A.   Work for the Internal Revenue Service.

23   Q.   What position do you have there?

24   A.   I am a revenue officer working for the self-employed,

25   small business self-employed collections division.

1    Q.   All right.  How long have you held that position?

2    A.   A little over 7 years.

3    Q.   Can you explain generally your duties as a revenue

4    officer?

5    A.   Yes, ma'am.  When I get assigned a case, whether it

6    is a delinquent return or back taxes owed, I will make a

7    cold call to the business or to that individual's

8    residence to make contact with them and let them correct

9    their deficiencies.

10   Q.   So how is it a tax matter ends up on your desk, as a

11   revenue officer?

12   A.    If it is delinquent terms or balances owed, back

13   taxes, the service center attempts to get ahold several

14   times to these individuals.  They get assigned to a crew,

15   and get assigned to me as a manager.

16   Q.   Were you assigned to a collection matter involving a

17   woman named Mimi Vigil?

18   A.   Yes, ma'am.

19   Q.   Do you know approximately when that was?

20   A.   Around the end of 2008, 2009.

21   Q.   Have you been involved in collection efforts with

22   respect to Mr. Brokaw, Mr. George Brokaw, or Mr. John

23   Pawelski?

24   A.   No.

25   Q.   What was the nature of your work involving Ms. Vigil?

1   A.   She had a delinquent return she hadn't filed, and she

2   also had balances showing owed on back taxes.

3   Q.   What steps did you take to bring Ms. Vigil into

4   compliance?

5   A.   I attempted to make contact with her at her

6   residence.  On a cold call, went to her residence.  No

7   answer.  I left a calling card for her to contact me.  And

8   I never heard from her until a long time later.

9   Q.   I will stop you there.  I will direct your attention

10  to what has been marked as Government's Exhibit 82.  You

11  should have a folder in front of you.  You can refer to it

12  there, first, please, sir.  Do you have 82 in front of

13  you?

14  A.   Yes, ma'am.

15  Q.   Okay.  This is Government's Exhibit 82.  Can you

16  generally describe what this is?

17  A.   Yeah.  This is a Final Notice of Intent to Levy,

18  which we issue when an individual or business have

19  balances for back taxes owed.

20  Q.   To whom is this letter addressed?

21  A.   Mimi M. Vigil.

22  Q.   On the second page, who signed this letter?

23  A.   I did.

24  Q.   Did you prepare this letter?

25  A.   Yes, ma'am.

1          MS. PALUCH:  Move to admit Government's Exhibit 82,

2    Your Honor.

3          THE COURT:  82 is admitted.

4          (Exhibit No. 82 is admitted.)

5    Q.   (BY MS. PALUCH)  Sir, what is the date of this

6    letter?

7    A.   December 8, 2008.

8    Q.   Now, at what stage in the collection process is a

9    Final Notice and Intent to Levy sent to a taxpayer?

10   A.   As soon as we get the case and we have balances and

11   we attempt to make contact, we will issue the 1058.  That

12   is the Notice of Intent to Levy on those balances.  So if

13   we can make no contact further on down the road, we may

14   issue levies on their assets.

15         MS. PALUCH:  Your Honor, at this time, if I could

16   have permission to publish Government Exhibit 82.

17         THE COURT:  You may.

18   Q.   (BY MS. PALUCH)  Sir, could you generally paraphrase

19   that first paragraph?  What are you saying in that first

20   paragraph of this letter?

21   A.   Service center attempted to contact her previously,

22   and now we are asking her to pay or get ahold of me to

23   contact me to fix the problems.

24   Q.   Okay.  And I will direct your attention to the second

25   paragraph of that letter.  Can you generally paraphrase

1    that?

2    A.   We can file a notice of federal tax lien any time

3    when an individual has a balance and against their assets.

4    Q.   Are you advising her of that possibility here?

5    A.   Yes, ma'am.

6    Q.   If you could turn to the second page.  Is there an

7    amount listed there on that second page?

8    A.   Yes, ma'am.

9    Q.   And what is that amount?

10   A.   $3,350.03.

11   Q.   What does that amount represent?

12   A.   Balance owed for 2004 on her 1040 income tax return.

13   Q.   Is that the balance as of the date of this letter?

14   A.   Yes, ma'am.

15   Q.   If you can now look, please, to the folder for

16   Government's Exhibit No. 83.

17   A.   Yes, ma'am.

18   Q.   Can you identify this document?

19   A.   Yes.  A letter I sent to Mimi Vigil on September 9,

20   2008.

21         MS. PALUCH:  I move admission of Government's

22   Exhibit 83.

23         THE COURT:  83 will be admitted.

24         (Exhibit No. 83 is admitted.)

25         MS. PALUCH:  Permission to publish.

```
 1            THE COURT:  You may.
 2    Q.   (BY MS. PALUCH)  What is the date of this letter?
 3    A.   December 9, 2008.
 4    Q.   Does your signature appear on this first page?
 5    A.   Yes, ma'am.
 6    Q.   Direct your attention to the second page.  Can you
 7    explain what the second page is?
 8    A.   This is a summary contact.  This is a letter
 9    explaining everything I need from her to help her fix her
10    issues, fix her problems.  And then a deadline for her to
11    give them to me.
12    Q.   Your signature -- did you sign this document?
13    A.   Yes, ma'am.
14    Q.   Okay.  And this middle section of this page --
15            MS. PALUCH:  If we could please focus in on that.
16    Q.   (BY MS. PALUCH)  -- Can you explain again what that
17    represents?
18    A.   All these items were things I requested from her by a
19    deadline; returns, bank statements, so I could help her
20    fix her tax problem.
21    Q.   Okay.  I will direct your attention to the very
22    bottom of what has been highlighted for you.  Could you
23    please read that full sentence for the record?
24    A.   "I have scheduled a meeting for you in my office on
25    12/29/2008 at 10 a.m.  If you do not show to meeting, will
```

 1   levy."

 2   Q.   Did you meet with Ms. Vigil on December 29, 2008?

 3   A.   She did show up for a meeting.

 4   Q.   Can you describe what occurred at that meeting?

 5   A.   She showed up with three other male individuals.  We

 6   went into the interview room.  She didn't bring me

 7   anything.  She didn't provide anything.  And she was very

 8   uncooperative.  So I dismissed the meeting and cancelled

 9   it.

10   Q.   So none of the documents that you listed on this

11   form, she did not bring any of those?

12   A.   Did not bring, no.

13   Q.   Okay.  If you could please turn to Government's

14   Exhibit 84.  You should have a folder there.  Can you

15   identify that document?

16   A.   It is another letter I sent to Mimi Vigil.

17   Q.   Is your signature on that letter?

18   A.   Yes.

19   Q.   It is addressed to Mimi Vigil?

20   A.   Yes, ma'am.

21        MS. PALUCH:  Your Honor, I move admission of

22   Government's Exhibit 84.

23        THE COURT:  Exhibit 84 is admitted.

24        (Exhibit No. 84 is admitted.)

25        MS. PALUCH:  Permission to publish.

 1          THE COURT:  You may.

 2    Q.   (BY MS. PALUCH)  Sir, can you describe the purpose of

 3    this letter?

 4    A.   This letter is the letter notice for the 2005 return

 5    that was sent to audit for verification.

 6    Q.   Do you know why it was sent for audit?

 7    A.   Yes, ma'am.  The information on the return and the

 8    information we had in the system on file didn't match up,

 9    so we sent it for a verification.

10    Q.   Turn your attention now to Government's Exhibit 210.

11    Can you generally describe what that document is?

12    A.   That is an Affidavit of Notary Presentment.

13    Q.   Is this a packet of documents, sir?

14    A.   Yes, ma'am.

15    Q.   Is this packet addressed to you?

16    A.   Yes, ma'am.

17    Q.   Did you receive these documents?

18    A.   I did.

19    Q.   From whom?

20    A.   Mimi Vigil.

21          MS. PALUCH:  Your Honor, I move for admission of

22    Government's Exhibit 210.

23          THE COURT:  210 is admitted.

24          (Exhibit No. 210 is admitted.)

25          MS. PALUCH:  Permission to publish.

```
 1            THE COURT:  You may.
 2   Q.   (BY MS. PALUCH)  Sir, if you could turn to page 3 of
 3   that document.  And can you state what the title is of
 4   that document?
 5   A.   A Registered Bonded Promissory Note.
 6   Q.   Do you know what that is?
 7   A.   No, ma'am.
 8   Q.   Okay.  What is the amount of that Registered Bonded
 9   Promissory Note?
10   A.   $62,435.95.
11   Q.   And for credit -- do you see the bold where it says
12   "For Credit To"?
13   A.   Yes, ma'am.
14   Q.   For whose credit is that amount to be assessed?
15   A.   The Internal Revenue Service for Mimi M. Vigil.
16   Q.   Okay.  And whose signature appears on this document?
17   A.   Mimi Michelle Vigil.
18   Q.   Okay.  Do you see in the bottom left-hand corner of
19   this document, does your name appear there?
20   A.   Yes, ma'am.
21   Q.   To your knowledge, is this a financial instrument
22   that can reduce a taxpayer's debt to the IRS?
23   A.   No, ma'am, it is not.
24   Q.   To your knowledge, did this document have any impact
25   on Ms. Vigil's tax debt?
```

1    A.    Not at all.

2    Q.    If you can please turn to pages 4 and 5 of this

3    document.  Starting at page 4, can you read the title of

4    that document?

5    A.    A Notice Concerning Fiduciary Relationship.

6    Q.    And do you know the purpose of this form?

7    A.    Yeah, it is to establish a fiduciary for a named

8    individual.  On this one for Mimi Vigil.

9    Q.    Can you describe generally what we mean when we say a

10   fiduciary?

11   A.    That they would be there for their liabilities.

12   Q.    Okay.  And who does she name on this form as her

13   fiduciary?

14   A.    Timothy Geithner.  Timothy F. Geithner, Secretary of

15   the Treasury.

16   Q.    If you can please turn to page 6 of that exhibit.  Do

17   you recognize this page?

18   A.    Yes, ma'am.

19   Q.    Do you see your name at the bottom left there?

20   A.    Yes, ma'am.

21   Q.    Did you prepare this document?

22   A.    I submitted this through the Automated Lien System,

23   which goes to the Central Lien Unit.  And they, when I

24   filed the lien, they print it up they send it certified.

25   Q.    Just so the record is clear, if you could state the

```
 1    title of this page?

 2    A.   It is a Notice of Federal Tax Lien.

 3    Q.   And what is the amount of this lien?

 4    A.   $24,974.38.

 5    Q.   As of what date?

 6    A.   December 10, 2008.

 7    Q.   Can you see to the box where it says "Place of

 8    Filing"?  Where was this filed?

 9    A.   El Paso County.

10    Q.   And why was it filed in El Paso County?

11    A.   That is where Mimi Vigil lives and resides.

12    Q.   And can you read at least the first few letters of

13    this handwritten handwriting that appears on this page?

14    A.   It says, "Accepted for Value.  Balance this Account

15    to Zero.  Mimi Michelle Vigil."

16    Q.   Okay.  Turn your attention now to Government's

17    Exhibit 289.  Is this document addressed to you?

18    A.   Yes, ma'am.

19    Q.   Did you receive it?

20    A.   Yes, ma'am.

21    Q.   From whom?

22    A.   Mimi Vigil.

23         MS. PALUCH:  Your Honor, I move to admit

24    Government's Exhibit 289.

25         THE COURT:  289 is admitted.
```

```
 1            MR. KIRSCH:  Permission to publish.
 2            THE COURT:  You may.
 3   Q.   (BY MS. PALUCH)  What is the date this document was
 4   mailed to you, sir?
 5   A.   December 2, 2009.
 6   Q.   Turning your attention to page 4 of that document,
 7   can you state the title of that document?
 8   A.   Registered Bonded Promissory Note.
 9   Q.   What is the amount of that bond?
10   A.   $62,435.95.
11   Q.   Direct your attention to the paragraph "For Credit
12   to."  Can you read for whom -- whose credit is that to be
13   applied?
14   A.   Internal Revenue Service for Mimi M. Vigil.
15   Q.   Who signed that document?
16   A.   Mimi Michelle Vigil.
17   Q.   Did this document have any impact on the taxes
18   Ms. Vigil owed?
19   A.   No.
20   Q.   If you could please turn your attention to page 5 of
21   that exhibit.  What is the title of that page?
22   A.   This is a Notice of Federal Tax Lien.
23   Q.   Okay.  And the date of that tax lien?
24   A.   10 December 2008.
25   Q.   Does your name appear on this lien?
```

```
 1    A.    Yes, ma'am.

 2    Q.    Did you prepare this lien?

 3    A.    Yes, ma'am, I submitted it.

 4    Q.    What is the amount of this lien?

 5    A.    $24,974.38.

 6    Q.    Okay.  Page 6, please.  Can you identify that

 7    document?

 8    A.    Yes, ma'am.  This is a Final Notice, Notice of Intent

 9    to Levy.

10    Q.    Is that another copy of the letter we have looked at

11    previously?

12    A.    Yes, ma'am.

13    Q.    Okay.  Directing your attention to pages 9 and 10 of

14    this document, can you state the title of that?

15    A.    Certificate of Foreign Status of Beneficial Owner for

16    the United States Tax Withholding.

17    Q.    Are you familiar with that form?

18    A.    No, ma'am.

19    Q.    Okay.  Page 11.  Have you seen that document before?

20    A.    Yes, ma'am.

21    Q.    Is that a document you testified about already here

22    today?

23    A.    Yes, ma'am.  This is a copy of the one that we talked

24    about.

25    Q.    That is the one where you were scheduling the meeting
```

1    with Ms. Vigil?

2    A.    Yes, ma'am.

3    Q.    If you could turn to page 13.  What is this document?

4    A.    This is a Final Notice, Notice of Intent to Levy.

5    Q.    And the date of this document?

6    A.    This one is dated August 3, 2009.

7    Q.    So this is an additional intent to levy?

8    A.    Yes, ma'am.

9    Q.    Okay.  Page 14, if you could, please.  Is that the

10   second page of this notice?  Let's start with 13.  Is 13 a

11   two-page document?

12   A.    Yes, ma'am.

13   Q.    Does your signature appear on page 14?

14   A.    Yes, ma'am.

15   Q.    What is the amount represented there?

16   A.    $5,017.01.

17   Q.    Is that -- what does that amount represent?

18   A.    That is the balance that is owed for that assessment

19   period.

20   Q.    And I will direct your attention to the last bolded

21   section of that page there, that page 2.  Can you

22   generally explain what you are advising Ms. Vigil in that

23   paragraph?

24   A.    Yeah.  If she couldn't have paid, she could call me

25   to help her correct her problems.

1    Q.    Okay.  Pages 15 and 16, if you would, please.  If you

2    could state what those are.

3    A.    This is a copy of one of the Final Notice of Intent

4    to Levy we just went over.

5    Q.    Now I will direct your attention to pages 17 through

6    20.  And if you could state what those pages represent.

7    A.    This is a Request for a Collection Due Process or

8    Equivalent Hearing.  When we send out this Notice of

9    Intent to Levy, this Form 1253 also goes with it.  It

10   gives them a chance to appeal the intent of notice to

11   levy.

12   Q.    Through this document could a taxpayer, in this case,

13   Ms. Vigil, request a due process or equivalent hearing?

14   A.    Yes, ma'am.

15   Q.    Turn your attention to page 21, what is that

16   document?

17   A.    This is a Voucher Notice that comes with the notice

18   that they have a new assessment that she gets from the

19   service center.

20   Q.    And to whom was this voucher sent?

21   A.    Mimi Vigil.

22   Q.    What is the amount stated on this document as owed?

23   A.    $5,000.

24   Q.    Okay.  Are you able to read the writing over this

25   document?

1    A.    It says, "Accepted for value.  Return for Value of

2    Set Off and Closure of the Account."

3    Q.    Is it signed by anyone?

4    A.    Yes, Mimi Michelle Vigil.

5    Q.    Is that similar to the writing you saw on the other

6    federal tax liens?

7    A.    Yes, ma'am.

8    Q.    The last page of this exhibit, can you state the

9    title of that document?

10   A.    This is a Notice of Federal Tax Lien.

11   Q.    What is the date of that tax lien?

12   A.    This one is August 6, 2009.

13   Q.    And the amount owed?

14   A.    $18,559.

15   Q.    Okay.  And do you see place of filing?  What is

16   represented there?

17   A.    Secretary of State.

18   Q.    And why was this filed with the Secretary of State?

19   A.    When we file a notice of federal tax lien, we file it

20   with the County and the Secretary of State, depending on

21   if they may have other assets somewhere.

22   Q.    And can you read that writing?  Is that the same

23   writing we have seen on the other pages?

24   A.    It is the same writing, "Accepted for value.  Return

25   for set off and closure of the accounting."

1    Q.   Did you receive this lien mailed back to you with

2    this handwriting?

3    A.   Yes, ma'am.

4    Q.   And what effect, if any, did this handwriting have on

5    Ms. Vigil's tax liability?

6    A.   None.

7              MS. PALUCH:  May I have one second, Your Honor?

8              THE COURT:  You may.

9              MS. PALUCH:  No further questions, Your Honor.

10             THE COURT:  All right.  Thank you very much.  You

11   may step down.

12             The Government may call its next witness.

13             MR. KIRSCH:  Thank you, Your Honor.  The Government

14   calls William Frankel.

15             COURTROOM DEPUTY:  Your attention, please.

16             Please raise your right hand.

17                        **WILLIAM FRANKEL**

18   having been first duly sworn, testified as follows:

19             COURTROOM DEPUTY:  Please be seated.

20             Please state your name, and spell your first and

21   last names for the record.

22             THE WITNESS:  William Frankel.  W-I-L-L-I-A-M

23   F-R-A-N-K-E-L.

24             THE COURT:  You may proceed.

25             MR. KIRSCH:  Thank you, Your Honor.

1                       **DIRECT EXAMINATION**

2  **BY MR. KIRSCH:**

3  Q.   Mr. Frankel, where do you work?

4  A.   With the Treasury Inspector General for Tax

5  Administration.

6  Q.   What is your position there?

7  A.   Currently I am assigned to electronic crimes and

8  intelligence division in operations in Washington, D.C. as

9  the undercover program manager.

10 Q.   Were you previously assigned as a special agent here

11 in the Denver, Colorado, area?

12 A.   Yes.  From 2006 to 2011, I worked in Denver,

13 Colorado.

14 Q.   The agency you mentioned is Treasury Inspector

15 General for Tax Administration.  Is that sometimes called

16 TIGTA?

17 A.   Yes, that is the acronym.

18 Q.   And going back to your time as the special agent here

19 in the Denver area, what was it that you did as a special

20 agent for TIGTA, generally?

21 A.   Generally, I worked criminal investigations,

22 administrative investigations, and threat investigations

23 involving the Internal Revenue Service.

24 Q.   While you held that position, were you assigned to

25 investigate activity involving George Thomas Brokaw, John

1    Joseph Pawelski and Mimi Michelle Vigil?

2    A.   Yes, I was.

3    Q.   And during the course of your investigation, did you

4    have the occasion to make personal contact with all three

5    of those people?

6    A.   Yes, I did.

7    Q.   During the course of your investigation, did you make

8    each of them aware that you were investigating them for

9    tax-related crimes?

10   A.   Yes, I did.

11   Q.   Did you also have the opportunity during that

12   investigation to learn the identities of some of the

13   people that they associated with?

14   A.   Yes.

15   Q.   I should ask you when it was that you were engaged in

16   this investigation?

17   A.   I believe I began back in '06, '07 area, into '08,

18   depending on which investigation it was.

19   Q.   Okay.  And did it continue in some respect, at least

20   up through 2011?

21   A.   Yes, it did.

22   Q.   Going back, then, to, I think you indicated that you

23   had learned the names of some of their associates during

24   that investigation?

25   A.   Yes, I did.

```
 1    Q.    Are you familiar with the name Nancy Berryman?

 2    A.    Yes.

 3    Q.    Do you know whether or not Ms. Berryman had any

 4    association with Mr. Brokaw, Mr. Pawelski, or Ms. Vigil?

 5    A.    Yes, she was associated with them.

 6    Q.    Do you know the name William Rogers?

 7    A.    Yes, I do.

 8    Q.    Do you know whether or not William Rogers was

 9    associated with any of the three of them?

10    A.    Yes, he was.

11    Q.    How about the name Charles Ledford?

12    A.    Yes.

13    Q.    Was Mr. Ledford associated with Mr. Brokaw,

14    Mr. Pawelski, and/or Ms. Vigil?

15    A.    Yes, sir.

16    Q.    At some point during your investigation, were you

17    involved in obtaining search warrants?

18    A.    Yes.

19    Q.    For whose residences?

20    A.    The residence of Mr. Brokaw, as well as Ms. Vigil and

21    Mr. Pawelski.

22    Q.    So how many warrants was that total?

23    A.    It was two search warrants total.  One residence had

24    two occupants, and one residence had one.

25    Q.    Just so we are clear, which two were together?
```

1    A.    Mr. Pawelski and Ms. Vigil were together, and

2    Mr. Brokaw was separate.

3    Q.    And do you recall the address for the house where

4    Mr. Pawelski and Ms. Vigil were living?

5    A.    Yes.  It was on, I believe, 513 Shady -- good

6    question.

7    Q.    513 Shady something?

8    A.    Yes.  Sorry.  Just went out of my head.

9    Q.    Shady Crest Circle, does that sound right?

10    A.    Yes, sir.

11    Q.    How about Mr. Brokaw's residence, do you recall that

12    address?

13    A.    Yes, 2260, I believe, Palm Drive.

14    Q.    Were those both in Colorado Springs?

15    A.    Both in Colorado Springs.

16    Q.    And approximately when were they executed, those

17    warrants executed?

18    A.    September of 2011, if I recall correctly.

19    Q.    And what was your role in obtaining those search

20    warrants?

21    A.    I was the affiant on both of the search warrant

22    affidavits.

23    Q.    What does that mean?

24    A.    I conducted data and pulled the investigation

25    together and testified before the judge to obtain the

  1    warrants.

  2    Q.    And then did you participate in the actual execution

  3    of either of those warrants?

  4    A.    Yes, I did.  I was present at the Pawelski and Vigil

  5    location during the search warrants.

  6    Q.    When you -- when a warrant like that is executed,

  7    does the occupant of the premises get any copies of the

  8    search warrant, itself?

  9    A.    Yes, they do.

 10    Q.    And so did the -- were copies of the search warrants

 11    left at Palm Drive and Shady Crest in connection with

 12    these warrants?

 13    A.    Yes, they were.

 14    Q.    And would those copies, then, have had your name on

 15    them?

 16    A.    Yes, they would have.

 17    Q.    At some point after those search warrants had been

 18    executed, did you begin to receive a series of documents

 19    from Mr. Brokaw, Mr. Pawelski, and Ms. Vigil?

 20    A.    Yes, I did.

 21    Q.    Let me ask you to look at what is marked as

 22    Government's Exhibit 320.  I will have you start with the

 23    paper, if you don't mind, please.  And just flip through

 24    that document.  And then I want you to tell me if you

 25    recognize it, please.

1   A.   Okay.  Yes, sir, I do recognize the document.

2   Q.   Is that a document that you received after the search

3   warrants had been executed that you just described?

4   A.   Yes, it is.

5   Q.   And who did you receive it from?

6   A.   Mr. Brokaw.

7        MR. KIRSCH:  I move to admit and publish

8   Government's Exhibit 320.

9        THE COURT:  Document 320 is admitted.

10        (Exhibit No. 320 is admitted.)

11        THE COURT:  And you may publish.

12   Q.   (BY MR. KIRSCH)  We have the first page on the screen

13   for you now, Special Agent Frankel.  Can you see that?

14   A.   Yes, I can.

15   Q.   And when there is a stamp up on the top of the page,

16   do you know how that stamp would have gotten there?

17   A.   That would have been stamped when it came to our

18   office in Denver.

19   Q.   Okay.  And the date, is that the date when it would

20   have come into your office?

21   A.   Yes, it is.

22   Q.   Whose name appears down in the lower left, or the

23   lower right, for being the notary on this document?

24   A.   Clara M. Mueller.

25   Q.   Was Ms. Mueller -- was that a name you knew through

1    your investigation?

2    A.   Yes, sir, I did.

3         MR. KIRSCH:  Can we please display page 2 of that

4    exhibit now.  And if we can focus, actually, on the lower

5    half.

6    Q.   (BY MR. KIRSCH)  So who does it say on this document?

7    Who does it say it is from?

8    A.   George Thomas Brokaw.

9    Q.   What is the title that appears under Mr. Brokaw's

10   information there?

11   A.   The large block?

12   Q.   Yes, sir.

13   A.   The Administrative Affidavit of Specific Negative

14   Averment, Opportunity to Cure and Counterclaim.

15   Q.   Okay.  And then do you see the reference in the next

16   line to an "administrative procedure, within the

17   admiralty"?

18   A.   Yes, sir.

19   Q.   Do you have any idea what that means?

20   A.   No, sir.

21        MR. KIRSCH:  Can we display the next page of this

22   exhibit, please.  And can we focus on the Counts Two,

23   Three and Four that are listed there, please.  Actually, I

24   am sorry, can we go up just a little bit higher in that

25   document so we can see the bottom of Count One there.

1    Q.   (BY MR. KIRSCH)  The last sentence above the heading

2    as to Count Two, Special Agent Frankel, did you

3    understand -- what was your understanding about the

4    reference there to "theft, fraud, conspiracy, and

5    racketeering"?

6    A.   My understanding, it was in reference to the search

7    warrants that we executed on the residence.

8    Q.   That your participation in executing those warrants

9    constituted one or more of those crimes?

10   A.   Correct.

11   Q.   All right.  Are there more references to that same

12   search and seizure warrant there in Count Two?

13   A.   Yes, sir.

14   Q.   And does there appear to be references to additional

15   crimes at the end of the section there labeled Count Two?

16   A.   Yes, there is.

17   Q.   Are those include theft, armed robbery, reckless

18   endangerment and threats with deadly force?

19   A.   Yes, sir.

20   Q.   Did you believe that you had engaged in any of those

21   crimes while you were executing the search warrant at

22   those residences?

23   A.   No, sir.

24        MR. KIRSCH:  Can we now display the bottom of that

25   page, please.

1    Q.   (BY MR. KIRSCH)  I want to direct your attention to

2    the "Opportunity to Cure" section.  Can you see that,

3    Special Agent Frankel?

4    A.   I can.

5    Q.   Is there a time limit indicated there?

6    A.   Ten calendar days.

7    Q.   Okay.  And then if we can go to the next page,

8    please.  Is there a list of ways that you could cure that

9    problem in this document?

10   A.   Yes.

11   Q.   Okay.  So now if we can focus on the first three

12   paragraphs above "Counterclaim."  What was the first way

13   Mr. Brokaw indicated that you could cure these problems?

14   A.   Pay him some money that he determined as damages.

15   Q.   Okay.  What was the second way that you could take

16   care of that problem?

17   A.   Return all of the property taken and cease and desist

18   from the additional information and actions in my

19   investigation.

20   Q.   There is some property referenced in No. 3, like

21   401Ks and retirement funds and personal wealth and

22   properties.  Did you understand that to be Mr. Brokaw's or

23   your own?

24   A.   That was my own, is my interpretation.

25   Q.   Okay.  Did you give Mr. Brokaw any of your retirement

1    funds or personal wealth or property?

2    A.    No, I have not.

3         MR. KIRSCH:   Can we now expand the section under

4    the "Counterclaim."

5    Q.    (BY MR. KIRSCH)   And what did you understand this to

6    be?

7    A.    Based upon my search warrant, that Mr. Brokaw filed a

8    counterclaim alleging damages, with these 11 items,

9    against myself.

10   Q.    Okay.  And generally what are the amounts that he's

11   listing here?

12   A.    A million dollars per count.

13   Q.    Can we go to page 6 of this exhibit now, please.  So

14   who appeared to sign that document?

15   A.    At the top, Mr. George Thomas Brokaw.

16   Q.    Okay.  Let me ask you to look now, please, at

17   Government Exhibit 321.  Go ahead, start with paper again

18   if you would, and then tell me if you recognize that

19   exhibit, please, sir.

20   A.    Yes, sir, I recognize this document.

21   Q.    Is that a document that you received after the

22   execution of the search warrants?

23   A.    Yes, it is.

24   Q.    From whom?

25   A.    Mr. Brokaw.

1          MR. KIRSCH:  I move to admit and publish Government

2     Exhibit 321.

3          THE COURT:  I am sorry, yes, you may.

4          (Exhibit No. 321 is admitted.)

5          MR. KIRSCH:  Thank you, Your Honor.

6     Q.  (BY MR. KIRSCH)  I will start by displaying page 5 of

7     that document, Special Agent Frankel.  What are we looking

8     at now?

9     A.  The outside of the envelope that arrived at our

10    office in Denver, Colorado.

11    Q.  Okay.  Is the remainder of this exhibit the contents

12    of that envelope?

13    A.  Yes, it is.

14         MR. KIRSCH:  Okay.  Let's briefly display page 1,

15    please.

16    Q.  (BY MR. KIRSCH)  Okay.  Is that the first page we

17    have on the screen now?

18    A.  Yes, sir.

19    Q.  And, again, who does this indicate that it came from?

20    A.  It came from George Thomas Brokaw.

21    Q.  Who acted as the notary?

22    A.  Clara M. Mueller.

23    Q.  And what is the date on this document?

24    A.  Date on the top is 31st of January 2012.

25         MR. KIRSCH:  Can we display page 2, now, please.

```
 1    Q.   (BY MR. KIRSCH)  What is the caption on this

 2    document?  It is underlined and in bold about a third of

 3    the way down there.

 4    A.   Notice of Fault and Demand for Payment.

 5    Q.   And who is this directed to?

 6    A.   To myself.

 7    Q.   And is there an amount that is demanded on this

 8    document?

 9    A.   Yes, sir.

10    Q.   What is that amount?

11    A.   $18 million.

12    Q.   Did you do anything while you were acting as a TIGTA

13    special agent that would cause you to have owed Mr. Brokaw

14    $18 million?

15    A.   No, sir.

16    Q.   Now I want to direct your attention, please, to

17    Government Exhibit 322.  And I will ask you the same

18    thing, Special Agent.  If you can look at it and tell me

19    if you recognize it, please.

20    A.   Yes, sir, I recognize the document.

21    Q.   How do you recognize that document?

22    A.   It came to my office in Denver, Colorado.

23    Q.   And who did it come from?

24    A.   George Thomas Brokaw.

25         MR. KIRSCH:  I move to admit and publish Government
```

1    Exhibit 322.

2              THE COURT:  322 is admitted.

3              (Exhibit No. 322 is admitted.)

4              THE COURT:  And you may publish.

5              MR. KIRSCH:  Thank you, Your Honor.

6    Q.   (BY MR. KIRSCH)  Let's start with the first page of

7    this one.  What is that page?

8    A.   That is the outside of the envelope that the document

9    arrived in.

10   Q.   Okay.  Can we go to page 3 of that exhibit, please.

11   What is the caption on this page?

12   A.   Second Notice of Fault and Demand for Payment.

13   Q.   And there is an amount listed on this document?

14   A.   Yes, there is.

15   Q.   What is that amount?

16   A.   $18 million.

17   Q.   Okay.  Had anything changed, from your perspective,

18   between the time you got the first Notice of Fault and

19   your second Notice of Fault?

20   A.   No, sir.

21             MR. KIRSCH:  Can we display page 5 of that exhibit,

22   please.

23   Q.   (BY MR. KIRSCH)  Whose signature appears to be on the

24   top of that gauge?

25   A.   George Thomas Brokaw.

1    Q.   Now let me ask you to look, please, at what is marked

2    as Government's Exhibit 323.  Have you had a chance to

3    look at it?  Please tell me if you recognize that exhibit,

4    Special Agent.

5    A.   Yes, sir, I recognize the document.

6    Q.   How do you recognize that?

7    A.   It came to my office in Denver, Colorado.

8    Q.   Who sent it there?

9    A.   George Thomas Brokaw.

10        MR. KIRSCH:  Move to admit Government's Exhibit

11   323, and publish.

12        THE COURT:  323 is admitted.

13        (Exhibit No. 323 is admitted.)

14        THE COURT:  And you may publish.

15        MR. KIRSCH:  Thank you.

16   Q.   (BY MR. KIRSCH)  Okay.  What is the caption of this

17   document, Special Agent Frankel?

18   A.   Notice of Final Determination and Judgment in Nihil

19   Dicit.

20        MR. KIRSCH:  Can we expand the top half of that

21   document, please.

22   Q.   (BY MR. KIRSCH)  Does this document have references

23   to the other documents that we've just been looking at,

24   Special Agent Frankel?

25   A.   Yes, sir.

1    Q.   And so let's go to the all capital letters at the

2    bottom there.  What is that?  What did you understand this

3    was indicating was going to happen?

4    A.   Final Notification and Judgment.  That I had failed

5    to acquiesce to his demands, and in three business days if

6    the claim was not paid in full, additional civil damages

7    and criminal charges might be forthcoming against me by

8    Mr. Brokaw.

9    Q.   Did you understand that that was because you had not

10   paid him the $18 million?

11   A.   Yes, sir.

12   Q.   Now I want to ask you to look at what is marked as

13   Government's Exhibit 324.  Please take a look at that one

14   and tell me if you recognize it.

15   A.   Yes, sir, I recognize the document.

16   Q.   How do you recognize that document?

17   A.   It came to my office in Denver, Colorado.

18   Q.   And who did this document come from?

19   A.   John Joseph Pawelski.

20   Q.   And did it come to you after you had helped to obtain

21   the search warrant for the residence for Mr. Pawelski

22   where was living?

23   A.   Yes, it did.

24        MR. KIRSCH:  I move to admit and publish Government

25   Exhibit 324.

1          THE COURT:  324 is admitted.

2          (Exhibit No. 324 is admitted.)

3          THE COURT:  And you may publish.

4          MR. KIRSCH:  Thank you, Your Honor.

5     Q.   (BY MR. KIRSCH)  We have page 1 on the screen now,

6     Special Agent Frankel.  What is the date on that document?

7     A.   Both top and bottom are January 19, 2012.

8     Q.   Okay.  And if we then go to the second page, please.

9     What is the caption at the bottom, the sort of all capital

10    section there at the top?

11    A.   Notice of Fault and Demand for Payment.

12         MR. KIRSCH:  And can we go to the next page of that

13    exhibit, please, and expand the text there.

14    Q.   (BY MR. KIRSCH)  Was there an amount that

15    Mr. Pawelski indicated that you owed him?

16    A.   $18 million.

17    Q.   And under the "Demand for Payment" section, what was

18    the amount of time that Mr. Pawelski gave you to pay him

19    the $18 million?

20    A.   Three days.

21    Q.   Did you pay Mr. Pawelski?

22    A.   No, I did not.

23    Q.   As far as you knew, had you done anything to cause

24    you to owe Mr. Pawelski $18 million?

25    A.   No, I did not.

```
 1        MR. KIRSCH:  Can we go to the next page of that
 2   document, please, and expand the top half, down to the
 3   "Jurat."
 4   Q.   (BY MR. KIRSCH)  Who appears to have signed that
 5   document verifying that the facts contained therein were
 6   true, correct, complete, and not misleading?
 7   A.   John Joseph Pawelski.
 8   Q.   Let me ask you to look now at what is marked as
 9   Government's Exhibit 325.  Do you recognize that exhibit?
10   A.   Yes, sir, I do.
11   Q.   How do you recognize that one?
12   A.   It came to my office in Denver, Colorado.
13   Q.   Who sent that to your office?
14   A.   John Joseph Pawelski.
15   Q.   Did that occur after the search warrant you described
16   at 513 Shady Crest?
17   A.   Yes, sir.
18        MR. KIRSCH:  Move to admit and publish Government
19   Exhibit 325.
20        THE COURT:  325 is admitted.  You may publish.
21        (Exhibit No. 325 is admitted.)
22        MR. KIRSCH:  Thank you, Your Honor.
23   Q.   (BY MR. KIRSCH)  We have the first page on the screen
24   now, Special Agent Frankel.  What is the title of that?
25   A.   Notice of Final Determination and Judgment in Nihil
```

1    Dicit.

2    Q.    What is the date of that document, the typewritten

3    date?

4    A.    On or about January 3, 2012.

5    Q.    I mean even higher than that, in the caption?

6    A.    February 6, 2012.

7    Q.    And does this document make reference to the document

8    that we were just looking at?

9    A.    Yes, it does.

10   Q.    Did Mr. Pawelski indicate in this document when

11   various collection actions or other things were going to

12   start with respect to you?

13   A.    Give me one second, sir.

14   Q.    Yes, sir.

15   A.    Yes, it does.

16   Q.    How long did he say that was going to take?

17   A.    Let me ask you.

18   Q.    Did he make a reference to three business days in

19   that all capital paragraph -- all capital letters

20   paragraph?

21   A.    Yes, it does.  I see it now.  Thank you.

22   Q.    So what was your understanding about what was --

23   Mr. Pawelski was suggesting was going to occur within

24   three business days?

25   A.    That if I cannot pay it in full, additional civil

1     charges and damages may be forthcoming against me.

2     Q.   All right.  Now let me ask you to look at what has

3     been marked as Government's Exhibit 326.  I will ask if

4     you recognize that document.

5     A.   Yes, sir, I recognize the document.

6     Q.   How do you recognize that one?

7     A.   That came to my office in Denver, Colorado.

8     Q.   And who did you understood sent that document to your

9     office?

10    A.   Mimi Michelle Vigil.

11    Q.   How did your receipt of that document relate in time

12    to the execution of the search warrant at 513 Shady Crest?

13    A.   It came after the search warrant.

14         MR. KIRSCH:  Move to admit and publish Government's

15    Exhibit 326.

16         THE COURT:  326 is admitted.  And you may publish.

17         (Exhibit No. 326 is admitted.)

18         MR. KIRSCH:  Thank you, Your Honor.

19    Q.   (BY MR. KIRSCH)  We have page 1 on the screen now.

20    What is the date up at the top of that exhibit, Special

21    Agent?

22    A.   6th day of January 2012.

23    Q.   And can we now go, please, to page, I believe, it is

24    12.  What is that page?

25    A.   That is the outside of the envelope that arrived at

1    my office in Denver, Colorado.

2    Q.    Okay.  What is the return address listed there?

3    A.    Vigil.  51 -- looks like 513 Shady Crest Circle.

4    Q.    Is that the address that you described before for the

5    search warrant?

6    A.    Yes, sir, it is.

7         MR. KIRSCH:  Now can we go to page 2 of that

8    exhibit, please.  And if we can expand the lower half,

9    please.

10   Q.    (BY MR. KIRSCH)  What is the caption of this

11   document?  It is sort of in the middle of the screen now

12   in bold capital letters.

13   A.    Administrative Affidavit of Specific Negative

14   Averment, Opportunity to Cure and Counterclaim.

15   Q.    Is that the same title that was on one of the

16   documents we looked at for Mr. Brokaw a few moments ago?

17   A.    Yes, sir, it is.

18   Q.    Can we go to page 3, please.  At the top of that

19   page, are there references to the search warrants that you

20   have been describing?

21   A.    Yes.

22   Q.    Or at least one of them?

23   A.    Yes.

24        MR. KIRSCH:  Now can we expand the lower half of

25   that page, please.

1    Q.   (BY MR. KIRSCH)   Under the "Opportunity to Cure"

2    section -- first of all, how long did Ms. Vigil give you

3    to cure these problems?

4    A.   Ten calendar days.

5    Q.   And what was the option that she presented to you for

6    that in No. 2?

7    A.   Pay the total amount of damages as indicated in the

8    counterclaim, Exhibit A.

9    Q.   Okay.  And then how about the option under No. 3?

10   A.   Surrender all public hazard bonds, corporate bonds,

11   blanket bonds, insurance policies, CAFR funds, 401Ks,

12   801Ks, retirement funds, personal wealth, and properties,

13   or any other source of revenue to cure your dishonor in

14   commence and to submit to the authorities for criminal

15   prosecution.

16   Q.   Again, to be clear, did you understand those were

17   your bonds and funds and retirement accounts that were

18   supposed to be surrendered?

19   A.   Yes, sir.

20   Q.   At the end of paragraph three, who did you understand

21   was supposed to submit to the authorities for criminal

22   prosecution?  Was that you?

23   A.   That was me.

24        MR. KIRSCH:  Go to the next page of that exhibit,

25   please.  And highlight the section that says

1    "Counterclaim."

2    Q.   (BY MR. KIRSCH)  Can you see that section on the

3    screen, Special Agent Frankel?

4    A.   I can.

5    Q.   Does that refer you to a different part of the

6    document?

7    A.   Yes, it does.

8    Q.   Called what?

9    A.   Counterclaim, Exhibit A.

10   Q.   Okay.  And then a section that begins with the title

11   "Billing Costs"?

12   A.   Correct.

13        MR. KIRSCH:  All right.  Now can we please display

14   page 6.  I am sorry, maybe page 7.

15   Q.   (BY MR. KIRSCH)  Well, actually, are there

16   handwritten references to Exhibit A on these two pages we

17   just put up on the screen?

18   A.   Yes, there are.

19        MR. KIRSCH:  And then can we go to page 8, please.

20   And can you expand the lower half under the section,

21   "Billing Costs," please.

22   Q.   (BY MR. KIRSCH)  What sorts of amounts were listed

23   there, Special Agent Frankel?

24   A.   2 million and 3 million dollars per count or

25   occurrence.

```
 1    Q.    Okay.  And do those say per occurrence per day, some
 2    of them per officer?
 3    A.    Yes, they do, sir.
 4    Q.    Did you pay Ms. Vigil any of the amounts of money
 5    that were listed anywhere on this document?
 6    A.    No, I did not.
 7    Q.    Did you have any understanding about anything that
 8    you had done in your work as a special agent for TIGTA
 9    that would have caused you to owe Ms. Vigil millions of
10    dollars?
11    A.    No, I have not.
12    Q.    Did you -- what was your understanding when you
13    received these documents?  Did you understand that they
14    had -- that they were intended to have some effect on your
15    investigative activities?
16    A.    It was my understanding they wanted to inhibit me and
17    interfere with my investigation by causing me to have to
18    reply to them and go step by step items to them related to
19    their counterclaims.
20    Q.    Were you able to proceed with your investigation
21    nevertheless?
22    A.    I did proceed, but I was -- I was slowed down.  I was
23    impeded from doing my job.
24          MR. KIRSCH:  Can I have just a moment to confer,
25    again, Your Honor?
```

1         THE COURT:  You may.

2         MR. KIRSCH:  Your Honor, could we approach briefly?

3         THE COURT:  You may.

4         (A bench conference is had.)

5         MR. KIRSCH:  Your Honor, I am not sure if this is

6    going to be an issue, but at some point, I am wondering

7    about identifying the defendants for the record.  Special

8    Agent Frankel is certainly able to do that.  I don't want

9    to create a spectacle attempting to bring the defendants

10   back in, but it just occurred to us today.

11        THE COURT:  The problem would be, I am probably

12   going to let them go, because they don't have to attend

13   the trial.  So we are going to need to do it through

14   someone before, because they may not show up again.

15        MR. KIRSCH:  Right.

16        MS. PALUCH:  If they could be escorted back with

17   court security.

18        MR. KIRSCH:  We think Ms. Gleeson is available

19   today, as well.

20        THE COURT:  Why don't we let her go, finish up,

21   have the defendants brought back in and identified.

22        MR. KIRSCH:  We could send him out and attempt to

23   get photos of them and either recall Special Agent Frankel

24   for that purpose.  We just didn't think of that

25   eventuality until today, Your Honor.

 1          THE COURT:  Why don't we have them step out, then

 2    bring the defendants in.  Can we just bring the defendants

 3    in?

 4          MR. KIRSCH:  I think we can probably ask him to

 5    step back into the holding cell and look in the holding

 6    cell, Your Honor, if that works.

 7          THE COURT:  That would work.

 8          We need them to ID the defendants.  We need keys.

 9    The marshals are the only one that have keys to the

10    holding cell, so I need to bring them in.

11          MR. KIRSCH:  Does it have a solid door or a window?

12          THE COURT:  It is bars.

13          MR. KIRSCH:  So he could see through the bars.

14          THE COURT:  But we can't get in there unless I have

15    a marshal down here.

16          MR. KIRSCH:  Do you want Ms. Hartmann to call the

17    marshal?

18          If we can get that done today, we don't have to

19    worry about it.  If the Court would indulge us with that,

20    I would appreciate it.

21          THE COURT:  Do you have direct communication with

22    the marshals?  Can you call them and tell them to have

23    them come down now to bring the -- at least open the door

24    for the defendants, and I need to talk to them.

25          All right.  So other than that issue, Mr. Kirsch?

```
 1          MR. KIRSCH:  No other questions besides that issue.
 2          (The following is had in open court.)
 3          THE COURT:  All right.  So, ladies and gentlemen,
 4   we are going to take a brief recess at this point.  I
 5   don't think it will be longer than 10 or so minutes.  And
 6   then we will let you go home early today.  But you do need
 7   to come back in so we can handle one other matter.  So I
 8   will excuse you.
 9          Remember, you are not to talk to each other about
10   this case or to anyone else or conduct any research.  At
11   this time we will take a 10- to 15-minute recess.
12          (A break is taken from 3:18 p.m. to 3:31 p.m.)
13          (The following is had in open court, outside the
14   hearing and presence of the jury.)
15          THE COURT:  You may be seated.
16          Ms. Hartmann, would you please bring in the jury.
17          (The following is had in open court, in the hearing
18   and presence of the jury.)
19          THE COURT:  All right.  You may be seated.
20          Mr. Kirsch, you may proceed.
21          MR. KIRSCH:  Thank you, Your Honor.
22   Q.   (BY MR. KIRSCH)  Special Agent Frankel, the Mimi
23   Michelle Vigil that you described as being the subject of
24   your investigation, do you see her in the courtroom now?
25   A.   Yes, sir, I do.
```

1    Q.   Could you please explain where she is?

2    A.   She is at the rear end of that table.

3         MR. KIRSCH:  If the record would reflect he

4    identified Ms. Vigil.

5         THE COURT:  The record will so reflect.

6    Q.   (BY MR. KIRSCH)  Similarly, Special Agent Frankel,

7    the George Thomas Brokaw you described as the subject of

8    your investigation, do you see him in the courtroom?

9    A.   Yes, sir, just to the right of Ms. Vigil.

10        MR. KIRSCH:  If the record would reflect he

11   identified Mr. Brokaw, Your Honor.

12        THE COURT:  The record will so reflect.

13   Q.   (BY MR. KIRSCH)  Special Agent Frankel, the John

14   Joseph Pawelski you described as the subject of your

15   investigation, do you see him in the courtroom?

16   A.   Yes, I do sir.

17   Q.   Where is he?

18   A.   Standing closest to me of the three people.

19        MR. KIRSCH:  If the record would reflect he

20   identified Mr. Pawelski, Your Honor.

21        THE COURT:  The record will so reflect.

22        MR. KIRSCH:  Thank you, Your Honor.  I have no

23   other questions for Special Agent Frankel.

24        THE COURT:  Thank you very much, Special Agent

25   Frankel, you may step down.

1          Ladies and gentlemen of the jury, we are going to

2    let you go home early today.  I need to take care of one

3    matter with the parties.  If you can be back at 8 o'clock

4    tomorrow morning.  If you can bring a lunch so that we can

5    go through with only a half an hour at noon.  And then we

6    will hopefully get you out of here by 2:30 or 2:45 at the

7    latest tomorrow.

8          Remember, you are not to talk to anyone about this

9    case, not to conduct any research on your own.  The jury

10   is excused.

11         (The following is had in open court, outside the

12   hearing and presence of the jury.)

13         THE COURT:  You may be seated.

14         All right.  Mr. Brokaw, Mr. Pawelski, and

15   Ms. Vigil, I have been trying to figure out how we should

16   proceed in the face of your refusing to participate in

17   these proceedings.  And I have conducted some research,

18   Rule 43(c)(1) of the Federal Rules of Criminal Procedure

19   allow a defendant who was initially present at trial,

20   which you have been, to waive the right to be present when

21   you voluntarily absent yourself after the trial has begun,

22   which is what you have essentially done, saying I have no

23   jurisdiction.

24         So you can voluntarily waive your right to be

25   present after the trial begins if you chose to do so.  And

```
 1    that is the United States Supreme Court case Fairey,
 2    F-A-I-R-E-Y, v. Tucker, 132 S. Ct. 2218, a 2012 case.
 3    Also Taylor v. United States, 414 U.S. 17, 1973.  And
 4    there is a Tenth Circuit case, Brown v. Gibson, Fed. Appx.
 5    894, Tenth Circuit, 2001, which held that a defendant's
 6    decision to waive his right to be present was permissible
 7    and knowingly, intelligently and voluntarily, because the
 8    Court did go through and call to the defendants' attention
 9    the disadvantages of not being present, which I have done
10    earlier today.
11           Now, I strongly advise you against what you are
12    doing in terms of absenting yourself from these
13    proceedings.  I think it is important and in your best
14    interest to be here.  That being said, the decision
15    ultimately whether you are present or not is yours.  This
16    trial will go on without you.  And so you will still be
17    subject to the verdict.
18           You also remain under the original conditions of
19    the order setting conditions of your release, that is why
20    you are out on bond.  That provides that you have to
21    appear in court as required.
22           I could require you to be here at 8 o'clock
23    tomorrow, and if you didn't come in, I could essentially
24    revoke your release and hold you in custody.  I do not
25    want to do that.  The law I found says that if you choose
```

1    not to be here, that is your choice.  And I am not going

2    to hold you in contempt.  I will not require that you be

3    here.  I will encourage you to be here.

4         But I don't want to have to put you into custody at

5    this point.  I don't want to force you to attend trial if

6    you do not wish to participate.  You have to understand,

7    though, that if you don't participate and you are

8    convicted, you are going to have to surrender as the Court

9    will order you to do.

10        So, I just want to make sure you understand the

11   rights you are giving up.  You have the right to this

12   speedy and public trial.  You have the right to trial and

13   to participate in the trial with this jury.  You have the

14   right to have competent assistance of an attorney, which

15   you have given up months ago.  You have the right to

16   confront and cross-examine the witnesses and the evidence

17   presented against you.  By not participating, you are

18   giving up that right.

19        You have the right to have witnesses subpoenaed and

20   compelled to come into court, which Mr. Pawelski was the

21   only one of you who attempted that, and this morning you

22   withdrew that.  You have the right to testify yourself if

23   you wish to do so, but you also have the right not to

24   testify or make any statement that would incriminate you.

25   And if you are not present, you can't do any of these

1    things.

2         So I just want to make sure that you understand

3    that these are rights that you will be giving up if you

4    continue to not participate in this proceeding.  Do you

5    understand that?

6         DEFENDANT PAWELSKI:  I do comprehend it.

7         DEFENDANT BROKAW:  I comprehend everything you are

8    saying.

9         THE COURT:  Ms. Vigil?

10        DEFENDANT VIGIL:  I comprehend.

11        THE COURT:  So I am leaving it to you.  I will not

12   order you to be here at 8 o'clock tomorrow.  I will leave

13   that to you.  You are free, hopefully, to change your

14   minds about participating.  And, if you do, then I would

15   expect you -- court will start at 8 o'clock tomorrow

16   morning.  So if you change your minds and you want to

17   participate, then you need to be here promptly at 8

18   o'clock tomorrow morning.

19        If you do not show up at 8 o'clock in the

20   morning -- we were supposed to start today, I told you

21   8:30, and you didn't show up on time and we were delayed

22   by about 15 or 20 minutes.  That will not happen any more.

23   If you don't show up by 8 o'clock tomorrow morning, I am

24   going to then assume that you have decided that you do not

25   want to voluntarily participate in this trial, and we will

1    proceed without you.  Do you understand that?

2         DEFENDANT BROKAW:  Judge, with exception.  This

3    morning was a snowstorm, and we allowed an hour longer

4    than normal time.  There were about 4 accidents along the

5    way.

6         THE COURT:  That is why I didn't do anything

7    further with it.

8         DEFENDANT BROKAW:  So I apologize for that.  That

9    was not the intent.

10        THE COURT:  Monument is terrible.  I used to live

11   in Colorado Springs.  That is why I didn't make a big deal

12   about it this morning.  If you do intend to participate,

13   you need to be here by 8 o'clock tomorrow morning,

14   regardless of what the weather conditions are going to be.

15        If you do not show up, I need you to call your

16   probation officer to let them know you do not intend to

17   come to court, and that you will be in Colorado Springs.

18   And you are not to leave the state.

19        At any time that you want to show up, you are

20   welcome to come back to this courtroom.  If you decide you

21   don't want to come to the trial, I will need you to be

22   here when the verdict is returned.  If you choose not to

23   participate, we will send you a message as to when the

24   matter is going to the jury for deliberation, and I will

25   expect you to be here.

1        Assuming that is early in the morning or so, I

2  would give you at least a days' warning so you know you

3  need to be here.

4        DEFENDANT PAWELSKI:  I have a question.

5        THE COURT:  You may.

6        DEFENDANT PAWELSKI:  What would be the ability of

7  the Court to move our time to start at 9:00 a.m. so that

8  we can make sure that you don't have stress on your life

9  that we're late?

10        THE COURT:  Well, tomorrow I just told the jury

11  they need to be here at 8:00.  The whole point is for them

12  to be able to get out of here earlier.  That is how I

13  conduct my trials.  8:00 to 230, otherwise 9:00 to 3:30.

14  They have already been told to come back at 8:00, at least

15  for tomorrow.

16        If you choose to participate, you are to be here at

17  8:00 if you chose to participate, which I hope you will,

18  and we need to change the time to 9:00 because you are

19  commuting from Colorado Springs, I will talk to the jury

20  about that and we will go from 9:00 to 3:30 instead of

21  8:00 to 2:30.

22        DEFENDANT PAWELSKI:  Very well.  Thank you.

23        THE COURT:  With that being said, I hope I will see

24  you back tomorrow, but I will not require it.  If you

25  don't come back, though, you are to call your probation

1    officer to let them know you will not be at trial, and you

2    need to do that before the 8 o'clock start.

3          DEFENDANT PAWELSKI:  Very well.

4          THE COURT:  Any other questions?

5          MR. KIRSCH:  Not from the Government, Your Honor.

6    Thank you.

7          THE COURT:  All right.  Court will be in recess

8    until 8 o'clock tomorrow.

9          (Proceedings conclude at 3:41 p.m.)

10

11          **R E P O R T E R ' S   C E R T I F I C A T E**

12

13          I, Darlene M. Martinez, Official Certified

14   Shorthand Reporter for the United States District Court,

15   District of Colorado, do hereby certify that the foregoing

16   is a true and accurate transcript of the proceedings had

17   as taken stenographically by me at the time and place

18   aforementioned.

19

20          Dated this 7th day of February, 2015.

21

22          _____

23          s/Darlene M. Martinez

24          RMR, CRR

25